UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| JACKSON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | Civil Action No. |
| | CLASS ACTION |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| CARLOS GHOSN, GREG KELLY, NISSAN MOTOR CO., LTD., HIROTO SAIKAWA, HIROSHI KARUBE and JOSEPH G. PETER, ) ) ) ) | |
| Defendants. ) ) | |
| _____ ) | DEMAND FOR JURY TRIAL |

Plaintiff Jackson County Employees' Retirement System ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Nissan Motor Co., Ltd. ("Nissan" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities fraud class action on behalf of all purchasers of Nissan American Depositary Receipts ("ADRs") between December 10, 2013 and November 16, 2018, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2. Defendant Nissan is an automobile manufacturer with its U.S. headquarters located in Smyrna, Tennessee. The Company sells vehicles under the Nissan, Infiniti and Datsun brands. Nissan sponsors its U.S. ADR program and issues press releases to investors from its U.S. headquarters in Tennessee.

3. Unbeknownst to investors, Nissan has been materially understating its expenses – and overstating profits – by concealing half of the annual executive compensation it was obligated to pay to its former Chief Executive Officer ("CEO") and Chairman of its Board of Directors ("Board"), defendant Carlos Ghosn ("Ghosn"). Over the past decade, Nissan reported paying defendant Ghosn ¥1 billion per year in compensation. In truth and in fact, Nissan paid defendant Ghosn an additional ¥1 billion per year in the form of deferred compensation I.O.U.'s, but failed to disclose these payments in the Company's publicly filed financial reports. As a result, Nissan underreported defendant Ghosn's true pay over the last decade by an estimated ¥10 billion. The Company also concealed from investors the significant defects in its corporate governance and internal controls that

facilitated this false financial reporting, notably while affirmatively emphasizing the Company's "strong ethics" and "high transparency." In so doing, Nissan affirmatively failed to heed the express direction of its outside auditors dating back to at least 2013 to accurately report its executive compensation. Not only did the underreporting deceive Nissan's investors, it violated the pay cap Nissan shareholders approved, and so Nissan ordinary shares are now under threat of being delisted.

4.     The scheme to understate defendant Ghosn's executive compensation was reportedly masterminded by former Nissan Board member defendant Greg Kelly ("Kelly"), a former Tennessee-based Senior Vice President of Nissan. Defendants expressly undertook to underreport Ghosn's pay in order to avoid shareholder scrutiny of Ghosn's inordinately high executive compensation. Even still, shareholders consistently chafed over just the disclosed portion of Ghosn's exorbitant executive compensation. Beyond avoiding the scrutiny of Nissan's shareholders over Ghosn's pay from Nissan, defendants were further motivated to conceal the full extent of what Ghosn was being paid by Nissan in order to avoid the scrutiny of the investors in France-based Renault SA ("Renault") – which includes the French government. Defendant Ghosn was simultaneously serving as CEO and Chairman of Renault – which owns 43% of Nissan's equity – and the French government had been viewing Ghosn's Nissan and Renault pay collectively in its attempts to lower his Renault compensation.

5.     Meanwhile, while reporting ¥1 billion in profits each year that Nissan had not actually earned over the prior decade, Nissan induced investors to believe it was a law-abiding company, honestly accounting to investors for its executive compensation. As a result of defendants' false and misleading Class Period statements about the Company's executive compensation, internal controls and governance, the trading prices of Nissan ordinary shares (traded on the Tokyo Exchange) and its ADRs (traded in the United States) were artificially inflated, with Nissan ADRs reaching a Class Period high of more than $22 per share in January 2018.

6.	On November 19, 2018, investors learned that defendants Ghosn and Kelly had been arrested by Japanese law enforcement, and the two have been jailed ever since. A statement from Tokyo prosecutors said defendant Ghosn was being held for violating a Japanese law that prohibits false financial filings.

7.	Defendants Ghosn and Kelly were reportedly arrested as a result of information provided by an unidentified non-Japanese executive in Nissan's legal department acting as a whistleblower. Nissan's current CEO, defendant Hiroto Saikawa ("Saikawa"), has since stated that an internal investigation at Nissan also found that defendant Ghosn improperly filed expenses and used Company assets for his private use for many years.

8.	On news of these arrests, the price of Nissan ADRs declined precipitously, closing down more than more than 5% on November 19, 2018, on unusually high trading volume.

9.	As detailed herein, subsequent reporting by the global financial media has revealed that Nissan's outside auditors previously challenged the Company's incomplete reporting of defendant Ghosn's pay, that the true compensation paid to Ghosn apparently exceeds the cap Nissan's shareholders placed on CEO pay at Nissan, and that the scheme to conceal from investors the actual level of Ghosn's compensation at Nissan was expressly designed to avoid global investor scrutiny of Ghosn's high executive compensation. On December 10, 2018, prosecutors in Japan indicted defendants Nissan, Ghosn and Kelly on charges that they had violated financial laws by underreporting Ghosn's compensation in Nissan's financial filings.

## JURISDICTION AND VENUE

10.	The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

- 3 -

11.     Nissan expressly agreed to subject itself to this Court's personal jurisdiction in connection with sponsoring its ADRs for sale in the United States.  This Court also has personal jurisdiction over Nissan and each of the Individual Defendants (defined below) by virtue of: (i) Nissan's having registered its ADR program with the SEC in 2007 utilizing a Form F-6 Registration Statement executed by the entire then-Nissan Board, including defendants Ghosn and Saikawa, issuing press releases announcing its financial results with the dateline "Nashville Tennessee" from its Nashville headquarters (including those issued by Nissan's Nashville-based Corporate Communications officer, Chris Keeffe, and posted to https://nissannews.com/en-US/nissan/usa), and having directed communications towards its U.S.-based investors from Japan; (ii) Nissan's appointment of an agent for service in the United States (detailed below); (iii) Nissan having operated a large manufacturing plant in Smyrna, Tennessee, since the 1980s, its first factory outside of Japan; (iv) Nissan's directors' and senior executives' decision to move Nissan's U.S. headquarters to Tennessee in 2005 in exchange for a package of tax breaks and other incentives and credits, to maintain it there ever since, and to undertake substantial business from Tennessee; and (v) each Individual Defendants' regular and systematic contacts with the State of Tennessee and purposeful availment of the privileges of doing business in the State of Tennessee.

12.     Venue is proper in this District pursuant to §27 of the 1934 Act, because Nissan's U.S. headquarters are located in this District and certain of the acts and practices complained of herein occurred in this District.

13.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

# PARTIES

14.     Plaintiff Jackson County Employees' Retirement System purchased Nissan ADRs as set forth in the accompanying certification incorporated herein by reference and has been damaged thereby.

15.     Defendant Nissan Motor Co., Ltd. maintains its global corporate headquartered in Tokyo, Japan and its U.S. headquarters in Smyrna, Tennessee. The Company's official name is Nissan Jidōsha Kabushiki-gaisha, but it goes by "Nissan." Renault owns 43% of Nissan ordinary shares and Nissan owns 15% of Renault. According to Nissan, more than 30% of its equity is held by foreigners. Nissan ADRs traded in an efficient market throughout the Class Period under the ticker symbol "NSANY." More than 50 million Nissan ADRs were issued, outstanding and trading in the United States during the Class Period, each of which represents two ordinary shares. According to the Registration Statement Nissan filed with the SEC on Form F-6 on February 27, 2007, the Company has more than 300 million ADRs registered for resale in the United States in its Company-sponsored ADR program. According to the Form F-X Nissan filed with the SEC on January 19, 2011, its U.S. agent for service of process in civil actions is Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, New York 10036.

16.     Defendant Carlos Ghosn served as the CEO of Nissan between 1999 and April 1, 2017 and as the Chairman of its Board between 1999 and November 22, 2018. Defendant Ghosn has also served as the Chairman and CEO of Renault since 1996 and as the Chairman of Mitsubishi Motors from December 2016 to December 2018. Between June 2013 and June 2016, defendant Ghosn was also the Chairman of Russian-based automobile manufacturer AvtoVAZ. Meanwhile, defendant Ghosn has served as the Chairman and CEO of the Renault-Nissan-Mitsubishi Alliance BV (the "Alliance") since 2002. The Alliance oversees Nissan, Mitsubishi and Renault through a cross-shareholding agreement. The Alliance, which includes AvtoVAZ, has held approximately

10% of the global market share since 2010, and as of 2017 was the third-largest automobile group worldwide.

17.     Defendant Greg Kelly served as a Representative Director of Nissan from 2012 until February 2015 and as a member of the Nissan Board from February 2015 until November 22, 2018. Defendant Kelly has also served as head of the Alliance Talent Management since 2014. Defendant Kelly initially joined Nissan North America Inc. in Nashville, Tennessee as a Senior Manager/Associate Counsel, Legal in 1988, and became Nissan's first American Board member in 2012.

18.     Defendant Hiroto Saikawa has served as the CEO of Nissan and as a member of its Board since April 1, 2017. He had previously served as co-CEO with defendant Ghosn between October 2016 and March 31, 2017 and has characterized defendant Ghosn as his "mentor." Defendant Saikawa first joined Nissan in 1977 and since 1999 has served in a variety of senior management positions, including Chairman of the Management Committees of the Americas and Europe, as well as the Executive Vice President of Purchasing. He also previously served as a member of the Board of Directors of Renault between 2006 and 2016.

19.     Defendant Hiroshi Karube ("Karube") is, and has been since May 18, 2018, the Chief Financial Officer ("CFO") of Nissan. He has been with Nissan in different capacities since 1980. Defendant Karube has been a member of the Mitsubishi Board of Directors since December 2016.

20.     Defendant Joseph G. Peter ("Peter") served as the CFO of Nissan between December 1, 2009 and May 2018.

21.     Defendants Ghosn, Kelly, Saikawa, Karube and Peter are sometimes referred to herein collectively as the "Individual Defendants." Nissan and the Individual Defendants are sometimes referred to herein collectively as "defendants."

22.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Nissan.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Nissan ADRs was a success, as it: (i) deceived the investing public regarding Nissan's executive compensation, business metrics and financial prospects, and the strength of its corporate governance and internal and reporting controls; (ii) artificially inflated the price of Nissan ADRs; (iii) permitted defendant Ghosn to be promised more executive compensation than applicable governance standards allowed and shareholders would have approved of; and (iv) caused plaintiff and other members of the Class (defined below) to purchase Nissan ADRs at artificially inflated prices.

## BACKGROUND TO THE CLASS PERIOD

23.     Shortly after defendant Ghosn took over as Nissan's Chief Operating Officer in 1999, he overhauled the manner in which the Company compensated its senior employees.  Abandoning Japanese traditions that rewarded seniority and shunned incentive awards, Ghosn enforced a performance-based system and awarded lucrative bonuses to mid-level managers.  The move rankled traditionalists but reflected Ghosn's outspoken position that merit- and market-based payments were desirable and beneficial.  By 2001, Ghosn was elevated to CEO and Chairman and was credited with reviving Nissan's profitability by dramatically slashing the size of its workforce.

24.     The scheme to understate defendant Ghosn's executive compensation was reportedly masterminded by defendant Kelly.  According to a report published by *The Wall Street Journal* ("*WSJ*") on November 19, 2018, "[a] statement from Tokyo prosecutors said that in the five fiscal years ending March 2015, Mr. Ghosn received compensation of nearly ¥10 billion . . . but . . . Nissan [had] reported [only] about half that in filings to the Tokyo Stock Exchange," with "[p]rosecutors [saying] he was under suspicion of violating a Japanese law that prohibits false financial filings."  The *WSJ* also quoted defendant Saikawa as disclosing that an "internal investigation over the past

several months sparked by a whistleblower's report" had brought the false financial reporting to the Company's attention and that it had "found Mr. Ghosn improperly filed expenses and used company assets for his private use," with the "improprieties [having] occurred over many years."

25.     According to subsequent November 27, 2018 *WSJ* reports, the scheme was expressly designed to conceal from investors the outsized compensation defendant Ghosn was receiving. The *WSJ* reported that the "practice" of intentionally underreporting defendant Ghosn's executive compensation had "began around a decade ago," citing an anonymous "person familiar with the situation, *just when Japanese regulation of management compensation became more onerous*."

26.     On November 28, 2018, the *WSJ* published a detailed exposé disclosing that defendant Ghosn had "amassed more than $80 million in IOUs from Nissan Motor Co. yet never settled on a plan for how the compensation would be paid," citing "a Nissan probe and people familiar with the matter." According to the *WSJ*, "[t]hat revelation and others are painting a picture of an executive who, at a time of intense public scrutiny of executive pay, deferred some pay in a way that his defenders say was legal but that prosecutors say may have violated Japan's securities law." Adding insult to injury, the *WSJ* reported that "[a]s Mr. Ghosn's IOUs piled up, Nissan also was laying out some $18 million for residences for the jet-setting chief, a person familiar with the company's probe said."

27.     Detailing the specific reasons defendants Ghosn and Kelly sought to conceal the true executive compensation defendant Ghosn was being promised by Nissan, the *WSJ* went on to report that "[t]he Ghosn matter ha[d] its origins in a March 2010 change in Japanese law to require that companies start disclosing salaries of executives earning more than ¥100 million, now equivalent to about $880,000." As the *WSJ* emphasized, "[i]n the previous fiscal year ended March 2009, Mr. Ghosn made around ¥1.75 billion, or a little more than $15 million, at Nissan, according to the person familiar with the investigations. But disclosing such a sum could have raised a public outcry,

as the world was just beginning to recover from the 2008 global financial crisis," particularly given that during the Company's restructuring in the early 2000s, many Nissan employees and suppliers had lost their jobs. As such, reports the *WSJ*, "[w]hat Mr. Ghosn did for the year ended March 2010, according to the Nissan investigation, was instruct subordinates to pay him only $7.8 million and record the remaining roughly $7.5 million as an amount to be paid later. As Nissan chairman, he had the power to decide his own salary under Nissan's corporate governance rules."

28.     But, "[e]ven so, the lower disclosed portion was enough to anger the left-leaning party that had recently swept to power in Japan," with the *WSJ* quoting then-Prime Minister Naoto Kan as stating in a June 2010 speech: "Why is Mr. Ghosn's salary so high? Because he's good at firing people . . . [i]f presidents who were good at firing people became respected at all companies, Japan would be full of unemployed people." According to the *WSJ*, in subsequent years, defendant Ghosn's "reported pay grew only slightly, ***but he increased the IOU portion more rapidly without telling fellow board members***, according to the Nissan investigation," such that "[i]n the most recent fiscal year, his total package added up to almost $22 million."

29.     By misrepresenting the executive compensation Nissan had actually obligated itself to pay to defendant Ghosn – to the tune of ¥10 billion over the last decade – Nissan deprived investors of their solemn right to decide whether to invest in a company that was excessively paying its CEO far more than they were being led to believe – at the same time that Nissan was being singled out and criticized for over-compensating defendant Ghosn compared to other Japanese senior executives. For instance, on June 30, 2011, the *WSJ* published a report, entitled "Nissan CEO Still Holds a Top Spot in Pay," revealing that Nissan "Chief Executive Carlos Ghosn held on to his place as the highest-paid foreign executive at a listed Japanese company, with ¥982 million ($12.1 million) in total compensation in the latest fiscal year, a rise of 10% from the previous year" – while that was only half of what Nissan had really obligated itself to pay him. According to the *WSJ* back then,

defendant "Ghosn's most recent pay package eclipsed the ¥863 million paid to Sony Corp. CEO Howard Stringer, who is British," and emphasized that even the underreported executive pay figures were gaining the ire of Nissan investors, stating as follows:

> *Some Nissan shareholders at Wednesday's meeting questioned the size of Mr. Ghosn's pay package, which was several times bigger than that of his counterparts at other major Japanese car makers*.
>
> He explained that his pay was based on global, rather than Japanese, standards. Mr. Ghosn, a Brazil-born Frenchman of Lebanese parents, said Nissan determines its executive pay based on data collected by human-resources firm Towers Watson, which is based in New York.
>
> "*This is a very transparent process*," said Mr. Ghosn, who also serves as CEO of Nissan's French partner, Renault SA. "*We want to be confident, and this is done very seriously*."
>
> Mr. Ghosn's salary was below *the $15.3 million average compensation for comparable auto-industry CEOs* and below *the $14.3 million average for comparable CEOs of other multinational industrial companies*, Nissan said.

30.     Indeed, Nissan investors were increasingly taking exception to even the grossly underreported executive pay Nissan was reportedly paying defendant Ghosn, especially since, as the *WSJ* disclosed in its June 30, 2011 report, defendant Ghosn's *underreported* "remuneration at Nissan was *seven times* the €1.24 million ($1.78 million) package he received from Renault in 2010," and he had actually "waived his bonus from the French car maker after it was embroiled in an embarrassing event in which it wrongly accused three top executives of selling secrets on Renault's electric-vehicle program," and defendant "Ghosn didn't receive a bonus the previous year, either, after the company failed to meet its targets."  Renault owns 43% of Nissan, and Nissan owns 15% of Renault.  Meanwhile, the *WSJ* report emphasized:

> *Japanese senior executives tend to earn less than their counterparts at other multinational companies*.  Toyota Motor Corp., Japan's biggest car maker by volume, said last week that President Akio Toyoda earned ¥136 million in the last fiscal year.  Takanobu Ito, CEO and president at Japan's third-biggest car maker, Honda Motor Co., received ¥130 million.
>
> General Motors Co. Chairman and CEO Daniel Akerson received compensation valued at $2.5 million last year after he became CEO on Sept. 1, while

Ford Motor Co. CEO Alan Mulally made more than $26.5 million in salary and stock options last year.

31. On June 25, 2013, *Agence Fr.-Presse* published a report lamenting that even with a 35% pay increase, Toyota's CEO was making far less than defendant Ghosn, stating in pertinent part as follows:

> Carlos Ghosn, head of rival Nissan, Japan's number-two automaker, retained his ranking as possibly Japan's best-paid CEO, raking in 988 million yen in the fiscal year to March.

> That was a modest 0.1 percent rise from a year earlier, shareholders were told at the company's annual meeting on Tuesday. Investors voted to keep him on for another two-year term.

> "Companies must employ and retain top leaders," Ghosn told investors last year in response to questions on his pay package.

> \*       \*       \*

> Pay packages for Japanese executives – and the salary gap between a firm's lowest and highest-paid workers – tends to be a fraction of levels seen North America and Europe, where top pay has attracted a growing chorus of criticism.

32. Even while being deceived by Nissan's false financial reports disclosing only a portion of the executive pay Nissan was actually obligated to pay defendant Ghosn, the investment community remained highly critical of his compensation, with *Forbes* publishing a report in 2015 entitled "Is Carlos Ghosn worth $15 million to Renault and Nissan?" The *Forbes* report stated that "Carlos Ghosn stands to earn 7.2 million euros for the year 2014 as executive chairman at Renault, while he gets about the same as boss of Japan's Nissan Motor Co.," emphasizing that "[t]he amount is more than double that of 2013 and is for a large part based on performance-related shares, ***but the total and the rise have raised eyebrows of the state representatives on Renault's board and staff members***."

33. Indeed, as recounted by the *Japan Times* on November 24, 2018, "Ghosn has for years faced skepticism amongst the Japanese public over whether he, or any company head for that matter, was worth a massive paycheck." *Reuters* reported on November 19, 2018 that "Ghosn is

familiar with pay scandals," as it had "reported in 2017 that Renault-Nissan bankers had drawn up plans to channel undisclosed bonuses to him and other managers," and that "[e]arlier this year his 7.4 million euro Renault pay packet for 2017 just about squeaked through a shareholder vote despite opposition from France's government, a 15 percent shareholder." And as *The New York Times* reported on November 20, 2018:

> By the time prosecutors boarded his corporate jet on Monday at Haneda Airport in Tokyo to take him off for questioning, ***Mr. Ghosn had been embroiled in several fights over executive pay, something of a recurring subplot in his career***. He has made many millions of dollars serving as chief executive and chairman of Nissan, Renault and Mitsubishi Motors. At times, his pay drew the ire of investors and politicians, including Emmanuel Macron, now the French president, when he was finance minister in 2016.

> "He was always arguing about whether he was adequately compensated," said Robin Ferracone, founder of Farient Advisors, an executive compensation advisory firm. "The question was whether he should be compared to Japanese standards, or international standards or American standards."

> ***In Japan, Mr. Ghosn's pay far outstripped those of his counterparts. As chairman of Nissan last year, he reported income of ¥735 million, more than four times the pay of Toyota's chairman***.

> "There was always a disconnect between Western management salaries and Japanese management salaries," said Christopher Richter, deputy head of Japan research at CLSA, an investment and brokerage group. Even though "compared to executives in other countries, some people would regard him as underpaid," Mr. Richter added, "I guess you could say there was something of a culture clash in that."

> Mr. Ghosn was unrepentant about his pay and engaging when discussing his achievements. When *The Financial Times* this year asked him if he was paid too much, he laughed. "You won't have any C.E.O. say, 'I'm overly compensated,'" he said.

34.     As the *WSJ* noted in its November 27, 2018 report, Nissan's false financial reporting with respect to executive compensation did a great disservice to investors because "disclosure of compensation for senior executives and directors and the way it is set are often the best clues investors can get into how a company is being run and overseen," and "***[g]enerous pay packets and undemanding bonus targets can be a warning that a company's board has been cowed by overbearing executives***." The *WSJ* further noted that "[t]he problems at Nissan have had more to do

with the board itself," because "[u]nder the company's rules, Mr. Ghosn – as chairman – was responsible for setting directors' pay, including his own, supposedly in consultation with a small group of other directors."

35.     Indeed, Nissan's underreporting of defendant Ghosn's executive pay may not have only overstated its profits and deprived investors of their right to know how much they were paying defendant Ghosn, it appears to have caused Nissan to violate the executive pay cap set by its shareholders.  According to a November 28, 2018 report by the *Japan Times*:

> Nissan Motor Co.'s executive remuneration for fiscal 2017 may have exceeded the nearly ¥3 billion cap set by shareholders, with a large sum going to arrested former Chairman Carlos Ghosn, sources said Wednesday.
>
> While only ¥735 million ($6.5 million) was stated in the company's securities reports as remuneration for Ghosn in the year that ended March, the sources said the payment to him may have actually been about ¥2.5 billion.
>
> In that case, Nissan may have paid Ghosn, who is facing allegations of falsifying securities reports, and other executives a total of more than ¥2.99 billion in fiscal 2017, eclipsing the cap that was adopted at a general shareholders' meeting in 2008.
>
> The act could be a "grave breach of trust" to shareholders that could even lead to the delisting of the company, some experts say.
>
> Under company rules, remuneration payments for each executive should be decided through talks involving the chair of the board and representative board members.  But the sources believe that Ghosn, the 64-year-old who led the company for nearly 20 years, had effectively been deciding the sum alone.

36.     According to the *Japan Times*, defendant Ghosn "was arrested last week by Tokyo prosecutors for allegedly violating the Financial Instruments and Exchange Act by underreporting his remuneration by around ¥5 billion over five years to March 2015," while "[p]rosecutors say he actually received ¥10 billion over the period."  The article further reported that the "prosecutors are also considering building a case against him on the suspicion that he underreported a further ¥3 billion in remuneration received over three years from April 2015."  The article went on to state:

> Ghosn has denied intending to falsify the financial statements, but admitted that he did not include in the documents part of the remuneration he was set to

receive when he retires because the "payments have not been settled," according to the sources.

Ghosn allegedly believed he should receive some ¥2 billion annually as remuneration. But authorities suspect he instructed Greg Kelly, a former Nissan representative director who was arrested along with him for alleged conspiracy, to submit that he earned ¥1 billion a year in securities reports and was planning to receive the remaining amount after retirement.

The post-retirement payment that was not reported was allegedly about ¥8 billion over the eight years from fiscal 2010.

According to the sources, Ghosn is apparently trying to argue the validity of a purported document that showed Nissan agreed on the payment, arguing that he has not signed it.

**Under the financial instruments law, remuneration needs to be disclosed in a securities report when it is fixed, even if the actual payout is planned in the future.**

37.     The *Japan Times* has further revealed that Nissan not only knew about the illegal underreporting of defendant Ghosn's executive compensation by one half over the past decade, it actually defended the false financial accounting when challenged by Nissan's outside auditors:

In a separate revelation, Nissan's auditor had repeatedly questioned transactions at the heart of allegations of financial misconduct by Ghosn but Nissan said they were proper, a person with direct knowledge of the matter said on Wednesday.

Ernst & Young ShinNihon LLC questioned Nissan's management several times, chiefly around 2013, about purchases of overseas luxury homes for Ghosn's personal use and of stock-appreciation rights that were conferred on him.

But the automaker said the transactions and financial reporting were appropriate, the source said on condition of anonymity.

The revelation shows Nissan and its auditor were discussing the transactions, in apparent contrast with Nissan's contention that the alleged misreporting of benefits for Ghosn was masterminded by Ghosn and Kelly.

                                *       *       *

Ernst & Young ShinNihon questioned Nissan management about Zi-A Capital BV, asking whether the Dutch unit – which purchased the overseas homes for Ghosn's use – was conducting business in line with its stated aim as an investment company, said the source, who is not authorized to speak publicly on the matter.

The carmaker said Zi-A was conducting its business appropriately, the source said. Japanese media have valued the transactions at more than ¥2 billion.

Similarly, the source said, the auditor asked whether the stock-appreciation rights – which are like stock options but pay out in cash if a share rises to a certain price – should be declared, but Nissan replied that was not necessary. Japanese media say the rights were worth some ¥4 billion.

Ernst & Young ShinNihon had been auditor for Toshiba Corp. and Olympus Corp. during financial scandals at the two companies in recent years.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**
**ISSUED PRIOR TO THE CLASS PERIOD THAT REMAINED ALIVE AND**
**UNCORRECTED IN THE MARKET DURING THE CLASS PERIOD**

38.     On March 3, 2013, defendant Ghosn – speaking as the CEO of "Nissan & Renault" – was interviewed by *Bloomberg*'s Guy Johnson on *Bloomberg TV* and was expressly questioned about rumored French government efforts to limit his pay, to which he responded by stating:

> GHOSN:  Well, what we – what we think is **obviously we follow the laws wherever they are**.  We are a global company.  We are present in 200 countries and **in each country we follow the laws**.  Now, laws have consequences.  So **if there is a limitation on pay, we'll implement a limitation on pay because we follow the laws in all the countries where we are based**.  At the same time, we are playing in a game of competition.  Competition for talent, competition for expertise, competition for vision also, particularly in our industry.  So I'm not going to speculate, but let's first see what are going to be the rules and then (inaudible) see what are going to be the consequences for the company.

39.     On May 9, 2013, Nissan issued a press release announcing its fiscal 2012 financial results for the fiscal year ended March 31, 2013 ("FY12").  The "Annual Report 2013" that Nissan published that day was prepared and distributed by and under the names of defendants: then-President, CEO and Chairman Ghosn; then-Executive Vice President, Chief Competitive Officer and Representative Director Saikawa; then-CFO Peter; and then-Representative Director Kelly.

40.     As to "Nissan's Approach to Corporate Governance & Internal Controls," the Annual Report 2013 stated in pertinent part as follows:

> Nissan's approach to corporate governance is founded on three cornerstones: **compliance built on the high ethical standards of all employees**, efforts to bolster information security and an effective and appropriate risk management system.

41.     Concerning the Company's "Internal Control Systems and Compliance," the Annual Report 2013 emphasized its purportedly good governance and transparency, stating in pertinent part as follows:

> Compliance built on the high ethical standards of all employees is integral to promoting CSR. *To foster compliance awareness throughout the company, Nissan has established specialized departments and placed officers in charge of promoting compliance policy in each region where it operates*.

> **Internal Control Systems**

> *Nissan places high value on transparency, both internally and externally, in its corporate management*. We focus consistently on the implementation of efficient management for the purpose of achieving *clear and quantifiable commitments*. In line with this principle, and in accordance with Japan's Companies Act and its related regulations, the Board of Directors has decided on the Internal Control Systems to pursue these goals and on its own basic policy. The board continually monitors the implementation status of these systems and the policy, making adjustments and improvements as necessary. One board member has also been assigned to oversee the Internal Control Systems as a whole.

42.     On or about May 9, 2013, Nissan published another report, entitled "Financial Information as of March 31, 2013," stating that for FY12, defendant Ghosn had been paid "Total Remuneration" of ¥988 million. The report further represented that "[t]he chairman of the Board of the Company in consultation with the representative directors and taking into account existing contracts determined the compensation of each director after reviewing the director's performance and the results of the benchmarking of executive pay survey conducted by the Company's compensation consultant."

43.     The statements in ¶¶38-42 remained alive and uncorrected in the market throughout the Class Period despite the fact that they were materially false and misleading and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was then known to defendants or recklessly disregarded by them:

(a)     since at least 2010, Nissan had been materially understating its costs – and thus overstating profits – by paying a material portion of Ghosn's executive compensation in the

form of billions of Yen of deferred compensation that the Company was concealing from its public financial reports;

(b)     in so doing, Nissan was concealing from investors significant defects in its corporate governance;

(c)     Nissan's overpayment of defendant Ghosn had caused it to exceed its shareholder-approved executive pay cap, thus threatening its continued stock listing;

(d)     Nissan lacked effective internal and reporting controls; and

(e)     as a result, defendants' statements about Nissan's business metrics, operations, and financial prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

44.     The Class Period starts on December 10, 2013.  Nissan ADRs opened that day at $17.61 per share, buttressed by the false and misleading statements detailed above at ¶¶38-42, which remained alive and uncorrected in the market throughout the Class Period and were then artificially inflating the market price of Nissan ADRs.

45.     On May 11, 2014, Nissan issued a press release announcing its fiscal 2013 financial results for the fiscal year ended March 31, 2014 ("FY13").  The "Annual Report 2014" Nissan published that day was prepared and distributed by and under the names of defendants: then-President, CEO and Chairman Ghosn; then-Chief Competitive Officer and Representative Director Saikawa; then-CFO Peter; and then-Representative Director Kelly.

46.     As to Nissan's "Corporate Governance & Internal Control," the Annual Report 2014 stated in pertinent part as follows:

Nissan believes that enhancing its corporate governance is one of its most important business issues.  Ensuring clear management responsibility is a key way to achieve this.  ***Nissan announces clear management targets and policies to all its***

*stakeholders and discloses its performance promptly with a high degree of transparency*.

47.     Concerning the Company's "Compliance" systems, the Annual Report 2014 emphasized its "high ethical standards," stating:

> In promoting corporate social responsibility (CSR), it is essential that *each employee practices compliance with high ethical standards*.  In order to raise compliance awareness throughout the company, Nissan has established specialized departments and appointed officers to promote compliance policy in each region where it operates.

48.     On or about May 12, 2014, Nissan published another report, entitled "Financial Information as of March 31, 2014," stating that for FY13, defendant Ghosn had been paid "Total Remuneration" of ¥995 million.  The report further represented that "[t]he chairman of the Board of the Company in consultation with the representative directors and taking into account existing contracts determined the compensation of each director after reviewing the director's performance and the results of the benchmarking of executive pay survey conducted by the Company's compensation consultant."

49.     On June 24, 2014, the *Japan Economic Newswire* published a report, entitled "Nissan's Ghosn to remain highest-paid executive in Japan," reiterating the materially false and misleading executive compensation figure for defendant Ghosn.  The report reiterated that "Nissan Motor Co. said Tuesday that Chief Executive Officer Carlos Ghosn earned 995 million yen in the 2013 business year ended in March, up from 988 million yen the previous year, adding to the view he will remain the highest-paid executive among listed companies in Japan," and noting that all "[l]isted firms in Japan have been obliged since fiscal 2009 to disclose all executive compensation over 100 million yen."  A June 26, 2014 report by *The Mercury (South Africa)*, entitled "Nissan's chief may top Japan pay rankings for fourth time in five years," went on to emphasize how much more defendant Ghosn was being paid compared to his Japanese counterparts – even based on the underreported compensation – stating that:

Among the few foreigners leading a Japanese firm, ***Ghosn earned five times what Toyota president Akio Toyoda did in 2012 despite Ghosn running a car maker with about a third the profit***. Last year, he steered Nissan to the smallest profit increase among Japanese car makers aside from Daihatsu, hurt by increased US incentive spending and recall costs.

Ghosn, who also heads Renault, was the top-paid boss in Japan in three of the four years since 2010, when the country's financial regulator began requiring disclosures by publicly traded firms of compensations exceeding ¥100m, Tokyo Shoko Research revealed.

***In 2012, Ghosn earned ¥988m, compared with ¥184m for Toyota's president and ¥145m for Honda president Takanobu Ito***.

50. On March 26, 2015, the *Australian Financial Review* published a report entitled "Renault defies Paris, doubles chief's pay," which discussed efforts by the French government to limit defendant Ghosn's pay at Renault, stating in pertinent part as follows:

Renault has proposed to more than double the pay of chief executive Carlos Ghosn despite opposition by the French state.

Mr Ghosn, who is also head of Renault's alliance partner Nissan of Japan, is set to receive a package worth €7.2 million in cash and shares for 2014. This is far above his €2.67 million package in 2013, and is made up of €1.23 million in fixed salary, another €1.81 million in variable pay and an extra 100,000 of performance-related shares worth €4.1 million.

This will be added to Mr Ghosn's package from Japanese partner Nissan, which in 2013 was Y995 million (€7.6 million at current exchange rates), in salary and bonuses, according to Nissan. Five of Renault's 19 board members voted against the pay rise, including the representative from the French state, according to people close to the board. The French state owns 15 per cent of the carmaker.

51. On May 12, 2015, Nissan issued a press release announcing its fiscal 2014 financial results for the fiscal year ended March 31, 2015 ("FY14"). The "Annual Report 2015" Nissan published that day was prepared and distributed by and under the names of defendants: then-President, CEO and Chairman Ghosn; then Representative Director, Vice Chairman and Chief Competitive Officer Saikawa; then-CFO Peter; and then-Representative Director Kelly.

52. As to Nissan's "Corporate Governance & Internal Control," the Annual Report 2015 stated in pertinent part as follows:

Nissan believes that enhancing its corporate governance is one of its most important business issues. Ensuring clear management responsibility is a key way to achieve this. ***Nissan announces clear management targets and policies to all its stakeholders and discloses its performance promptly with a high degree of transparency***.

53. Concerning the Company's "Compliance" systems, the Annual Report 2015 emphasized its purportedly "high ethical standards," stating in pertinent part as follows:

In promoting corporate social responsibility (CSR), it is essential that ***each employee practices compliance with high ethical standards***. In order to raise compliance awareness throughout the company, Nissan has established specialized departments and appointed officers to promote compliance policy in each region where it operates.

54. On or about May 12, 2015, Nissan published another report, entitled "Financial Information as of March 31, 2015," stating that for FY14, defendant Ghosn had been paid "Total Remuneration" of ¥1.035 billion. The report further represented that "[t]he chairman of the Board of the Company in consultation with the representative directors and taking into account existing contracts determined the compensation of each director after reviewing the director's performance and the results of the benchmarking of executive pay survey conducted by the Company's compensation consultant."

55. On June 23, 2015, *Reuters* published a report, entitled "Nissan says paid CEO Ghosn $8.4 mln last year," which stated that "Japan's second-biggest automaker, said on Tuesday it paid Chief Executive Carlos Ghosn 1.035 billion yen ($8.39 million) last business year, up 4 percent from the previous year," while emphasizing that "[a]mong the 2,451 listed Japanese companies that had submitted their annual securities reports as of Monday, just 77 executives at 32 firms received more than 100 million yen in compensation, according to Tokyo Shoko Research." Likewise, a June 24, 2015 *Windsor Star* report, entitled "Nissan CEO's pay continues to top Japan's executives," emphasized that "[a]mong the few foreigners leading a Japanese company, ***Ghosn, 61, earned more than four times what Toyota Motor Corp. president Akio Toyoda did*** in the fiscal year ended March 2014 – even as Nissan's profit was about one-fifth of Toyota's."

56. On April 29, 2016, *Reuters* published a report, entitled "Renault board maintains CEO pay deal despite shareholder revolt," noting that "Renault stuck by its decision to pay Carlos Ghosn 7.2 million euros ($8.2 million) for 2015, ***defying a shareholder vote against the chief executive's package on Friday***," that "***[i]nvestors representing 54 percent of voting rights opposed Ghosn's pay*** deal at their annual meeting," and that the "French state proved decisive in the non-binding vote, a year after increasing its stake in the carmaker." The report emphasized that France's "Finance ministry officials confirmed that the state had voted against Ghosn's package," quoting one as stating that "'[t]he government has been consistent in calling for pay moderation, starting with companies under public ownership.'" According to that report, "[b]efore the vote, Ghosn was publicly taken to task by a representative of shareholder advisory firm Proxinvest, which had recommended that investors reject the pay package." *Reuters* reported that defendant Ghosn had responded that "'[t]he board does not decide (on pay) on the basis of caprice. . . . ***It is the board acting on your delegated authority*** that decides who runs the company and the remuneration that matches their efforts and talents.'"

57. On May 12, 2016, Nissan issued a press release announcing its fiscal 2015 financial results for the year ended March 31, 2016 ("FY15"). The "Annual Report 2016" Nissan published that day was prepared and distributed by and under the names of defendants: then-President, CEO and Chairman Ghosn; then-Representative Director, Chief Competitive Officer and Vice Chairman Saikawa; then-CFO Peter; and then-Representative Director Kelly.

58. As to Nissan's "Corporate Governance & Internal Control," the Annual Report 2016 stated in pertinent part as follows:

> Nissan believes that enhancing its corporate governance is one of its most important business issues. Ensuring clear management responsibility is a key way to achieve this. ***Nissan announces clear management targets and policies to all its stakeholders and discloses its performance promptly with a high degree of transparency***.

59.     Concerning the Company's "Compliance" systems, the Annual Report 2016 emphasized its purportedly "high ethical standards," stating in pertinent part as follows:

> In promoting corporate social responsibility (CSR) , it is essential that each employee practices compliance with high ethical standards.  In order to raise compliance awareness throughout the Company, Nissan has established a Global Compliance Office, as well as specialized departments, and appointed officers to promote compliance policy in each region where it operates.

60.     On or about May 12, 2016, Nissan published another report, entitled "Financial Information as of March 31, 2016," stating that for FY15, defendant Ghosn had been paid "Total Remuneration" of ¥1.071 billion.  The report further represented that "[t]he chairman of the Board of the Company in consultation with the representative directors and taking into account existing contracts determined the compensation of each director after reviewing the director's performance and the results of the benchmarking of executive pay survey conducted by the Company's compensation consultant."

61.     On June 10, 2016, *Reuters* published a report, entitled "French parliament says shareholders must set bosses' pay," which detailed how the French government was attempting to reign in defendant Ghosn's Renault pay:

> Shareholders must set French chief executives' pay in a binding vote that corporate boards cannot ignore, the French parliament decided early on Friday in reaction to a public outcry over Renault chief Carlos Ghosn's giant package.
>
> However, lawmakers in the lower house rejected a left-wing bid to impose a legal ceiling on CEO remuneration.
>
> ***The executive pay amendment was added to a package of corporate legislation going through parliament after Renault's board defied a shareholder vote in May rejecting Ghosn's 7.2 million euro ($8.14 million) pay package***.  He earns another salary as CEO of Nissan, Renault's alliance partner.
>
> In reaction, President Francois Hollande pledged to give legal clout to shareholder votes on pay if boards ignored them, which would bring French law on "say-on-pay" into line with other big European countries such as Britain and Germany.

Rebel leftwing Socialist lawmakers wanted to go further by banning executive pay packages worth more than 20 times the average salary in companies.

The bill is due to got [sic] to the Senate in early July.

62. On June 22, 2016, *Reuters* published a report, entitled "Nissan says CEO Ghosn's salary rose 3.5 percent last year," that reiterated the underreported pay Nissan had reported, stating "Nissan . . . said that it paid CEO Carlos Ghosn 1.1 billion yen ($10.2 million) in the last business year, up 3.5 percent from the previous year." The report further emphasized that "Ghosn, who also serves as CEO for Nissan's alliance partner Renault, received a separate annual salary of 7.2 million euros for 2015 from the French automaker, defying a shareholder vote against the chief executive's package in April," and that "[h]is compensation has drawn regular criticism from the French government, which has more than 18 percent of voting rights in the company."

63. On November 18, 2016, *Reuters* published a report, entitled "EXCLUSIVE-Renault boss sees pay row with French government in election year," which detailed how defendant Ghosn had been further incentivized to understate his Nissan pay to avoid the ire of the French government, stating in pertinent part as follows:

> ***Renault Chief Executive Carlos Ghosn expects the French government to oppose his pay package in 2017***, he told Reuters in an interview, setting the stage for another shareholder meeting clash – this time in an election year.
>
> "I don't think there's any chance that they will approve" Renault's pay proposals, Ghosn said of the likely government position. The economy and finance ministry declined to comment.
>
> Ghosn nonetheless hopes to avoid a repeat of the last annual meeting outcome in April, when investors with 54 percent of voting rights opposed his 7.2 million euro ($7.6 million) pay. "Our objective is to have a majority vote," he said.
>
> The French state owns 19.7 percent of Renault. Under a complex deal struck last year, its voting rights on routine questions including compensation are capped between 17.9 percent and 20 percent, depending on meeting attendance. . . .
>
> Executive pay is attracting tougher shareholder scrutiny at companies from HSBC to BP and has become a hot political issue in France, where campaigning is well underway for presidential and legislative elections next April-June.

The French parliament last week passed a law granting shareholders a binding vote on CEO pay structures, starting next year, and on actual payouts from 2018. Until now, French "say on pay" votes have lacked legal force.

After the April 29 shareholder vote, Renault's board reconvened hastily and decided to uphold Ghosn's 2015 package, while pledging a review of future pay policy. . . .

*The immediacy of its response intensified French criticism of Ghosn, who draws a second salary as CEO of alliance partner Nissan . . . 44.5 percent-owned by the French carmaker.*

*His 15.6 million euros in combined Renault-Nissan pay last year amounted to the third-biggest haul among CEOs of France's blue-chip CAC 40 index,* according to advisory firm Proxinvest, which counsels funds on how to vote their shares.

*The firm wants to set a "socially acceptable maximum" for executive pay at 240 times the French minimum wage, or 4.8 million euros at today's rates.*

Renault's review culminated in July with a 20 percent cut to the variable component of Ghosn's 2016 pay packet.

The reduction, worth 369,000 euros at last year's levels, is unlikely to satisfy the French government. "We'll need to discuss this again (but) *the new board proposals don't yet look sufficient,*" a ministry source said.

*Several people familiar with the matter said Renault's announcement was preceded by weeks of talks with investors who had opposed Ghosn's package or voiced concerns, including asset manager Amundi and Norwegian sovereign fund Norges.*

The consultations make it more likely Renault's revised pay policy will command at least narrow majority support at the next shareholder meeting despite state opposition, some said.

France's political calendar nonetheless adds a degree of unpredictability and more scope for corporate embarrassment.

Renault has yet to set a date for the 2017 meeting. Unless substantially delayed, however, it is likely to fall within an election season that begins with the first-round presidential vote on April 23 and ends with legislatives on June 18.

64. On February 23, 2017, it was disclosed that defendant Ghosn would step down as CEO of Nissan, though he would remain its Chairman and he would continue to lead the global automobile Alliance created during his tenure at Nissan, which also included Renault and Mitsubishi. According to a report by the *Hindustan Times* that day, "[b]y pulling back from day-to-

day control of Nissan, Ghosn ends years of speculation about the company's succession plans," over which "[s]ome analysts and investors had grown concerned that he was overstretched with his multiple roles" at Nissan, Renault, Mitsubishi and the Alliance.

65.     On May 11, 2017, Nissan issued a press release announcing its fiscal 2016 financial results for the fiscal year ended March 31, 2017 ("FY16"). The "Annual Report 2017" Nissan published that day was prepared and distributed by and under the names of defendants: then-Chairman Ghosn; then-President, CEO and Representative Director Saikawa; then-CFO Peter; and then-Representative Director Kelly.

66.     As to Nissan's "Corporate Governance & Internal Control," the Annual Report 2017 stated in pertinent part as follows:

> ***Nissan aims to conduct fair, impartial and efficient business activities, having a high degree of transparency and consistency by adhering to the applicable laws and corporate rules***.

67.     On or about May 11, 2017, Nissan published another report, entitled "Financial Information as of March 31, 2017," stating that for FY16, defendant Ghosn had been paid "Total Remuneration" of ¥1.098 billion. The report further represented that "[c]ompensation of each Director is based on each Director's compensation contracts, performance, and benchmarks of executive pay surveys conducted by the Company's compensation consultants, which is then consulted with the representative directors and approved by the chairman of the Board of the Company."

68.     On June 13, 2017, *Reuters* published a report disclosing in pertinent part as follows:

> Brazilian-born Ghosn, 63, is in open conflict with the French state, Renault's biggest shareholder, whose opposition to his CEO pay package was instrumental to its symbolic rejection in a non-binding vote at last year's shareholder meeting. His combined 15.6 million euros in Renault-Nissan pay amounted to the third-biggest haul among French CAC 40 company bosses.
>
> In response, Renault cut Ghosn's variable pay component by 20 percent and clarified bonus criteria. Shareholders will have their say again at the 2017 general meeting on Thursday, in a vote that has now become binding under French law.

*　　*　　*

Pressure on Ghosn over pay had been easing ahead of Thursday's shareholder meeting, following the Renault pay concessions and his exit from the Nissan CEO role.

ISS, an influential shareholder adviser that opposed Ghosn's pay last year, is urging clients to back his package, which may be enough to overcome the usual government opposition.

69.　　On June 15, 2017, *Reuters* published a report discussing the vote at Renault's shareholder meeting and stating in pertinent part that:

Renault shareholders approved Ghosn's 7.06 million euro ($7.87 million) CEO salary in a narrow 53-47 vote on Thursday, a year after their rejection of his 2015 payout forced a 20 percent variable-pay cut.

Ghosn also received a similar package as Nissan CEO, a role he relinquished in April as he prepares to hand over operational leadership of the alliance, while likely staying on in one or more chairman roles.

70.　　On June 27, 2017, *EFE World News* published a report, entitled "Carlos Ghosn earned record salary at the helm of Renault-Nissan alliance," which stated that defendant Ghosn had "earned a record 1.098 billion yen ($9.8 million) in 2016, according to information released Tuesday." According to the report, "Ghosn, who has topped the list of the best paid executives of Japan in recent years, saw his salary increase by 27 million yen last year owing to new responsibilities as the head of the alliance, as mentioned in an announcement at Nissan's shareholder meeting on Tuesday."

71.　　On May 14, 2018, Nissan issued a press release announcing its fiscal 2017 financial results for the fiscal year ended March 31, 2018 ("FY17"). The "Annual Report 2018" Nissan published that day was prepared and distributed by and under the names of defendants: then-Chairman Ghosn; then-Representative Director, President and CEO Saikawa; CFO Karube; and then-Representative Director Kelly.

72.　　As to Nissan's corporate "Governance Initiatives," the Annual Report 2018 stated in pertinent part as follows:

*Nissan is improving its governance through an enhanced compliance system. As part of this effort, the company appointed two new independent directors at the beginning of the current fiscal year. By reinforcing governance, Nissan is contributing to the growth of the company while increasing its stakeholder value*.

73. On or about May 14, 2018, Nissan published another report, entitled "Financial Information as of March 31, 2018," stating that for FY17, defendant Ghosn had been paid "Total Remuneration" of ¥735 million. The report further represented that "[c]ompensation of each Director is based on each Director's compensation contracts, performance, and benchmarks of executive pay surveys conducted by the Company's compensation consultants, which is then consulted with the representative directors and approved by the chairman of the Board of the Company."

74. On June 15, 2018, *Reuters* published a report entitled "Renault boss Ghosn wins board renewal, contested pay vote," which stated in pertinent part as follows:

> Renault shareholders approved Chairman and CEO Carlos Ghosn's 7.4 million euro ($8.6 million) compensation for 2017, averting a boardroom crisis as the carmaker explores closer consolidation with alliance partner Nissan.
>
> Investors backed Ghosn's renewal for another four-year board term and voted by 56 to 43 percent in favor of last year's payout – in addition to which he received 9.2 million euros in his final year as Nissan chief executive.
>
> Ghosn, who lost a 2016 shareholder vote on pay, agreed to cut his 2018 compensation by 30 percent to secure French government backing for his renewal. France, Renault's biggest shareholder with a 15 percent stake, opposed the 2017 payout but backed this year's reduced package.
>
> Paris-based Proxinvest, a shareholder advisory firm, had recommended voting against last year's package on the grounds that Ghosn's additional Nissan salary was poorly disclosed and bonuses too high. But rival proxy advisor ISS backed the payout, saying it "does not raise any significant concern."

75. As a result of defendants' false and misleading statements about the Company's expenses, profits, internal controls and governance during the Class Period, Nissan's ordinary shares (traded on the Tokyo Exchange) and its ADRs (traded in the United States) traded at artificially

inflated prices, with the ADRs alone reaching a Class Period high of more than $22 per share on January 29, 2018.

76.     The statements in ¶¶45-74 were materially false and misleading at the time they were made and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was then known to defendants or recklessly disregarded by them:

(a)     for more than a decade, Nissan had been materially understating its costs – and thus overstating profits – by paying a material portion of Ghosn's executive compensation in the form of billions of Yen of deferred compensation that the Company was concealing from its public financial reports;

(b)     in so doing, Nissan was concealing from investors significant defects in its corporate governance;

(c)     Nissan's overpayment of defendant Ghosn had caused it to exceed its shareholder-approved executive pay cap, thus threatening its continued stock listing;

(d)     Nissan lacked effective internal and reporting controls; and

(e)     as a result, defendants' statements about Nissan's business metrics, operations, and financial prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

77.     On November 19, 2018, Tokyo District Prosecutors arrested defendants Ghosn and Kelly for questioning over allegations of false accounting. Nissan publicly acknowledged that day that Nissan had underreported defendant Ghosn's compensation (a violation of securities laws) and that Ghosn had used Company assets for personal use. Defendants Ghosn and Kelly were reportedly arrested as a result of information provided by an unidentified non-Japanese executive in Nissan's legal department, in what was only the second deal ever struck under Japan's recently introduced plea bargaining system.

78.     Nissan stated on November 19, 2018 that defendants Ghosn and Kelly would be stripped of all roles at the Company at a November 22, 2018 Board meeting. Defendants Ghosn and Kelly were formally stripped of their roles at Nissan at the November 22, 2018 Board meeting.

79.     Defendant Saikawa has since admitted that Nissan's current management and Board knew about the executive compensation scheme and the false financial reporting for at least most of 2018. According to the *WSJ*, "[e]arly this year, Mr. Saikawa was handed a whistleblower complaint by corporate auditors . . . according to the person familiar with the investigations by Nissan and prosecutors," and "Nissan has said the investigation that followed uncovered widespread misconduct by Mr. Ghosn" that "Nissan says it has fully shared . . . with prosecutors."

80.     As a result of these disclosures, the price of Nissan ADRs declined precipitously, closing down more than 5% on November 19, 2018, on unusually high volume of more than 800,000 shares traded.

81.     On December 4, 2018, *Reuters* reported that, "[c]iting unnamed sources, the Sankei daily said prosecutors plan to [re-]arrest Ghosn and Kelly on Dec. 10 for the same crime covering the period from 2015 to 2017, during which the suspects allegedly understated Ghosn's income by about 4 billion yen," and that "[i]f authorities approve the maximum detention for that case, Ghosn and Kelly would remain in custody until Dec. 30, the paper said."

82.     On December 10, 2018, prosecutors in Japan indicted defendants Nissan, Ghosn and Kelly on charges that they had violated financial laws by underreporting Ghosn's compensation in Nissan's financial filings. Both defendant Ghosn and Kelly were rearrested that day on related charges and remain in jail.

## ADDITIONAL SCIENTER ALLEGATIONS

83.     As alleged herein, Nissan and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Nissan, their control over and/or receipt and/or modification of Nissan's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Nissan, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

84.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nissan securities and operated as a fraud or deceit on Class Period purchasers of Nissan ADRs by misrepresenting the Company's business and prospects. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Nissan ADRs fell significantly, as the prior artificial inflation came out of the price over time. As a result of their purchases of Nissan ADRs during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Nissan ADRs during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

86.     The members of the Class are so numerous that joinder of all members is impracticable.  Nissan ADRs were actively traded in the United States on the over-the-counter ("OTC") market.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nissan, the ADR depository bank or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

88.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

89.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nissan; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

91. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a) employed devices, schemes and artifices to defraud;

    (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Nissan ADRs during the Class Period.

94. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nissan ADRs. Plaintiff and the Class would not have purchased Nissan ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

# COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     Defendants Nissan, Ghosn, Kelly, Saikawa, Karube and Peter and/or persons under their control violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiff and the other members of the Class.

97.     By virtue of their positions as controlling persons, each of the Individual Defendants are liable pursuant to §20(a) of the 1934 Act for the acts and omissions of their co-defendants in violation of the 1934 Act.

98.     Each of these defendants acted as a controlling person of some or all of their co-defendants, as set forth in the chart below, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws:

| DEFENDANT | CONTROLLED DEFENDANTS | BY VIRTUE OF |
|---|---|---|
| Ghosn | Nissan, Kelly, Saikawa, Karube and Peter | his positions of power and control and his responsibilities as Nissan's CEO (through April 1, 2017) and as its Chairman (through the end of the Class Period), and his positions at Renault, Mitsubishi and the Alliance; his power to hire and fire and his supervisory authority over Kelly, Saikawa, Karube, Peter and other members of Nissan's senior, regional, and branch managers and employees; his day-to-day involvement in, and control over, Nissan's operations, including those relating to reporting requirements and regulatory compliance; and his ability to control the contents of Nissan's press releases, financial reports and other public statements during the Class Period. |

| DEFENDANT | CONTROLLED DEFENDANTS | BY VIRTUE OF |
|---|---|---|
| Kelly | Nissan, Ghosn, Saikawa, Karube and Peter | his positions of power and control and his responsibilities as a Representative Director at Nissan (through February 2015), and as a Nissan Director (through the end of the Class Period), and his positions at the Alliance; his power to hire and fire and his supervisory authority over Ghosn, Saikawa, Karube, Peter and other members of Nissan's senior, regional, and branch managers and employees; his day-to-day involvement in, and control over, Nissan's operations, including those relating to reporting requirements and regulatory compliance; and his ability to control the contents of Nissan's press releases, financial reports and other public statements during the Class Period. |
| Saikawa | Nissan, Karube and Peter | his positions of power and control and his responsibilities as Nissan's CEO (since April 1, 2017), as co-CEO of Nissan with Ghosn between October 2016 and March 31, 2017, and in his role as a director of Renault; his power to hire and fire and his supervisory authority over Karube, Peter and other members of Nissan's senior, regional, and branch managers and employees; his day-to-day involvement in, and control over, Nissan's operations, including those relating to reporting requirements and regulatory compliance; and his ability to control the contents of Nissan's press releases, financial reports and other public statements during the Class Period. |
| Karube and Peter | Nissan | Karube's ability since May 18, 2018 and Peter's ability between 2009 and May 17, 2018 to control the contents of Nissan's press releases, SEC filings and other public statements during the Class Period; their supervisory authority over other members of Nissan's senior, regional, and branch management and employees; and their day-to-day involvement in and control over Nissan's operations. |
| Nissan | Ghosn, Kelly, Saikawa, Karube and Peter | its power to hire, fire, supervise and otherwise control the actions of its employees, including the Individual Defendants, and the salaries, bonuses, incentive compensation, and other employment consideration and arrangements provided to the Individual Defendants. |

99.     Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did,

control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of and contractual rights with Nissan, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury

DATED: December 10, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
JERRY E. MARTIN, #20193
CHRISTOPHER M. WOOD, #032977

*/s/Jerry E. Martin*
JERRY E. MARTIN

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
600 West Broadway, Suite 1800
San Diego, CA 9210
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\CPT Nissan 34Act.docx

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

JACKSON COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re BHP Billiton Limited Sec. Litig.*, No. 1:16-cv-01445 (S.D.N.Y.)
*Jackson County Employees' Ret. Sys. v. Acadia Healthcare Co..*, No. 3:18-cv-00286 (M.D. Tenn.)

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

NISSAN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of December, 2018.

JACKSON COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: _____

Its: _Chairperson / Trustee_

- 2 -

NISSAN

## SCHEDULE A

## SECURITIES TRANSACTIONS

**ADR**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/02/2015 | 14,480 | $21.15 |
| 07/30/2015 | 1,520 | $19.70 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 12/01/2016 | 2,972 | $18.89 |