UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| JACKSON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. CARLOS GHOSN, et al., Defendants. | Civil Action No. 3:18-cv-01368<br><br>CLASS ACTION<br><br>Hon. William L. Campbell, Jr.<br>Magistrate Judge Alistair Newbern<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE FINANCIAL INSTRUMENTS AND EXCHANGE ACT OF JAPAN<br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................1

II. JURISDICTION AND VENUE ....................2

III. PARTIES ....................3

IV. DEFENDANTS' FRAUDULENT SCHEME ....................9

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................21

A. Defendants' Materially False and Misleading Statements Regarding Nissan's Financial Results ....................21

B. Defendants' Materially False and Misleading Statements Regarding Ghosn's Compensation and Nissan's Compliance with Laws and Regulations, and Its Internal Governance and Controls ....................31

VI. THE RELEVANT TRUTH IS DISCLOSED ....................37

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ....................40

VIII. ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY AND THE MARKET FOR NISSAN SECURITIES ....................43

A. Applicability of Presumption of Reliance ....................43

B. Ghosn's Compensation Was Material to Nissan Shareholders ....................44

C. The Market for Nissan Securities ....................46

IX. CLASS ACTION ALLEGATIONS ....................49

X. PRAYER FOR RELIEF ....................58

XI. JURY DEMAND ....................58

## I. INTRODUCTION

1. This is a securities class action brought on behalf of purchasers of Nissan Motor Co., Ltd. ("Nissan" or the "Company") securities between May 11, 2014 and November 16, 2018, inclusive (the "Class Period"), against Nissan, Carlos Ghosn ("Ghosn"), Nissan's former Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board"), Greg Kelly ("Kelly"), a former Nissan Representative Director and Executive Vice President, Hiroto Saikawa ("Saikawa"), Nissan's current CEO, Hiroshi Karube ("Karube"), Nissan's current Chief Financial Officer "("CFO"), and Joseph G. Peter ("Peter"), Nissan's former CFO, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act") and the Financial Instruments and Exchange Act of Japan (the "FIEA").

2. For most of the last six months, one of the world's most prominent automotive executives, Carlos Ghosn, was imprisoned in a Japanese detention center. Mr. Ghosn has been charged by Japanese prosecutors in four separate indictments with orchestrating one of the most brazen corporate frauds in modern Japanese history. As Nissan has now admitted, since at least 2010 Ghosn orchestrated an elaborate scheme to secretly increase his own pay by approving billions of yen in deferred compensation which Nissan would be obligated to pay him at later dates. At the same time, Ghosn and other senior Nissan insiders caused the Company to disseminate false statements which failed to disclose Ghosn's compensation arrangements, resulting in an understatement of Nissan's compensation expenses and a concomitant overstatement of Nissan's operating income throughout the Class Period. Nissan has since admitted that these financial reports were false and misleading and will have to be restated.

3. Charged alongside Ghosn was Nissan, as well as a former Nissan Board member and Brentwood, Tennessee resident, Greg Kelly, who was known to Nissan insiders as the "'CEO whisperer.'" Kelly spent 30 years at Nissan as an attorney and executive prior to the joining the

Company's Board, and Nissan's internal investigation revealed that Kelly was "'the mastermind of [the scheme], together with Carlos Ghosn.'"

4. Even though Nissan's executives and auditors had raised questions internally about Ghosn's secret compensation arrangements since at least 2013, this information was concealed from the Company's shareholders until November 19, 2018. That afternoon, shortly after Ghosn touched down in Toyko aboard Nissan's private jet, prosecutors from a Japanese Special Investigations Unit boarded the plane and took Ghosn into custody. At almost the same time, Kelly, who had also just landed in Tokyo aboard another private plane, was pulled over by authorities and arrested at a highway rest stop.

5. As word of Ghosn and Kelly's arrests quickly spread, Nissan's current President and CEO, Saikawa, rushed to convene a press conference. During the 10:00 p.m. press conference, Saikawa "deeply apologize[d] for the great concern caused by the misconduct of the company's Representative Director and Chairman Carlos Ghosn." Saikawa admitted that Nissan "[r]eported compensation amounts in the annual securities report that were less than the actual amount," and that Ghosn misappropriated investments and expenses for "personal use." When asked if Nissan had engaged in "fraudulent financial reporting," Saikawa admitted that the "report[s] did not represent what should have been reported. We need to admit the error as the reporting was inappropriate."

6. When the market opened in the US hours later, and in Tokyo the next day, the price of Nissan securities declined, causing hundreds of millions of dollars in damages to investors who purchased Nissan securities at prices inflated by defendants' fraud.

7. This action seeks to recover for such losses.

## II. JURISDICTION AND VENUE

8. The Exchange Act claims are asserted on behalf of purchasers of ADSs and arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5,

17 C.F.R. §240.10b-5. Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

9. Lead Plaintiff Jackson County Employees' Retirement System is a citizen of Michigan ("Lead Plaintiff"). Plaintiff Providence Employees Retirement System is a citizen of Rhode Island (together with Lead Plaintiff, "plaintiffs"). Defendant Nissan is a citizen of Japan. Defendant Kelly is a citizen of Tennessee. The amount in controversy with respect to the FIEA claims exceeds $5 million. Jurisdiction over the FIEA claims is therefore conferred by 28 U.S.C. §1332(d)(2).

10. The FIEA claims are so related to the Exchange Act claims such that they form part of the same case or controversy. Jurisdiction over the FIEA claims is therefore also conferred by 28 U.S.C. §1367.

11. As set forth herein, defendants are subject to personal jurisdiction in this District.

12. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c)(3).

13. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

14. Lead Plaintiff Jackson County Employees' Retirement System is a defined benefit plan that provides retirement, disability and death benefits to eligible Jackson County, Medical Care Facility and Jackson County Department of Transportation employees. The Retirement System was established in 1947, currently has over $200 million in assets, and serves over 1,200 active and

retired members. The Retirement System purchased Nissan ADR securities as set forth in its certification incorporated herein by reference and has been damaged thereby. ECF Nos. 32-2, 32-3.

15. Plaintiff Providence Employees Retirement System is a defined benefit plan that provides benefits to eligible Providence, Rhode Island city employees and their beneficiaries who are members of the Retirement System. The Retirement System was established in 1923, currently has over $300 million in assets, and serves approximately 6,125 active and retired members. The Retirement System purchased Nissan common stock as set forth in its certification attached hereto, and has been damaged thereby.

16. Defendant Nissan is a multinational automobile manufacturer. The Company sells its cars under the Nissan, Infiniti, and Datsun brands. Since 1999, Nissan has been part of the Renault-Nissan-Mitsubishi Alliance, a partnership between Nissan of Japan, Renault of France, and, since 2016, Mitsubishi Motors of Japan. As of 2013, Renault held a 43.4% voting stake in Nissan, while Nissan held a 15% non-voting stake in Renault. In 1990, Nissan North America, Inc. ("NNA") was created to coordinate all of Nissan's various activities in North America. NNA is a subsidiary of Nissan. Headquartered in Franklin, Tennessee, NNA's operations include automotive styling, engineering, consumer and corporate financing, sales and marketing, distribution and manufacturing for the United States, Canada, and Mexico. Nissan Motor Acceptance Corporation ("NMAC"), also headquartered in Franklin, Tennessee, is the automotive financial services arm of NNA. NMAC's Franklin headquarters are responsible for marketing, finance, accounting, and re-marketing of vehicles. Nissan also operates three manufacturing facilities in Tennessee. Since 2000, Nissan has accepted at least $600 million in government subsidies in Tennessee. The fraudulent scheme and wrongful course of conduct described herein arose from transactions and occurrences that took place and caused foreseeable losses in Tennessee, by among other things, sponsoring an ADR program to solicit and facilitate investment from individuals and entities, including in Tennessee. In committing

the fraudulent acts complained of herein, Nissan operated an integrated enterprise with its wholly-owned subsidiaries, including those based in Tennessee, and controlled the internal affairs and operations of those subsidiaries such that they functioned as instrumentalities of their parent.

17. Defendant Ghosn served as the CEO of Nissan between 1999 and April 1, 2017 and as the Chairman of its Board between 1999 and November 22, 2018. Ghosn also served as the Chairman and CEO of Renault between 1996 and January 2019, and as the Chairman of Mitsubishi Motors from December 2016 to December 2018. Between June 2013 and June 2016, Ghosn was also the Chairman of Russian-based automobile manufacturer AvtoVAZ. Ghosn also served as the Chairman and CEO of the Renault-Nissan-Mitsubishi Alliance BV (the "Alliance") between 2002 and 2018. The Alliance oversees Nissan, Mitsubishi and Renault through a cross-shareholding agreement. Ghosn is a French-Lebanese-Brazilian national. Ghosn reportedly speaks four languages fluently, but Japanese is not one of them. When he first arrived at Nissan, Ghosn made English, not Japanese, the official language of the Company. Ghosn maintains, or maintained, residences in Amsterdam, Beirut, Paris, Rio de Janeiro, and Tokyo. Ghosn regularly traveled to NNA's headquarters, and was personally responsible for Nissan's decision to relocate its U.S. headquarters to Franklin. Ghosn made many of the statements described below in §V, including when presenting on behalf of Nissan at shareholders' meetings and press conferences, by endorsing and providing introductory letters to Annual Reports and Sustainability Reports, and by signing "Confirmation Notes" accompanying Financial Reports.

18. Defendant Kelly served as a Representative Director of Nissan from 2012 until February 2015 and as a member of the Board from February 2015 until November 22, 2018. Defendant Kelly has also served as head of the Alliance Talent Management since 2014. Kelly joined Nissan as an attorney in Smyrna, Tennessee in 1988. During his 30 years at Nissan, Kelly was promoted from Director, Human Resources, to Senior Director, Vice President, Corporate Vice

President, and ultimately Senior Vice President before becoming the first American to serve as a Representative Director. When NNA relocated from California to Franklin, Kelly helped orchestrate the move and hired many of NNA's executives in Tennessee. While Kelly stepped away from day-to-day operational roles in 2015, he remained a frequent presence at NNA's Franklin headquarters. Kelly resides in Brentwood, Tennessee. As a representative director at all relevant times, Kelly authorized many of the statements described below in §V, including those in Annual Reports, which Kelly allowed to be published under his name and helped prepare.

19. Defendant Saikawa has served as the CEO of Nissan since April 1, 2017. Defendant Saikawa first joined Nissan in 1977 and since 1999, has served in a variety of senior management positions, including Chairman of the Management Committees of the Americas and Europe, as well as the Executive Vice President of Purchasing. Saikawa became a member of Nissan's Board and Executive Vice President in 2005. In 2007, Saikawa was promoted to head Nissan's U.S. operations and served in that position when Nissan relocated its U.S. headquarters from California to Franklin, Tennessee. Saikawa served in that position until 2009, when he was put in charge of Nissan's operations in Asia. Saikawa became a Representative Director in 2011, and served as Chief Competitive Officer – second in command to Ghosn – from January 2014 until his appointment as co-CEO from October 2016 until March 31, 2017. Saikawa, who speaks both Japanese and English, has characterized defendant Ghosn as his "mentor." Saikawa travels to the United States on business, and his trips have included a 2018 presentation he delivered at the Detroit Auto Show and a 2017 meeting with U.S. Senator Bob Corker in Washington, D.C. Saikawa made many of the statements described below in §V, including when presenting on behalf of Nissan at shareholders' meetings and press conferences, by endorsing and providing introductory letters to Annual Reports and Sustainability Reports, and by signing "Confirmation Notes" accompanying Financial Reports.

20. Defendant Karube is, and has been since May 18, 2018, the CFO of Nissan. As CFO, Karube oversees Nissan's financial activity, and is responsible for overseeing Nissan's balance sheets, cash flow, and compliance with corporate governance practices, as well as for financial planning and analysis, control, accounting, treasury, tax, investor relations, and M&A support. Karube has been with Nissan in different capacities since 1980, holding several senior management positions covering different functions of the company, including finance, budget accounting, and investor relations. In March 2010, Karube was appointed Corporate Vice President and Global Controller. Karube was one of the first members of the "CEO Office" following the formation of the Renault-Nissan Alliance in 1999. Karube also joined the Board of Directors of Mitsubishi Motors Corporation following Nissan's acquisition of a 34% equity stake in that company in 2016. Karube speaks Japanese and English. Karube made many of the statements described below in §V, including by endorsing and providing introductory letters to Annual Reports and a Sustainability Report.

21. Defendant Peter served as the CFO of Nissan between December 1, 2009 and May 2018. As CFO, Peter was responsible for Nissan's global finance activity including control, accounting, treasury, investor relations, tax, and M&A support. In addition, Peter had operational and P&L responsibility for Nissan's global sales finance business and was also responsible for the overall administration of Nissan's affiliated companies and its global IS/IT operations. He was a member of Nissan's Executive Committee and Chairman of the Board of Directors at Nissan's sales finance companies, including NMAC and their counterparts located in Japan and Mexico. Peter received a Bachelor of Science and a Master of Business Administration from Wayne State University. Peter was born in Michigan and currently resides in Bloomfield Hills, Michigan. Peter speaks English. Peter made many of the false or misleading statements described in §V below,

including by endorsing and providing introductory letters to Annual Reports and Sustainability Reports, and by signing "Confirmation Notes" accompanying Financial Reports.

22. Defendants Ghosn, Kelly, Saikawa, Karube, and Peter are sometimes referred to herein collectively as the "Individual Defendants." Nissan and the Individual Defendants are sometimes referred to herein collectively as "defendants."

23. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Nissan, were privy to confidential, proprietary information concerning Nissan, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Nissan, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public information about its finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Nissan's business.

25. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit and did commit the fraudulent acts alleged herein.

26. As senior executive officers and/or directors and as controlling persons of a publicly traded company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Nissan's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Nissan stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Nissan securities. The scheme: (a) deceived the investing public regarding Nissan's business, operations and management, and the intrinsic value of Nissan securities; and (b) caused plaintiffs and members of the Class (defined below) to purchase Nissan securities at artificially inflated prices.

## IV. DEFENDANTS' FRAUDULENT SCHEME

28. Nissan's current organizational structure and Ghosn's rise to power therein are both rooted in Nissan's deep financial troubles of the 1990s.

29. Nissan's origins stretch back to 1911, when Masujiro Hashimoto founded Kwaishinsha Motor Car Works in Tokyo. The name "Nissan" originated during the 1930s as an abbreviation used on the Tokyo stock market for Nippon Sangyo, meaning "Japan industry" in Japanese. In 1959, the Company formed a U.S. subsidiary, Nissan Motor Corporation U.S.A, in Gardena, California, and by 1970, Nissan had become one of the world's largest exporters of automobiles. In 1972, production in Japan surpassed 10 million units. The energy crises of 1973 and 1979 boosted Nissan's exports due to substantially higher demand for compact and fuel efficient cars. Nissan later expanded manufacturing operations in the United States (1980) and the United Kingdom (1984).

30. In the mid-1980s, the Company dropped the Datsun brand globally in favor of the Nissan marque (the brand was revived in 2013 in certain markets). By the late 1990s, Nissan was struggling financially. Sales were plummeting and the Company had taken on $20 billion in debt. Some commentators have attributed that decline to the loss of goodwill due to brand confusion, particularly in the United States, among consumers who were familiar with the Datsun brand. Others have blamed the Company's downturn during that period on a stale design, excessive manufacturing capacity, a lack of planning and vision, and a general complacency brought about by Nissan's earlier successes. Regardless of the underlying cause, Nissan was on the brink of collapse and in 1999, French carmaker Renault bailed out Nissan by purchasing 36.8% of Nissan's shares. Currently, Renault owns 43.4% of Nissan's shares, with 15% of Renault's shares, in turn, held by the French Government. Nissan itself holds a 15% stake in Renault.

31. As part of the bailout, Renault sent Ghosn to serve as Chief Operating Officer of Nissan in 1999. Ghosn overhauled the manner in which the Company compensated its senior employees. Abandoning Japanese traditions that rewarded seniority and shunned incentive awards, Ghosn enforced a performance-based system and awarded lucrative bonuses to mid-level managers.

The move rankled traditionalists but reflected Ghosn's outspoken position that merit- and market-based payments were desirable and beneficial.

32. Two years later, after implementing significant layoffs, factory closures, and other cost-cutting measures, Ghosn assumed the role of President and CEO. In 2003, in addition to his position as President and CEO, Ghosn became co-Chairman of the Board and, in 2008, the Chairman of the Board. In 2017, Ghosn stepped down from his role as President and CEO of Nissan. Ghosn remained the Chairman of Nissan's Board until he was removed in November 2018.

33. Renault's bailout of Nissan in 1999 and the resulting cross-ownership arrangement marked the beginning of the Renault-Nissan "Alliance." Over the past twenty years, Ghosn has been central to bringing the Alliance companies closer together. In 2005, he became Chairman and President of Renault-Nissan B.V., a 50-50 joint venture between the two businesses. By 2014, the Alliance had consolidated four core business functions: Engineering, Manufacturing and Supply Chain Management, Purchasing, and Human Resources. For example, the Alliance develops common engines and gearboxes. And around 75% of powertrain components are shared across the Alliance. In 2016, the Alliance expanded with Nissan's bailout of Mitsubishi, taking a 34% stake in the beleaguered company. That year, Ghosn became Chairman and CEO of Nissan-Mitsubishi B.V, another 50-50 joint venture. The Alliance has held approximately 10% of the global market share for passenger cars and light commercial vehicles since 2010, and as of 2017 was the third-largest automobile group worldwide.

34. Throughout his time at Nissan, Ghosn had always been dissatisfied with his compensation, complaining bitterly that Japanese executive compensation standards were inadequate compared to the lavish compensation packages bestowed on automotive executives based in the United States and other countries.

35. Japan's approach to executive compensation and corporate governance is a product of its history. Following World War II and until the early 1990s, the traditional ownership structure of Japanese businesses was characterized by *keiretsu* – powerful conglomerates made up of diversified yet interlocking companies that held stock in one another. Advantages to this corporate structure included long-term stability for *keiretsu* businesses and their employees, information sharing and synergy, and protection from hostile takeovers by foreign companies. At the heart of each *keiretsu* was a large bank that would act as a lender to the member companies while holding equity positions in them. These banks played a vital role in monitoring and supervising the businesses in *keiretsu*.

36. Starting in 1991, Japan experienced a lengthy period of severe economic stagnation – including a banking crisis – that is commonly described as the "Lost Decade." One consequence was that Japanese banks, which had a customary oversight role, were weakened, and *keiretsu* began to unwind. Recognizing a vacuum of supervision, the Japanese government enacted measures to improve corporate governance in line with international market standards. In 2002, for example, the Commercial Code was amended to allow for U.S.-style three-person committees of independent directors responsible for audit, nomination, and compensation. This reform was designed to supplant the existing practice of insider-dominated corporate boards.

37. Reflecting Japan's attitude toward executive compensation, Japanese chief executives generally earn far less than their American counterparts, and at rates far closer to that of the average worker. As of 2012, a typical Japanese CEO of a large company earned $2.4 million (67 average worker salaries) whereas a typical American CEO of a large company earned $12.3 million (354 average worker salaries). The sharp difference in those pay ratios is reflected in the chart below from the Economist:




38. In 2009, in response to widespread public concern about excessive executive compensation in the wake of the global financial crisis, Japan's Financial System Council recommended substantially enhanced disclosure of director pay, along with other regulatory measures aimed at improving corporate governance. Taking heed of these recommendations, the Japanese legislature amended the FIEA to require listed companies to disclose the amount of compensation to individual directors if it exceeded ¥100 million (approximately $1.1 million when the law came into effect). The new law mandated disclosure of the total amount of director remuneration and a detailed breakdown by salary, bonus, stock option value, pension benefits, and other payments. Moreover, it required remuneration to be disclosed in a securities report when it was fixed, even if the actual payout was planned for the future. At the time, the *Wall Street Journal* (the "*WSJ*") noted that, before the new law, "Japanese companies . . . only had to disclose the compensation of top executives as a group without identifying what individuals were paid. The new rule will shine a light on the closely guarded salary details of Japan's top-paid executives – and potentially expose the long-suspected sizeable gap in compensation levels between non-Japanese executives and their Japanese counterparts."

39. Ghosn, whose compensation was already extraordinarily high compared to even the highest paid Japanese directors, was very concerned by the prospect of compensation transparency. In fiscal year 2009, Nissan awarded him ¥1.75 billion (over $15 million), more than twice what the other nine top Nissan executives were making – combined. As the *WSJ* reported on December 16, 2018, "[w]hen Japan changed corporate-disclosure rules" as described above, "Mr. Ghosn was worried about public-relations fallout, according to the person [familiar with Nissan's internal investigation]."

40. Fearing greater accountability brought on by Japan's new era of corporate governance reform, an elaborate, multiyear scheme was devised to hide Ghosn's true compensation from investors by continually "postponing" undisclosed pay until his retirement in the form of IOUs. At the beginning of the scheme, as reported by the *WSJ*, "Mr. Ghosn nudged what he had to disclose lower still by asking Nissan to pay him the equivalent of about $7.8 million and postponing the payment of nearly $2 million, the person said." Year after year, Ghosn's "reported pay grew only slightly, but he increased the IOU portion more rapidly without telling fellow board members, according to the Nissan investigation," such that "[i]n the most recent fiscal year, his total package added up to almost $22 million." On November 29, 2018, the *WSJ* published a detailed exposé reporting that Ghosn had "amassed more than $80 million in IOUs from Nissan Motor Co. yet never settled on a plan for how the compensation would be paid," citing "a Nissan probe and people familiar with the matter." Adding insult to injury, the *WSJ* reported that "[a]s Mr. Ghosn's IOUs piled up, Nissan also was laying out some $18 million for residences for the jet-setting chief."

41. Nissan's own independent "Special Committee for Improving Governance" (the "Committee" or the "Special Committee") recently corroborated the media reports above, finding "facts sufficient to suspect violations of laws and regulations, violation of internal rules and private use of company funds and expenses etc. by Mr. Ghosn and Mr. Kelly and also facts demonstrating

their lack of ethics as a manager." The Committee described the following collectively as the "Misconduct" they found:

- "Mr. Ghosn was delegated by the resolution of Nissan's Board of Directors to determine the compensations of the Directors and top line managers (including Executive Vice Presidents, Senior Vice Presidents, Corporate Vice Presidents, and Vice Presidents etc.), including determination of his own compensation." [As reported by the *Nikkei Asian Review*, "Nissan did not create board committees led by outside directors to oversee nominations or compensation, as many other companies do. Instead, those issues were handled by the chairman of the board, Ghosn."]

* * *

- "In order to reduce the disclosed amount of his director compensations, Mr. Ghosn avoided disclosing some part of director compensations which he had granted to himself (the "Postponed Compensations") by, among other things, deferring the time of their payment after his retirement. As a result, Mr. Ghosn's total disclosed amount of compensation had been underreported from the fiscal year ended March 2010 to the fiscal year ended March 2018."

- "From the fiscal year ended March 2010, a few particular persons including Mr. Kelly had had various discussions on how to pay the Postponed Compensations without disclosing. In addition, payment of Mr. Ghosn's compensation after his retirement was studied as one of the payment method for the amount equivalent to the Postponed Compensations, or as a separate compensation after his retirement. There are documents remaining which were created in relation to the above discussions, some of which have affixed the signatures of Mr. Ghosn."

- "Regarding the post retirement treatment of Mr. Ghosn, Mr. Ghosn, through Mr. Kelly as the person responsible for Global Human Resources and Legal, obtained documents signed by the current CEO."

- "Documents were falsified in order to increase the amount paid to Mr. Ghosn as the final payment of retirement allowance for directors approved by the general meeting of shareholders in 2007."

- "Documents were falsified and the details of compensation were manipulated in order to circumvent the disclosure of stock-price-linked incentive compensation."

- "Mr. Ghosn obtained compensation etc. from [Nissan-Mitsubishi B.V.] without going through prescribed appropriate procedure."

42. Nissan's failure to disclose Ghosn's true compensation violated the relevant accounting standards, and admittedly understated Nissan's compensation expenses while overstating Nissan's operating income.

43. Nissan stated in its financial results for the nine months ended December 31, 2018, that its consolidated financial statements were prepared pursuant to Japanese accounting standards. Japanese accounting standards are equivalent to International Financial Reporting Standards ("IFRS") with respect to expenses and recording and accruing compensation to employees and executives. Additionally, Nissan disclosed each year that "the Company's consolidated companies prepare their financial reports for consolidation in accordance with the IFRSs as part of the reports submitted to the Company."

44. IFRS specifically requires that expenses, including employee entitlements, be recorded at the time they are incurred:

> **Recognition of expenses**
>
> 4.49 Expenses are recognized in the income statement when a decrease in future economic benefits related to a decrease in an asset or an increase of a liability has arisen that can be measured reliably. ***This means, in effect, that recognition of expenses occurs simultaneously with the recognition of an increase in liabilities or a decrease in assets (for example, the accrual of employee entitlements*** or the depreciation of equipment). (Emphasis added).
>
> 4.50 Expenses are recognized in the income statement on the basis of a direct association between the costs incurred and the earning of specific items of income. This process, commonly referred to as the matching of costs with revenues, involves the simultaneous or combined recognition of revenues and expenses that result directly and jointly from the same transactions or other events; for example, the various components of expense making up the cost of goods sold are recognised at the same time as the income derived from the sale of the goods. However, the application of the matching concept under this *Conceptual Framework* does not allow the recognition of items in the balance sheet which do not meet the definition of assets or liabilities.

45. Additionally, IFRS requires that promised compensation, even if unpaid, be accrued (recorded) in the income statement in the period in which it occurred, not when paid.

**Financial performance reflected by accrual accounting**

> OB17 Accrual accounting depicts the effects of transactions and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, ***even if the resulting cash receipts and payments occur in a different period***. This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period. (Emphasis added).

46. Accordingly, Ghosn's executive compensation was required to be recorded and disclosed under IFRS and Japanese accounting standards. Ultimately, after the compensation scheme was revealed, Nissan admitted that it had falsified the Company's financial reports and as a result recorded ¥9.232 billion of expenses in the nine months ended December 31, 2018. Nissan has admitted that the following compensation amounts were improperly not recorded in Nissan's consolidated annual financial results:

| **Period** | **Understated Compensation (millions of yen)** |
|---|---|
| FY 2009 | 246 |
| FY 2010 | 806 |
| FY 2011 | 926 |
| FY 2012 | 1,056 |
| FY 2013 | 960 |
| FY 2014 | 1,134 |
| FY 2015 | 1,164 |
| FY 2016 | 1,248 |
| FY 2017 | 1,692 |
| **TOTAL** | **9,232** |

47. As a result, Nissan materially understated Ghosn's compensation that was disclosed in the Company's consolidated annual financial results as shown in the table below:[1]

[1] The failure to record and disclose Ghosn's secret compensation expenses was also qualitatively material. Intentional misstatements designed to conceal true expenses, no matter the size are qualitatively material. *See* SEC Staff Accounting Bulletin Topic 1.M., ***Materiality***, which shows that even small misstatements intentionally made by management can be material: "The evidence

| Ghosn's Compensation FY 2009 – FY 2017 | | | |
|---|---|---|---|
| **Fiscal Year** | **Reported Compensation (millions of yen)** | **Actual Compensation (millions of yen)** | **Actual Exceeded Reported** |
| FY 2009 | 891 | 1,137 | 28% |
| FY 2010 | 982 | 1,788 | 82% |
| FY 2011 | 987 | 1,913 | 94% |
| FY 2012 | 988 | 2,044 | 107% |
| FY 2013 | 995 | 1,955 | 96% |
| FY 2014 | 1,035 | 2,169 | 110% |
| FY 2015 | 1,071 | 2,235 | 109% |
| FY 2016 | 1,098 | 2,346 | 114% |
| FY 2017 | 735 | 2,427 | 230% |
| **Total** | **8,782** | **18,014** | **105%** |

48. Improprieties regarding Ghosn's compensation and personal expenses were known within Nissan, including by Nissan's senior management. Nissan's audit firm, Ernst & Young, raised questions each year about Zi-A Capital B.V. ("Zi-A"), a Dutch subsidiary of Nissan created in 2010 that was supposedly established to fund venture capital investments. Nissan endowed Zi-A with 73 million euros ($83 million) and put Kelly in charge of it. In an internal investigation, Nissan learned that Zi-A had in fact been used to buy or rent properties that Ghosn lived in when he traveled. In addition to a 5,400-square-foot property in Paris, Zi-A bought a $6 million apartment in

---

may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements. . . . Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement . . . [and] [i]n certain circumstances, intentional immaterial misstatements are unlawful . . . [and] failure to record accurately immaterial items, in some instances, may result in violations of the securities laws." *See also* International Accounting Standard ("IAS") 8 which states that "[m]aterial Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances. The size or nature of the item, or a combination of both, could be the determining factor." (IAS 8 at 5.) Additionally, "Financial statements do not comply with IFRSs if they contain either material errors or immaterial errors made intentionally to achieve a particular presentation of an entity's financial position, financial performance or cash flows." (IAS 8, ¶41.)

Rio de Janeiro in 2011 and an $8.8 million mansion in Beirut in 2012 (followed by $6 million in renovations and furnishings, including two chandeliers totaling $74,000). The fact that Zi-A was buying homes for Ghosn's personal use, and not cutting-edge auto start-ups for Nissan's benefit, was among the red flags raised.

49. By 2017, red flags had come to the attention of Hidetoshi Imazu ("Imazu"), an internal compliance auditor. Imazu was trying to figure out what Zi-A was doing, and thus contacted one of Zi-A's directors, a Malaysia-born British-educated lawyer named Hemant Kumar Nadanasabapathy, better known as Hari Nada ("Nada"). Nada, who had worked at Nissan since the 1990s and had long been loyal to Ghosn and Kelly, was responsible for global compliance and managing the CEO's office – Kelly's old job. *Bloomberg* has reported that Nada was "intimately involved with many aspects of the chairman's compensation." Nada took Imazu to talk to Zi-A's third director, Toshiaki Onuma ("Onuma"), a longtime staffer for Ghosn who handled the paperwork for Ghosn's deferred compensation. Imazu then began to understand the full scope of Ghosn's deferred compensation, which by that time had risen to $80 million.

50. The group then reached out to former prosecutors working in private practice to determine whether the conduct uncovered might constitute criminal activity. Those lawyers helped the executives take advantage of a new law that took effect in June 2018 allowing criminal suspects to secure plea bargains. Both Nada and Onuma struck deals with the government and provided evidence against Ghosn.

51. *Bloomberg* has reported that in August 2018, Saikawa informed the Japanese Ministry of Economy, Trade, and Industry that "Nissan was likely to face a serious problem later in the year." In early October 2018, prosecutors decided they had a case. Imazu drew up a formal whistleblower report, stating that a Nissan unit was being used to provide homes to Ghosn at no cost, and that the directors' compensation information on financial filings was incomplete.

52. On October 12, 2018, while the internal investigation was ongoing yet unknown to investors, Nissan sold ¥60 billion ($532 million) in corporate bonds. One Japanese fund manager believed that because "'people inside Nissan knew about the investigation'" "'it's disingenuous for them to have issued new debt under those circumstances. . . . The next time they try to tap the market, I expect they'll need to issue at higher spreads and yields.'"

53. On November 19, 2018, in a coordinated operation by the Tokyo District Public Prosecutor's Office, Ghosn was arrested upon landing at Tokyo's Haneda Airport on the Company's private jet known for its vanity FAA registration code: NI55AN. At the same time, investigators searched Ghosn's Tokyo penthouse. Kelly was apprehended later that day en route to Nissan's global headquarters in Yokohama having just arrived on another private jet directly from Nashville. Both were charged with violating the FIEA for falsifying the Annual Securities Reports and underreporting Ghosn's compensation by approximately ¥4.9 billion from fiscal years 2011 to 2015. Ghosn, Kelly, and Nissan were later separately charged with falsifying securities filings by under-reporting Ghosn's compensation in the fiscal years 2015-2017.

54. *The Japan Times* reported that defendants Ghosn, Kelly, and Nissan are expected to stand trial later this year in the 17th Criminal Court Division at the Tokyo District Court before a panel of three judges. *Nikkei Asian Review* has reported that "[t]he prosecution has already submitted to the court a list of facts to be proven, which states that Ghosn received a total of 31.4 billion yen ($282 million) in remuneration from Nissan since 1999." Moreover, pretrial discovery has begun and the defendants are already in the process of identifying relevant evidence. Nissan has stated that the company "has been providing information to the Japanese Public Prosecutors Office and has been fully cooperating with its investigation" and that it "will continue to do so." According to *Automotive News*, prosecutors are "turn[ing] the documents over to Ghosn's defense team as part of pretrial discovery."

55. On January 27, 2019, *Bloomberg* reported that Nissan was also being investigated by the U.S. Securities and Exchange Commission (the "SEC"), which is "examining whether Nissan's executive-pay disclosures were accurate and whether the carmaker had adequate controls to prevent improper payments" and the SEC's inquiry "is focused on whether lapses by Nissan in reporting on its executives' pay violated U.S. securities law." In response to questions, Nissan confirmed that they had "received an inquiry [from the Securities and Exchange Commission] and said [they] are cooperating fully."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

56. During the Class Period, defendants repeatedly and materially misled investors. Defendants' false and misleading statements included false and misleading statements and omissions of material fact with regard to: Ghosn's compensation; Nissan's financial results, operating income and compensation expenses; Nissan's compliance with applicable laws and regulations; Nissan's commitment to ethical conduct and transparency; and Nissan's internal controls.

### A. Defendants' Materially False and Misleading Statements Regarding Nissan's Financial Results

57. Throughout the Class Period, defendants issued and/or approved Nissan's periodic financial reports, which included specific, quantitative statements about the compensation paid to defendant Ghosn, as they were required to do under Japanese law. As explained in §§IV, VI, VII, and VIII, and as Nissan has now publicly admitted, these statements were materially false and misleading because they vastly understated the actual compensation paid to Defendant Ghosn.

58. On or about May 11, 2014, Nissan issued a release announcing its financial results for the fiscal year ended March 31, 2014 ("FY13"), which was translated to English and published on Nissan's website. The release quoted Ghosn and set forth Nissan's purported revenues, operating profit, ordinary profit, and net income for FY13. Ghosn led a press conference on May 12, 2014, at which he reported, among other things, Nissan's purported FY13 operating profit.

59. On June 24, 2014, Nissan convened its 115th General Shareholders Meeting. As recounted in the *Japan Times* that day, Ghosn underreported his compensation at the meeting: "Ghosn was paid ¥995 million in salary and bonuses for the fiscal year that ended March 31, an increase of 0.7 percent from a year earlier, he said at the carmaker's annual shareholders' meeting Tuesday in Yokohama. . . . 'I understand the sensitivity of the issue,' Ghosn said. 'Being in Japan should not be a handicap to attract talent. We need the best minds, we need the best talents.'"

60. On June 26, 2014, Nissan released a report, entitled "Financial Information as of March 31, 2014" (the "Financial Report 2014") reporting Nissan's financial results for FY13. The Financial Report 2014 was: submitted to the Director of the Kanto Local Finance Bureau, as required under Article 24, Paragraph 1, of the Financial Instruments and Exchange Law; made available for public inspection at the Tokyo Stock Exchange; and posted (with an English translation) on Nissan's website. The Financial Report 2014 also included a "Confirmation Note" pursuant to Article 24-4-2, Paragraph 1, of the Financial Instruments and Exchange Law which stated that "Carlos Ghosn, President of Nissan Motor Co., Ltd., and Joseph G. Peter, Chief Financial Officer have confirmed that this Securities Report 'Yukashoken-Houkokusho (from April 1, 2013 to March 31, 2014)' of the 115th Fiscal Term is reasonably and fairly described in accordance with the Financial Instruments and Exchange Law."

61. The Financial Report 2014 stated that for FY13, defendant Ghosn was paid "Total Remuneration" of ¥995 million. This statement was false: Ghosn's actual compensation for FY13 was ¥1.955 billion, 96% higher than reported.

62. The Financial Report 2014 also reported Nissan's purported operating income for FY13. This statement was false: accounting only for Ghosn's actual FY13 compensation, Nissan's reported operating income for FY13 was overstated by ¥960 million; accounting for the cumulative

unrecorded actual compensation paid to Ghosn by the end of FY13, Nissan's reported operating income for FY13 was overstated by ¥3.994 billion.

63. The statements in ¶¶58-62, above were materially false and misleading when made as they omitted material facts required to be disclosed, and because they failed to disclose adverse information then known or recklessly disregarded by defendants, including:

(a) That, as Nissan has now admitted, its financial reports were misstated because the actual compensation amount incurred in FY13 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, Ghosn's actual compensation for FY13 was ¥1.955 billion, not the reported ¥995 million; and

(b) That, as Nissan has now admitted, its financial reports were misstated because the actual operating income amount for FY13 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, accounting for the cumulative unrecorded actual compensation paid to Ghosn, Nissan's operating income for FY13 was overstated by ¥3.994 billion.

64. On or about May 12, 2015, Nissan issued a release announcing its financial results for the fiscal year ended March 31, 2015 ("FY14"), which was translated to English and published on Nissan's website. The release quoted Ghosn and set forth Nissan's purported revenues, operating profit, ordinary profit, and net income for FY14. Ghosn led a press conference on May 13, 2015, at which he reported, among other things, Nissan's purported FY13 operating profit.

65. On June 23, 2015, Nissan convened its 116th General Shareholders Meeting. Ghosn summarized Nissan's director compensation, underreporting his compensation as follows:

> My compensation for fiscal year 2014 was 10.35 [hundred million] yen. In fiscal year 2013, I was paid 9.95 [hundred million] yen. Expressed in U.S. dollars, which is the base of the comparison for Towers Watson, my compensation for fiscal year 2014 was 8.4 million dollars compared to 9.8 million dollars for fiscal year 2013. By comparison in fiscal year 14 the average compensation of auto industry CEOs we benchmark was 28.78 million dollars.

66. Ghosn justified Nissan's executive compensation by reference to the "objective and independent" study by Towers Watson, and the fact that "just under half" of the top 100 executive positions were held by executives who were not from Japan, and that Nissan needed to provide "competitive levels of compensation" in order to attract and retain talent.

67. A report in the *Daily Kanban* that same day, entitled "Nissan shareholders question executive pay, extend Ghosn's contract by a landslide," reported on the annual shareholders' meeting as follows:

> It's an annual ritual: Nissan CEO Carlos Ghosn shows what CEOs of multinational carmakers earn. He goes into a long discussion of how Nissan competes for talent in the global marketplace, and how its managers will fall victim to headhunters if not paid well. He[] shows a study by compensation consultant Tower Watson . . . which has himself at $8.4 million, and at the bottom of the pay scale.
>
> While Ghosn does that, a Nissan staffer ascends to the media that monitors the proceedings from the balcony of the Pacifica in Yokohama, and hands out a paper titled "Executive Compensation Facts and Figures."
>
> Each year, the shareholders are not convinced, if one can go by the questions asked. Each year, they ask why Ghosn also makes nearly $8 million at Renault (answer: that's a question to be asked at the Renault stockholder meeting) and why Akio Toyoda makes only $1.8 million . . . (answer: that's a question to be asked at the Toyota stockholder meeting).

68. On June 25, 2015, Nissan released a report, entitled "Financial Information as of March 31, 2015" (the "Financial Report 2015") reporting Nissan's financial results for FY14. The Financial Report 2015 was: submitted to the Director of the Kanto Local Finance Bureau, as required under Article 24, Paragraph 1, of the Financial Instruments and Exchange Law; made available for public inspection at the Tokyo Stock Exchange; and posted (with an English translation) on Nissan's website. The Financial Report 2015 also included a "Confirmation Note" pursuant to Article 24-4-2, Paragraph 1, of the Financial Instruments and Exchange Law which stated that "Carlos Ghosn, President of Nissan Motor Co., Ltd., and Joseph G. Peter, Chief Financial Officer have confirmed that this Securities Report 'Yukashoken-Houkokusho (from April 1, 2014 to

March 31, 2015)' of the 116th Fiscal Term is reasonably and fairly described in accordance with the Financial Instruments and Exchange Law."

69. The Financial Report 2015 stated that for FY14, defendant Ghosn was paid "Total Remuneration" of ¥1.035 billion. This representation was false: Ghosn's actual compensation for FY14 was ¥2.169 billion, 110% higher than reported.

70. The Financial Report 2015 also reported Nissan's purported operating income for FY14. This statement was false: accounting only for Ghosn's actual FY14 compensation, Nissan's reported operating income for FY14 was overstated by ¥1.134 billion; accounting for the cumulative unrecorded actual compensation paid to Ghosn by the end of FY14, Nissan's reported operating income for FY14 was overstated by ¥5.128 billion.

71. The statements in ¶¶64-70, above, were materially false and misleading when made as they omitted material facts required to be disclosed, and because they failed to disclose adverse information then known or recklessly disregarded by defendants including:

(a) That, as Nissan has now admitted, its financial reports were misstated because the actual compensation amount incurred in FY14 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, Ghosn's actual compensation for FY14 was ¥2.169 billion, not the reported ¥1.035 billion; and

(b) That, as Nissan has now admitted, its financial reports were misstated because the actual operating income amount for FY14 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, accounting for the cumulative unrecorded actual compensation paid to Ghosn, Nissan's operating income for FY14 was overstated by ¥5.128 billion.

72. On or about May 12, 2016, Nissan issued a release announcing its financial results for the fiscal year ended March 31, 2016 ("FY15"), which was translated to English and published on Nissan's website. The release quoted Ghosn and set forth Nissan's purported revenues, operating

profit, ordinary profit, and net income for FY15. Ghosn led a press conference on May 13, 2016, at which he reported, among other things, Nissan's purported FY15 operating profit.

73. On June 22, 2016, Nissan convened its 117th General Shareholders Meeting. Again, Ghosn addressed questions by shareholders about executive compensation, stating that "[o]ne of Nissan's main strengths is its leadership team," and that in order "to retain and attract" talent, Nissan must provide "competitive compensation." Ghosn summarized Nissan's director compensation, underreporting his compensation as follows: "In fiscal year 2015, my compensation was 1 billion and 71 million yen, a 3.48% increase from fiscal year 2014. Expressed in U.S. dollars my compensation for fiscal year 2015 was $8.9 million dollars."

74. On June 24, 2016, Nissan released a report, entitled "Financial Information as of March 31, 2016" (the "Financial Report 2016") reporting Nissan's financial results for FY15. The Financial Report 2016 was: submitted to the Director of the Kanto Local Finance Bureau, as required under Article 24, Paragraph 1, of the Financial Instruments and Exchange Law; made available for public inspection at the Tokyo Stock Exchange; and posted (with an English translation) on Nissan's website. The Financial Report 2016 also included a "Confirmation Note" pursuant to Article 24-4-2, Paragraph 1, of the Financial Instruments and Exchange Law which stated that "Carlos Ghosn, President of Nissan Motor Co., Ltd., and Joseph G. Peter, Chief Financial Officer have confirmed that this Securities Report 'Yukashoken-Houkokusho (from April 1, 2015 to March 31, 2016)' of the 117th Fiscal Term is reasonably and fairly described in accordance with the Financial Instruments and Exchange Law."

75. The Financial Report 2016 stated that for FY15, defendant Ghosn was paid "Total Remuneration" of ¥1.071 billion. This representation was false: Ghosn's actual compensation for FY15 was ¥2.235 billion, 109% higher than reported.

76. The Financial Report 2016 also reported Nissan's purported operating income for FY15. This statement was false: accounting only for Ghosn's actual FY15 compensation, Nissan's reported operating income for FY15 was overstated by ¥1.164 billion; accounting for the cumulative unrecorded actual compensation paid to Ghosn by the end of FY15, Nissan's operating income for FY15 was overstated by ¥6.292 billion.

77. The statements in ¶¶72-76, above, were materially false and misleading when made as they omitted material facts required to be disclosed, and because they failed to disclose adverse information then known or recklessly disregarded by defendants, including:

(a) That, as Nissan has now admitted, its financial reports were misstated because the actual compensation amount incurred in FY15 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, Ghosn's actual compensation for FY15 was ¥2.235 billion, not the reported ¥1.071 billion; and

(b) That, as Nissan has now admitted, its financial reports were misstated because the actual operating income amount for FY15 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, accounting for the cumulative unrecorded actual compensation paid to Ghosn, Nissan's operating income for FY15 was overstated by ¥6.292 billion.

78. On or about May 11, 2017, Nissan issued a release announcing its financial results for the fiscal year ended March 31, 2017 ("FY16"), which was translated to English and published on Nissan's website. The release set forth Nissan's purported revenues, operating profit, ordinary profit, and net income for FY16. Saikawa led a press conference that day, at which he reprorted, among other things, Nissan's purported FY16 operating profit.

79. On June 27, 2017, Nissan convened its 118th General Shareholders Meeting. Again, Ghosn addressed shareholder questions about executive compensation. Ghosn claimed that Nissan had a broad range of senior executives from many countries, and that Nissan must compete to attract

the "strongest and most effective" executives. He represented that "careful benchmarking" was done by Willis Towers Watson to support executive compensation. Ghosn underreported his own compensation, as follows:

> In fiscal year 2016, my compensation 1 billion and 98 million yen, a 2.5% increase from fiscal year 2015. Expressed in U.S. dollars my compensation for fiscal year 2016 was 9.9 million dollars. By comparison, in 2016 our benchmark studies found that for comparable global auto makers the average CEO compensation was 17.7 million dollars.

80. On June 29, 2017, Nissan released a report, entitled "Financial Information as of March 31, 2017" (the "Financial Report 2017") reporting Nissan's financial results for FY16. The Financial Report 2017 was: submitted to the Director of the Kanto Local Finance Bureau, as required under Article 24, Paragraph 1, of the Financial Instruments and Exchange Law; made available for public inspection at the Tokyo Stock Exchange; and posted (with an English translation) on Nissan's website. The Financial Report 2017 also included a "Confirmation Note" pursuant to Article 24-4-2, Paragraph 1, of the Financial Instruments and Exchange Law which stated that "Saikawa Hiroto, President of Nissan Motor Co., Ltd., and Joseph G. Peter, Chief Financial Officer have confirmed that this Securities Report 'Yukashoken-Houkokusho (from April 1, 2016 to March 31, 2017)' of the 118th Fiscal Term is reasonably and fairly described in accordance with the Financial Instruments and Exchange Law."

81. The Financial Report 2017 stated that for FY16, defendant Ghosn was paid "Total Remuneration" of ¥1.098 billion. This representation was false: Ghosn's actual compensation for FY16 was ¥2.346 billion, 114% higher than reported.

82. The Financial Report 2017 also reported Nissan's purported operating income for FY16. This statement was false: accounting only for Ghosn's actual FY16 compensation, Nissan's reported operating income for FY16 was overstated by ¥1.248 billion; accounting for the cumulative

unrecorded actual compensation paid to Ghosn by the end of FY16, Nissan's operating income for FY16 was overstated by ¥7.54 billion.

83. The statements in ¶¶78-82, above, were materially false and misleading when made as they omitted material facts required to be disclosed, and because they failed to disclose adverse information then known or recklessly disregarded by defendants, including:

(a) That, as Nissan has now admitted, its financial reports were misstated because the actual compensation amount incurred in FY16 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, Ghosn's actual compensation for FY16 was ¥2.346 billion, not the reported ¥1.098 billion; and

(b) That, as Nissan has now admitted, its financial reports were misstated because the actual operating income amount was improperly not recorded in Nissan's consolidated annual financial results. As noted above, accounting for the cumulative unrecorded actual compensation paid to Ghosn, Nissan's operating income for FY16 was overstated by ¥7.54 billion.

84. On or about May 14, 2018, Nissan issued a release announcing its financial results for the fiscal year ended March 31, 2018 ("FY17"), which was translated to English and published on Nissan's website. The release set forth Nissan's purported revenues, operating profit, ordinary profit, and net income for FY17. Saikawa led a press conference that day, at which he reported, among other things, Nissan's purported FY17 operating profit.

85. On June 26, 2018, Nissan convened its 119th General Shareholders Meeting. Ghosn and Nissan's new CEO Hiroto Saikawa addressed shareholders. Again, Ghosn justified Nissan's compensation practices by arguing that Nissan needed the "strongest, most effective" executives to seize opportunities, and justified those practices by reference to a benchmarking study by Willis Towers Watson. Ghosn underreported his own compensation as follows:

> In fiscal year 2017, my compensation was 7.3 [hundred million] yen a 33% decrease from fiscal year 2016. For fiscal year 2017, the first full year that [Hiroto Saikawa-

> san] served as CEO, his compensation was 5 [hundred million] yen a 26 % increase from fiscal year 2016. By comparison, in fiscal year 2017, our benchmark studies found, that for comparable global auto makers the average CEO compensation was 17.7 million dollars.

86. On June 28, 2018, Nissan released a report, entitled "Financial Information as of March 31, 2018" (the "Financial Report 2018") reporting Nissan's financial results for FY17. The Financial Report 2018 was: submitted to the Director of the Kanto Local Finance Bureau, as required under Article 24, Paragraph 1, of the Financial Instruments and Exchange Law; made available for public inspection at the Tokyo Stock Exchange; and posted (with an English translation) on Nissan's website. The Financial Report 2018 also included a "Confirmation Note" pursuant to Article 24-4-2, Paragraph 1, of the Financial Instruments and Exchange Law which stated that "Hiroto Saikawa, President of Nissan Motor Co., Ltd., and Hiroshi Karube, Chief Financial Officer have confirmed that this Securities Report 'Yukashoken-Houkokusho (from April 1, 2017 to March 31, 2018)' of the 119th Fiscal Term is reasonably and fairly described in accordance with the Financial Instruments and Exchange Law."

87. The Financial Report 2018 stated that for FY17, defendant Ghosn was paid "Total Remuneration" of ¥735 million. This representation was false: Ghosn's actual compensation for FY17 was ¥2.427 billion, 230% higher than reported.

88. The Financial Report 2018 also reported Nissan's purported operating income for FY17. This statement was false: accounting only for Ghosn's actual FY17 compensation, Nissan's reported operating income for FY17 was overstated by ¥1.692 billion; accounting for the cumulative unrecorded actual compensation paid to Ghosn by the end of FY17, Nissan's operating income for FY17 was overstated by ¥9.232 billion.

89. The statements in ¶¶84-88, above, were materially false and misleading when made as they omitted material information required to be disclosed, and because they failed to disclose adverse information then known or recklessly disregarded by defendants, including:

(a) That, as Nissan has now admitted, its financial reports were misstated because the actual compensation amount incurred in FY17 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, Ghosn's actual compensation for FY17 was ¥2.427 billion, not the reported ¥735 million; and

(b) That, as Nissan has now admitted, its financial reports were misstated because the actual operating income amount for FY17 was improperly not recorded in Nissan's consolidated annual financial results. As noted above, accounting for the cumulative unrecorded actual compensation paid to Ghosn, Nissan's operating income for FY17 was overstated by ¥9.232 billion.

### B. Defendants' Materially False and Misleading Statements Regarding Ghosn's Compensation and Nissan's Compliance with Laws and Regulations, and Its Internal Governance and Controls

90. In addition to their quantitative statements about Ghosn's compensation, defendants also made qualitative statements throughout the Class Period about Nissan's compliance with applicable laws and regulations, its (and its employees') commitment to ethical conduct and transparency, and its internal controls. As explained in §§1V, VI, VII, and VIII, and as shown by the facts publicly admitted by Nissan, these statements were materially false and misleading. Contrary to its statements, Nissan had serious, chronic governance issues that allowed the massive, secret compensation fraud to continue undisclosed for almost a decade.

91. On June 26, 2014, Nissan published its Financial Report 2014. That report stated in pertinent part as follows:

> **Status of the Company's Internal Control Systems**
>
> ***The Company focuses on highly transparent management internally and externally***, and aims to conduct consistent and efficient management to firmly achieve its specific commitments. Under this basic policy, the Company's Board of Directors has determined 'systems to ensure proper and appropriate corporate operations' in accordance with the Corporate Law and the Corporate Law Enforcement Regulations, and appointed a Director in charge of general internal control.

*     *     *

> The Company is committed to improve and enhance the internal control systems to ensure accuracy and reliability of its financial reports in accordance with the Financial Instruments and Exchange Law together with its related rules and standards.

92. Substantially similar statements were repeated in Nissan's Financial Report 2015, its Financial Report 2016, its Financial Report 2017, and its Financial Report 2018.

93. The Financial Report 2014 further represented that "[t]he chairman of the Board of the Company in consultation with the representative directors and taking into account existing contracts determined the compensation of each director after reviewing the director's performance and the results of the benchmarking of executive pay survey conducted by the Company's compensation consultant." A substantially similar statement was repeated in the Financial Report 2015 and the Financial Report 2016.

94. Contemporaneously with the Financial Report 2014, Nissan published its Annual Report 2014, including an English translation that was posted to its website. The Annual Report 2014 was prepared and distributed by and under the names of defendants: then-President, CEO, and Chairman Ghosn; then Chief Competitive Officer and Representative Director Saikawa; then-CFO Peter; and then-Representative Director Kelly. The Annual Report 2014 featured an introductory letter signed by Ghosn.

95. As to Nissan's "Corporate Governance & Internal Control," the Annual Report 2014 stated in pertinent part as follows:

> Nissan believes that enhancing its corporate governance is one of its most important business issues. Ensuring clear management responsibility is a key way to achieve this. ***Nissan announces clear management targets and policies to all its stakeholders and discloses its performance promptly with a high degree of transparency***.

96. Nissan repeated substantially similar statements in its Sustainability Report 2014, published on its website on June 23, 2014 with a signed prefatory letter from Ghosn; its

Sustainability Report 2015, published on its website on June 22, 2015 with a signed prefatory letter from Ghosn; its Sustainability Report 2016, published on its website on June 30, 2016 with a signed prefatory letter from Ghosn; its Sustainability Report 2017, published on its website on June 30, 2017 with a signed prefatory letter from Saikawa; and its Sustainability Report 2018, published on its website on July 31, 2018 with a signed prefatory letter from Saikawa and message from Karube. Nissan also repeated substantially similar statements in its Annual Report 2015 published contemporaneously with the Financial Report 2015, and its Annual Report 2016, published contemporaneously with the Financial Report 2016. Both the Annual Report 2015 and the Annual Report 2016 were prepared and distributed by and under the names of defendants: then-President, CEO, and Chairman Ghosn; then-Representative Director, Vice Chairman, and Chief Competitive Officer Saikawa; then-CFO Peter; and then-Representative Director Kelly, and both included introductory letters by Ghosn and Peter.

97. Concerning the Company's "Compliance" systems, the Annual Report 2014 emphasized Nissan's high ethical standards," stating:

> In promoting corporate social responsibility (CSR), it is essential that ***each employee practices compliance with high ethical standards***. In order to raise compliance awareness throughout the company, Nissan has established specialized departments and appointed officers to promote compliance policy in each region where it operates.

98. Nissan repeated substantially similar statements in its Sustainability Report 2014, its Sustainability Report 2015, and its Sustainability Report 2016. Nissan also repeated substantially similar statements in its Annual Report 2015 and its Annual Report 2016.

99. Nissan's Sustainability Report 2014 also trumpeted Nissan's purported commitment to transparency, stating as follows:

> **Corporate Governance System in Detail**
>
> ***To increase management transparency and flexibility, Nissan uses a corporate structure with supervision by the Board of Directors and auditing by the***

> ***Statutory Auditors***. The company has also adopted a corporate officer system. This clarifies the structure for taking responsibility and ensures appropriate supervision and auditing of activities by the directors. The Board of Directors includes outside directors and they make key decisions on important company operations, as well as supervising individual directors' execution of duties.
>
> * * *
>
> **Internal Control Systems**
>
> ***Nissan places high value on transparency in its corporate management, both internally and externally***. The company focuses on consistent and efficient management in order to achieve clear commitments. In line with this principle, and in accordance with Japan's Companies Act and its related regulations, the Board of Directors has decided on the Internal Control Systems to pursue these goals and on its own basic policy. The board continually monitors the status of implementation regarding these systems and the policy, making adjustments and improvements if necessary.

100. Describing the Company's "Global Code of Conduct," the Sustainability Report 2014 stated in pertinent part as follows:

> **Be Transparent and Accountable**
>
> Nissan employees shall make fair, transparent, timely and appropriate disclosure of the Company's business activities to our stakeholders, including stockholders, customers, other employees and local communities.

101. Nissan repeated substantially similar statements in its Sustainability Report 2015, its Sustainability Report 2016, its Sustainability Report 2017, and its Sustainability Report 2018.[2]

102. On or about June 29, 2017, Nissan published its Financial Report 2017. That report represented that "[c]ompensation of each Directors is based on each Director's compensation contracts, performance, and benchmarks of executive pay surveys conducted by the Company's compensation consultants, which is then consulted with the representative directors and approved by

---

[2] The Sustainability Report 2018 omitted the third and fourth sentences quoted under the heading "Corporate Governance in Detail," above, and inserted a new first sentence under the heading "Be Transparent and Accountable," above, which read: "Accounts and records shall be maintained with integrity."

the chairman of the Board of the Company." An identical statement was made in Nissan's Financial Report 2018.

103. Contemporaneously with the Financial Report 2017, Nissan published its Annual Report 2017, including an English translation that was posted to its website. The Annual Report 2017 was prepared and distributed by and under the names of defendants: Chairman Ghosn; President and CEO Saikawa; then-CFO Peter; and then-Representative Director Kelly. The Annual Report 2017 featured introductory letters signed by defendants Ghosn, Saikawa, and Peter.

104. As to Nissan's "Corporate Governance & Internal Control," the Annual Report 2017 stated in pertinent part as follows:

> Nissan aims to conduct fair, impartial and efficient business activities, having a high degree of transparency and consistency by adhering to the applicable laws and corporate rules.

105. On June 30, 2017, Nissan published its Sustainability Report 2017, with a prefatory letter signed by Saikawa, on its website. The introduction to the "Corporate Governance & Internal Control" section of that report stated as follows:

> To be a sustainable company, Nissan must display a high level of ethics and transparency, as well as a strong foundation for the organization. . . .
>
> Nissan has established a corporate governance system that maintains business transparency. The system allows Nissan to implement various monitoring systems, as well as assess and effectively manage risks that have the potential of preventing the company from achieving its business goals. . . .

106. Nissan repeated substantially similar statements in its Sustainability Report 2018, which was published on its website on July 31, 2018, and included a prefatory letter signed by Saikawa and a message from Karube.

107. On or about June 14, 2018, the *Financial Times* published an article entitled "'Le cost killer': the relentless drive of Carlos Ghosn," based on an interview with Ghosn. Discussing compensation, Ghosn acknowledged: "'Compensation is more scrutinized today than in the past – I

have a lot of that . . . . You won't have any CEO say, "I'm overly compensated'," he laughs. 'It's not up to me, ***the board is sovereign on this***.'"

108. On or about June 30, 2018, Nissan published its Annual Report 2018, including an English translation that was posted to its website. The Annual Report 2018 was prepared and distributed by and under the names of defendants: Chairman Ghosn; President and CEO Saikawa; CFO Karube; and then-Representative Director Kelly. The Annual Report 2018 featured introductory letters signed by defendants Saikawa and Karube.

109. As to Nissan's corporate "Governance Initiatives," the Annual Report 2018 stated in pertinent part as follows:

> Nissan is improving its governance through an enhanced compliance system. As part of this effort, the company appointed two new independent directors at the beginning of the current fiscal year. By reinforcing governance, Nissan is contributing to the growth of the company while increasing its stakeholder value.

110. The statements in ¶¶91-109, above, were materially false and misleading when made as they omitted material facts required to be disclosed, and because they failed to disclose adverse information then known or recklessly disregarded by defendants, including:

(a) That, for almost a decade, Nissan had been materially understating its costs – and thus overstating profits – by paying a material portion of Ghosn's executive compensation in the form of billions of Yen of deferred compensation that the Company was concealing from its public financial reports;

(b) That, in so doing, Nissan was concealing from investors significant defects in its corporate governance, including that Ghosn was effectively setting his own compensation, while misleading investors to believe that Nissan's Board was exercising meaningful oversight over compensation and that Nissan had effective internal and reporting controls;

(c) That, Nissan's secret compensation overpayment to Ghosn had caused Nissan to exceed its shareholder-approved executive pay cap, thus threatening its continued stock listing;

(d) That, in light of the facts set forth in §IV, above, Nissan did not "follow the laws" in connection with its compensation practices;

(e) That, in light of the facts set forth in §IV, above, Nissan did not "place[] high value on" or "focus[] on" "transparency, both internally and externally, in its corporate management," Nissan did not "disclose[] its performance promptly with a high degree of transparency," Nissan employees did not "make fair, transparent, timely and appropriate disclosure of the Company's business activities to [Nissan's] stakeholders, including stockholders," Nissan did not "conduct fair, impartial and efficient business activities, having a high degree of transparency and consistency by adhering to the applicable laws and corporate rules," and Nissan did not have "a corporate governance system that maintains business transparency";

(f) That, in light of the facts set forth in §IV, above, Nissan did not have an approach "founded on compliance with a strong sense of ethics held by each and every employee," the relevant Nissan employees did not "practice[] compliance with high ethical standards," and Nissan did not "display a high level of ethics and transparency"; and

(g) That, in light of the facts set forth in §IV above, Nissan did not effectively "use[] a corporate structure with supervision by the Board of Directors and auditing by the Statutory Auditors" with the Board, including outside directors, making "key decisions on important company operations, as well as supervising individual directors' execution of duties"; and the chairman of Nissan's Board (Ghosn) did not effectively "consult[] with the representative directors" in "determin[ing] the compensation of each director," much less was Nissan's Board "sovereign" with respect to compensation.

## VI. THE RELEVANT TRUTH IS DISCLOSED

111. During the Class Period, defendants made materially false and misleading statements and omissions as detailed herein and engaged in a scheme to deceive the market. By artificially

inflating and manipulating the price of Nissan's securities, defendants deceived plaintiffs and the Class (defined below) and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, it caused the price of Nissan's securities to fall as the prior artificial inflation came out of the stock price. As a result of their purchases of Nissan securities at inflated prices during the Class Period, and the decline of those prices when the relevant truth was revealed, plaintiffs and other members of the Class suffered damages.

112. On November 19, 2018, after the markets closed in Tokyo and before the markets opened in the United States, media outlets began reporting that Ghosn and Kelly had been arrested, and were being questioned by Japanese prosecutors. Shortly thereafter, Nissan issued a release entitled, "Regarding serious misconduct by Nissan Chairman and one representative director." The release reported that for many years, Nissan's Tokyo Stock Exchange reports had underreported Ghosn's compensation, that other improprieties by Ghosn and Kelly had been uncovered, and that Ghosn and Kelly would be removed from their positions at Nissan:

> **Regarding Serious Misconduct by Nissan Chairman and One Representative Director**
>
> YOKOHAMA, Japan – Based on a whistleblower report, Nissan Motor Co., Ltd. (Nissan) has been conducting an internal investigation over the past several months regarding misconduct involving the company's Representative Director and Chairman Carlos Ghosn and Representative Director Greg Kelly.
>
> The investigation showed that over many years both Ghosn and Kelly have been reporting compensation amounts in the Tokyo Stock Exchange securities report that were less than the actual amount, in order to reduce the disclosed amount of Carlos Ghosn's compensation.
>
> Also, in regards to Ghosn, numerous other significant acts of misconduct have been uncovered, such as personal use of company assets, and Kelly's deep involvement has also been confirmed.
>
> Nissan has been providing information to the Japanese Public Prosecutors Office and has been fully cooperating with their investigation. We will continue to do so.

> As the misconduct uncovered through our internal investigation constitutes clear violations of the duty of care as directors, Nissan's Chief Executive Officer Hiroto Saikawa will propose to the Nissan Board of Directors to promptly remove Ghosn from his positions as Chairman and Representative Director. Saikawa will also propose the removal of Greg Kelly from his position as Representative Director.
>
> Nissan deeply apologizes for causing great concern to our shareholders and stakeholders. We will continue our work to identify our governance and compliance issues, and to take appropriate measures.

113. Later that evening in Tokyo, Saikawa convened a press conference to discuss the misconduct. During the conference Saikawa admitted that: (i) significant misconduct by Ghosn and Kelly had been discovered through an internal investigation; (ii) Nissan's securities reports filed with the Tokyo Stock Exchange misrepresented the compensation paid to Ghosn; and (iii) Ghosn used Nissan investments and assets for his personal use.

114. When markets in the United States opened shortly thereafter on November 19, the price of Nissan's ADRs fell, opening at $16.30, a decline of over 9% from their close of $17.95 on Friday, November 16. When markets in Tokyo opened on November 20, the price of Nissan's common stock also declined, opening at ¥941, a decline of over 6% from their close of ¥1,005.50 on November 19, 2018.

115. The decline in the price of Nissan securities was a direct result of the revelation of the nature and extent of defendants' fraudulent misrepresentations to investors and the market. The timing and magnitude of the price declines in Nissan securities compared to the market and its peers negate any inference that the loss suffered by plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The damages, suffered by plaintiffs and the other Class members was a direct result of defendants' false and misleading statements and fraudulent scheme to artificially inflate the price of Nissan securities and the subsequent significant decline in the value of Nissan securities when defendants' prior misrepresentations and fraudulent conduct were revealed.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

116. As set forth in ¶¶5, 41, and 112-113, Nissan and Saikawa have each admitted to the misconduct alleged herein, including specifically that Nissan's financial statements during the Class Period were both materially and intentionally falsified. Nissan and Saikawa have also each acknowledged that Ghosn and Kelly committed significant misconduct and violated their "duty of care," as Nissan directors.

117. Furthermore, the nature of defendants' misconduct demonstrates it was intentional. The goal of the alleged scheme was to increase Ghosn and Kelly's personal compensation without having to publicly disclose or account for such payments, as disclosure would have reduced Nissan's reported operating income, violated shareholder imposed compensation caps, led to significant criticism, and thwarted these defendants' scheme.

118. Defendants' scheme and wrongful course of business was designed to and did cause Nissan to award Ghosn over 9 billion yen in undisclosed compensation, in addition to billions more spent for his personal benefit through Zi-A and the CEO reserve. Kelly's compensation exceeded 100 million yen each year between FY13 and FY18, yet defendants concealed Kelly's compensation, and failed to disclose it as they were required to do pursuant to the FIEA.

119. Beyond nondisclosure, the scheme involved the falsification of documents to cover-up the misconduct. As set forth by the Special Committee, in the course of the scheme, documents "were falsified and the details of compensations were manipulated in order to circumvent the disclosure of stock-price-linked incentive compensation." In addition, documents "were falsified in order to increase the amount paid to Mr. Ghosn as the final payment of retirement allowance for directors approved by the general meeting of shareholders in 2007."

120. The Special Committee also found that certain documents regarding Ghosn's deferred compensation were signed by Saikawa, demonstrating his knowledge of, and involvement in, the

alleged scheme. Saikawa also knew that, despite the fact that he became CEO of Nissan in April 2017, Ghosn had never given up his authority as CEO, and continued to control the Company. As the Special Committee concluded:

> Mr. Ghosn did not relinquish any decision-making authority regarding Nissan's human affairs and compensation even after retiring as CEO in 2017 and thereby continued holding significant authority as de-facto CEO during the period until Mr. Ghosn was arrested on the charge of violation of the Financial Instruments and Exchange Act on November 19, 2018 or until Nissan's Board of Directors revoked the delegation of the authority to determine compensation on December 17, 2018.

121. Ghosn and Kelly's undisclosed compensation was also the result of defendants' recklessness, which enabled the fraud to persist for almost a decade before being publicly revealed. As set forth in §III, the Individual Defendants were all senior Nissan executives and/or members of Nissan's Board during the Class Period. As such they were directly responsible for the accuracy of Nissan's public statements and reported financial results, as well as Nissan's compliance with its own internal corporate governance policies and FIEA.

122. According to the Special Committee, the "root causes" of the fraud included failures by Nissan's Board, as well as Nissan's Accounting Department, Legal Department, and Finance Department to perform their vital checks and balances and monitoring/audit functions.

123. For example, the Special Committee found that one of the root causes of the fraud was a "partial failure of the supervisory function of the Board of Directors." The Special Committee found that Board operated in "an atmosphere where it [was] not possible to ask questions about or give opinions on the agenda at the meetings," and that until June 2018, the average length of the meetings of the Board "was less than 20 minutes." Such an environment shows that Nissan's Board utterly dissembled and abdicated even a pretense of governance and supervision, in reckless disregard of their critical duties.

124. The Special Committee also found that a root cause was the "partial failure of the monitoring/audit functions of organizations within the company," and the "partial failure of the checks and balances functions of each internal department." The Special Committee found that the "Statutory Auditors had doubts about" Zi-A, the entity through which Nissan funded Ghosn's purchases and renovations of international mansions, but that they failed to discover the fraud. The Special Committee also found that the "Legal Department, Internal Audit Office and Accounting Department had at least some degree of opportunity to see some part of such payments and private use of funds," and in fact detect certain problems, yet failed to pursue the matters.

125. Defendants' misconduct also violated the limit set by Nissan's shareholders regarding director compensation. Nissan's June 5, 2008, Notice of Convocation of the 109th Ordinary General Meeting of Shareholders (comparable to a U.S. proxy statement) "proposed that for the future the aggregated amount of remuneration (compensation and bonus) authorized for Directors be changed to 2,990,000,000 yen per year (including 30,000,000 yen per year for outside Directors) which equals the present maximum total remuneration for the Directors." The proposal was approved, and Nissan represented in its annual financial reporting that "the amount to be paid to each Director is determined within this range based on the business results and reflecting the firm's global competitiveness."

126. Defendants' secret compensation to Ghosn violated this cap. Specifically, in FY17, Nissan reported cash compensation to directors totaling ¥1.564 billion. That year, Nissan underreported Ghosn's compensation by ¥1.692 billion. Thus, Nissan's actual cash compensation to directors for FY17 was ¥3.256 billion, some ¥266 million over the shareholder-imposed cap. In FY16, Nissan reported cash compensation to directors totaling ¥1.836 billion, and underreported Ghosn's compensation by ¥1.248 billion. The directors' actual FY16 cash compensation of ¥3.084 billion exceeded the cap by ¥94 million.

## VIII. ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY AND THE MARKET FOR NISSAN SECURITIES

### A. Applicability of Presumption of Reliance

127. Because of defendants' pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

128. Plaintiffs' claims for securities fraud are also asserted, in part, under the fraud-on-the market theory of reliance. The market price of Nissan securities was artificially maintained and inflated by the false and misleading statements and omissions complained of herein. Defendants' false statements and omissions inflated the price of Nissan securities both before and during the Class Period.

129. The Class Period inflation in the price of Nissan securities was eliminated when the financial conditions, business risks, and other information concealed by defendants' fraud was revealed to the market.

130. At all relevant times, the market for Nissan securities was an efficient market for the following reasons, among others:

(a) Nissan's common stock met the requirements for listing, and were listed and actively traded, on the Tokyo Stock Exchange, a highly efficient market;

(b) Nissan's ADRs were listed and traded on the over-the-counter ("OTC") market, a highly efficient market;

(c) During the Class Period, a high volume of Nissan securities traded on the Tokyo Stock Exchange and OTC;

(d) Nissan filed periodic public reports with the Tokyo Stock Exchange and translated such reports into English, which were made available to investors through Nissan's publicly-available website;

(e) Nissan regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services;

(f) During the Class Period, Nissan was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by defendants about Nissan. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(g) Nissan had substantial institutional ownership during the Class Period. Each of these institutions regularly analyzed and reported on the publicly available information about Nissan and its operations.

131. Through the foregoing mechanisms, the information publicly disseminated by defendants about Nissan and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in Nissan securities, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of Nissan publicly traded securities.

132. Under these circumstances, all purchasers of Nissan securities during the Class Period suffered similar injury through their purchase of Nissan securities at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

**B. Ghosn's Compensation Was Material to Nissan Shareholders**

133. Ghosn and Kelly's arrests, and the disclosures regarding defendants' secret compensation scheme, shocked Nissan's shareholders, who had for years expressed deep concerns

about even the understated portions of Ghosn's executive compensation packages which were publicly disclosed. As recounted by the *Japan Times* on November 24, 2018, "Ghosn has for years faced skepticism amongst the Japanese public over whether he, or any company head for that matter, was worth a massive paycheck." The *Nikkei Asian Review* reported that, after the Japanese disclosure rules took effect, "[Nissan] [s]hareholders at subsequent annual meetings continued to raise issues, even over his disclosed pay, saying that Nissan could have averted some of its layoffs if Ghosn's salary were trimmed."

134. For instance, on June 30, 2011, the *WSJ* published a report titled "Nissan CEO Still Holds a Top Spot in Pay," revealing that Nissan "Chief Executive Carlos Ghosn held on to his place as the highest-paid foreign executive at a listed Japanese company, with ¥982 million ($12.1 million) in total compensation in the latest fiscal year, a rise of 10% from the previous year" (of course that was only half of what Nissan had secretly obligated itself to pay him). According to that report, at the time, "Ghosn's most recent pay package eclipsed the ¥863 million paid to Sony Corp. CEO Howard Stringer, who is British," and emphasized that even the underreported executive pay figures were gaining the ire of Nissan investors:

> Some Nissan shareholders at Wednesday's meeting questioned the size of Mr. Ghosn's pay package, which was several times bigger than that of his counterparts at other major Japanese car makers.
>
> He explained that his pay was based on global, rather than Japanese, standards. Mr. Ghosn, a Brazil-born Frenchman of Lebanese parents, said Nissan determines its executive pay based on data collected by human-resources firm Towers Watson, which is based in New York.
>
> "This is a very transparent process," said Mr. Ghosn, who also serves as CEO of Nissan's French partner, Renault SA. "We want to be confident, and this is done very seriously."

135. Concerns about Ghosn's compensation were not limited to his role at Nissan. In 2015, *Forbes* reported that "Carlos Ghosn stands to earn 7.2 million euros for the year 2014 as executive chairman at Renault, while he gets about the same as boss of Japan's Nissan Motor Co.,"

emphasizing that "[t]he amount is more than double that of 2013 and is for a large part based on performance-related shares, but the total and the rise have raised eyebrows of the state representatives on Renault's board and staff members." In 2018, Ghosn's 7.4 million euro Renault compensation package for the previous year barely passed a shareholder vote despite opposition from the French government.

136. As the *WSJ* noted in its November 27, 2018 report, Nissan's false financial reporting with respect to executive compensation did a great disservice to investors because "disclosure of compensation for senior executives and directors and the way it is set are often the best clues investors can get into how a company is being run and overseen," and "[g]enerous pay packets and undemanding bonus targets can be a warning that a company's board has been cowed by overbearing executives." Indeed, as reported by the *Financial Times* on December 12, 2018:

> An official at Japan's Securities and Exchange Surveillance [Commission], which asked Tokyo prosecutors to press charges against Mr Ghosn and Mr Kelly, stressed that director compensation is "material information" that needs to be accurately reflected in financial statements.
>
> "For investors, director compensation is critical information that is necessary to judge whether a company's governance is functioning or not," the SESC official said.

137. Finally, Nissan itself admitted in a December 10, 2018, Tokyo Stock Exchange filing that "[m]aking false disclosures in annual securities reports greatly harms the integrity of Nissan's public disclosures in the securities markets."

**C. The Market for Nissan Securities**

138. Class members acquired their interests in Nissan through the purchase of the following securities: 7201 and NSANY.

139. 7201 is the ticker symbol assigned to Nissan common stock and it is traded on the Tokyo Stock Exchange in Japan. During the Class Period, there were over four billion shares of 7201 issued and outstanding.

140. NSANY is the ticker symbol assigned to Nissan's American Depository Receipts ("ADRs"). NSANY is traded OTC in the United States. During the Class Period, there were more than 50 million NSANY ADRs issued and outstanding. One NSANY ADR is equal to two common shares of 7201.

141. An ADR is a negotiable certificate that represents an ownership interest in an American Depository Share ("ADS") held in trust by a U.S. financial institution (the "Depository"). An ADS is set to a fixed ratio of underlying common stock in a foreign company purchased by the Depository. The terms ADR and ADS are often used interchangeably.

142. Since 1927, ADR programs have given foreign companies access to U.S. investors. ADRs are denominated in U.S. dollars, pay dividends in U.S. dollars, and are traded like the shares of U.S.-based companies. As a result, ADRs allow U.S. investors to invest in foreign companies without the need to transact in a foreign currency or navigate a foreign stock exchange.

143. Nissan's ADRs trade pursuant to a sponsored Level I ADR program. A sponsored Level I ADR program is initiated by the issuer (here, Nissan) and involves the filing of a F-6 registration statement, but allows for exemption under Rule 12g3-2(b) from full SEC reporting requirements. The company controls the ADRs issued under a sponsored Level I program, since a deposit agreement is executed between the company and one selected Depositary, here J.P. Morgan Chase & Co. of New York, NY. According to an opinion letter from counsel attached to Nissan's Form F-6, the deposit agreement contains a New York choice of law provision. Level I ADRs can only be traded on the OTC market.

144. U.S. investors have been trading Nissan ADRs in the United States for nearly half a century.

145. For the past decade, Nissan ADRs have been traded OTC in the United States. During the Class Period, NSANY was traded on "OTC Link" in the manner described below.

Nissan ADRs are priced and trade in U.S. dollars. Nissan ADR holders also receive periodic dividend payments priced in U.S. dollars.

146. OTC Markets Group, Inc., through its wholly-owned subsidiary OTC Link LLC, operates OTC Link: a real-time electronic interdealer quotation and messaging system that facilitates negotiated trading in OTC securities. OTC Markets Group, Inc. and OTC Link LLC are headquartered in New York, NY. OTC Link trading hours are 6:00 A.M. to 5:00 P.M. Eastern Time, Monday through Friday, except for certain U.S. holidays.

147. The OTC Link system operates exclusively on datacenter infrastructure (dedicated computer servers) located within the United States. The primary datacenter is located in Carlstadt, NJ and the secondary datacenter is located in Philadelphia, PA. Broker-dealers have several options to access OTC Market Group's servers in New Jersey and/or Pennsylvania, including a direct fiber optic connection or an indirect third-party "extranet" provider.

148. Only SEC-registered and FINRA-approved broker-dealers may trade on OTC Link. At the time of filing, there are 91 broker-dealer firms registered to trade on OTC Link. Every single one of those firms is based in the United States.

149. To demonstrate a willingness to trade a security at a particular price, broker-dealers publish their quotes (*i.e.*, make offers to buy or sell) on OTC Link. The aggregation and ranking of these quotes in turn defines the market for that security.

150. Under FINRA Rules 2010 and 5220, broker-dealers are prohibited from making offers to buy or sell securities at a given price if they are not prepared to honor the trade at that price. Broker-dealers therefore cannot walk away from a firm offer to buy or sell a security on OTC Link if accepted by another broker-dealer. FINRA promulgated Rule 5220 because "[s]uch 'backing away' from quotations disrupts the normal operation of the over-the-counter market."

151. All purchases of NSANY on the OTC Market during the Class Period were the result of a domestic transaction in securities within the meaning of the Exchange Act, because, *inter alia*: (i) NSANY was only sold on the OTC Market, based in the United States; (ii) transactions on the OTC Market are arranged through electronic trading systems that are located in the United States; (iii) all NSANY shares were issued and sold by J.P. Morgan Chase Bank & Co., located in the United States; (iv) the underlying shares of Nissan common stock (7201) sold as ADSs were held in trust by a Depositary Bank located in the United States; and (v) NSANY is not available to be sold on any foreign exchange or other trading platform located outside of the territorial jurisdiction of the United States.

## IX. CLASS ACTION ALLEGATIONS

152. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all Class Period purchasers of: (i) NSANY on the OTC Market during the Class Period ("NSANY Purchasers"); and (ii) Nissan 7201 common stock who are citizens and residents of the United States ("7201 Purchasers") (collectively, the "Class"). Excluded from the Class are defendants, all subsidiaries, business units, and consolidated entities of Nissan, and any person who was an officer or director of Nissan or any of its subsidiaries, business units, or consolidated entities at any time from 2014 to the present (collectively, "Excluded Person(s)"). Also excluded from the Class are all members of the immediate families of any Excluded Person, all legal representatives, heirs, successors, or assigns of any Excluded Person or any member of their immediate families, all entities in which any Excluded Person has or had a controlling interest, and any person or entity claiming under any Excluded Person.

153. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. There are over 3 billion shares of Nissan common stock outstanding and

over 50 million ADSs available for trading. The shares of Nissan common stock and ADSs are owned by thousands of persons.

154. Reliance on the alleged misrepresentations and material omissions is presumed. The market for Nissan securities is efficient, as alleged above. Public information regarding the Company is rapidly incorporated into and reflected by the market price for Nissan securities. The omitted information described herein was not known to, and could not have been discovered through reasonable investigation by members of the Class. Investors who purchased Nissan securities at the prices prevailing in the market during the Class Period therefore presumptively did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

155. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the Exchange Act or the FIEA was violated by defendants;

(b) whether defendants omitted and/or misrepresented material facts;

(c) whether defendants statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) with respect to the Exchange Act claims, whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether and to what extent the price of 7201 and NSANY was affected by the alleged misrepresentations; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

156. Plaintiffs' claims are typical of those of the Class because plaintiffs and the members of the Class all purchased Nissan securities at the prices prevailing in the market during the Class

Period and sustained damages from defendants' wrongful conduct. Damages under the FIEA and under the Exchange Act will both be calculated using common and reliable methodologies that are based on the movement of Nissan's stock price during and after the Class Period, including calculations based on the price at which the Class members obtained Nissan securities, the market price of Nissan securities at the time corrective information was disclosed, and analysis of the public information that impacted the market price of Nissan securities at those times.

157. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class. There are no conflicts between NSANY and 7201 Purchasers, as all purchasers seek to hold defendants liable based on the same alleged misrepresentations and omissions and seek damages based on the same corrective event.

158. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**First Claim for Relief (Violation of §10(b) of the Exchange Act & Rule 10b-5)**
**(On Behalf of NSANY Purchasers)**

159. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160. By engaging in the acts, practices, and omissions previously alleged, defendants violated §10(b) of the Exchange Act and Rule 10b-5 by:

(a) employing devices, schemes, and artifices to defraud;

(b) making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Nissan securities during the Class Period.

161. During the Class Period, defendants made, disseminated, and/or approved each of the statements as specified in §V, above.

162. Each of the statements and omissions specified in §V, above, were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163. Each of the statements and omissions specified in §V, above, were in connection with the purchase or sale of NSANY by the members of the Class in that they affected the value or merit of those securities and the risks associated with their purchase or sale, and induced the members of the Class to purchase those securities at the prices prevailing in the market during the Class Period.

164. The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

(a) the statements were not forward-looking, or identified as such when made;

(b) the statements were not accompanied by meaningful cautionary language that sufficiently identified the specific, important factors that could cause actual results to differ materially from those in the statement;

(c) the statements were included in a financial statement prepared in accordance with relevant accounting standards; or

(d) the statements were made by defendants with actual knowledge that the statements were false or misleading.

165. Defendants made, disseminated, or approved the statements specified in §V, above, while knowing or recklessly disregarding that the statements were false or misleading, or omitted to disclose facts necessary to prevent the statements from misleading investors in light of the circumstances under which they were made.

166. Plaintiffs purchased Nissan securities in reliance upon the truth and accuracy of the statements specified in §V, above, and the other information that was publicly reported by defendants about Nissan's operations, and without knowledge of the facts, transactions, circumstances, and conditions fraudulently misrepresented to or concealed from the market during the Class Period, as specified above.

167. Plaintiffs and the Class have suffered damages as a result of the material misrepresentations and omissions alleged in §V, above, in that they:

(a) paid artificially inflated prices of NSANY shares;

(b) purchased their NSANY shares on an open, developed, and efficient public market; and

(c) incurred economic losses when the price of those securities declined as the direct and proximate result of the public dissemination of information that was inconsistent with defendants' prior public statements or otherwise alerted the market to the facts, transactions, circumstances, risks, and conditions concealed by defendants' misrepresentations and omissions, or the economic consequences thereof.

168. Plaintiffs and the Class would not have purchased Nissan securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions specified above.

## COUNT II

### Second Claim for Relief (Violation of §20(a) of the Exchange Act)
### (On Behalf of NSANY Purchasers)

169. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170. Defendants Nissan, Ghosn, Kelly, Saikawa, Karube, and Peter and/or persons under their control violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiffs and the other members of the Class.

171. By virtue of their positions as controlling persons, each of the Individual Defendants are liable pursuant to §20(a) of the 1934 Act for the acts and omissions of their co-defendants in violation of the 1934 Act.

172. Each of these defendants acted as a controlling person of some or all of their co-defendants, as set forth in the chart below, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws:

| DEFENDANT | CONTROLLED DEFENDANTS | BY VIRTUE OF |
|---|---|---|
| Ghosn | Nissan, Kelly, Saikawa, Karube, and Peter | his positions of power and control and his responsibilities as Nissan's CEO (through April 1, 2017) and as its Chairman (through the end of the Class Period), and his positions at Renault, Mitsubishi and the Alliance; his power to hire and fire and his supervisory authority over Kelly, Saikawa, Karube, Peter, and other members of Nissan's senior, regional, and branch managers and employees; his day-to-day involvement in, and control over, Nissan's operations, including those relating to reporting requirements and regulatory compliance; and his ability to control the contents of Nissan's press releases, financial reports, and other public statements during the Class Period. |

| | | |
|---|---|---|
| Kelly | Nissan, Ghosn, Saikawa, Karube, and Peter | his positions of power and control and his responsibilities as a Representative Director at Nissan (through February 2015), and as a Nissan Director (through the end of the Class Period), and his positions at the Alliance; his power to hire and fire and his supervisory authority over Ghosn, Saikawa, Karube, Peter, and other members of Nissan's senior, regional, and branch managers and employees; his day-to-day involvement in, and control over, Nissan's operations, including those relating to reporting requirements and regulatory compliance; and his ability to control the contents of Nissan's press releases, financial reports, and other public statements during the Class Period. |
| Saikawa | Nissan, Karube, and Peter | his positions of power and control and his responsibilities as Nissan's CEO (since April 1, 2017), as co-CEO of Nissan with Ghosn between October 2016 and March 31, 2017, and in his role as a director of Renault; his power to hire and fire and his supervisory authority over Karube, Peter, and other members of Nissan's senior, regional, and branch managers and employees; his day-to-day involvement in, and control over, Nissan's operations, including those relating to reporting requirements and regulatory compliance; and his ability to control the contents of Nissan's press releases, financial reports, and other public statements during the Class Period. |

| | | |
|---|---|---|
| Karube and Peter | Nissan | Karube's ability since May 18, 2018 and Peter's ability between 2009 and May 17, 2018 to control the contents of Nissan's press releases, SEC filings, and other public statements during the Class Period; their supervisory authority over other members of Nissan's senior, regional, and branch management and employees; and their day-to-day involvement in and control over Nissan's operations. |
| Nissan | Ghosn, Kelly, Saikawa, Karube, and Peter | its power to hire, fire, supervise and otherwise control the actions of its employees, including the Individual Defendants, and the salaries, bonuses, incentive compensation, and other employment consideration and arrangements provided to the Individual Defendants. |

173. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of and contractual rights with Nissan, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the Tokyo Stock Exchange and Japan's Financial Services Agency and disseminated to the investing public, defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

**COUNT III**

**Third Claim for Relief (Violation of FIEA Article 21-2)**
**(On Behalf of 7201 Purchasers)**

174. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

175. Nissan was the Issuer of the securities acquired by plaintiffs and other members of the Class.

176. Nissan submitted the annual financial reports identified above (collectively, the "Reports") to the Japanese Financial Services Agency via the Tokyo Stock Exchange's Timely Disclosure Network (TDnet).

177. Each of the Reports contained false statements about material particulars, omitted statements as to material particulars that were required to be stated, or omitted statements of material fact that were necessary to prevent the Reports from being misleading, as alleged in §V above.

178. Nissan breached its duty to make a reasonable and diligent investigation of the statements in the Reports and any incorporated or attached documents and to ensure that the statements contained therein were truthful and accurate, and that no material information necessary to prevent the statements from being misleading had been omitted.

179. During the period that the Reports were required to be made available for public inspection, plaintiffs and the other members of the Class acquired securities issued by Nissan.

180. The false statements and omissions were concealed by defendants and unknown to the investing public, as alleged above. At the time plaintiffs and the other members of the Class acquired the 7201 securities issued by Nissan they did not know, and in the exercise of reasonable diligence could not have known, that the statements in the Reports were false or that the Reports omitted statements of material particulars or material facts that were required to be stated therein or necessary to prevent the Reports from being misleading.

181. The material false information and omissions in the Reports artificially inflated the prices of the securities acquired by plaintiffs and the other members of the Class.

182. Plaintiffs and other members of the Class suffered damages arising from the statements alleged herein being false or having omitted material information due to the declines in

the market value of Nissan securities that occurred as alleged above. The damages sustained by plaintiffs and other members of the Class were not due to circumstances other than the decline in the value of Nissan securities arising from the false and misleading statements alleged herein.

183. Nissan is therefore liable under Article 21-2 to compensate plaintiffs for damages arising from the false statements and omissions in the Reports.

## X. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action, and certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## XI. JURY DEMAND

Plaintiffs hereby demand a trial by jury

DATED: May 6, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
JERRY E. MARTIN, #20193
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853

CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com
clyons@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
DEBASHISH BAKSHI
600 West Broadway, Suite 1800
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dbakshi@rgrdlaw.com

Lead Counsel for Lead Plaintiff

VANOVERBEKE, MICHAUD &
TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF PROVIDENCE, RHODE ISLAND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
| --- | --- | --- | --- |

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*French v. CBL & Associates Properties, Inc., et al.*, No. 1:16-cv-00165 (E.D.Tenn.)
*Kukkadapu v. Embraer S.A., et al.*, No. 1:16-cv-06277 (S.D.N.Y.)
*Heed v. Universal Health Services, Inc., et al.*, No. 2:16-cv-09499 (C.D. Cal.)
*In re The Allstate Corporation Sec. Litig.*, No. 1:16-cv-10510 (N.D. Ill.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of May, 2019.

CITY OF PROVIDENCE, RHODE ISLAND

By: ______________________________
Jeffrey Dana, City Solicitor

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/30/2015 | 5,700 | ¥ 1,219.09 |
| 09/28/2015 | 4,000 | ¥ 1,117.00 |
| 09/30/2015 | 4,600 | ¥ 1,067.00 |
| 07/31/2018 | 15,200 | ¥ 1,063.00 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 12/02/2016 | 25,800 | ¥ 1,077.54 |
| 02/02/2017 | 8,900 | ¥ 1,112.00 |
| 05/30/2017 | 6,600 | ¥ 1,072.50 |
| 04/03/2018 | 4,900 | ¥ 1,093.00 |

*Opening position of 92,900 shares.

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 6, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:18-cv-01368 Jackson County Employees' Retirement System v. Ghosn et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ameya S. Ananth**
  aananth@paulweiss.com
- **Mary K. Blasy**
  mblasy@rgrdlaw.com
- **Joseph B. Crace , Jr**
  jcrace@bassberry.com,llewis@bassberry.com
- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com
- **Aubrey B. Harwell , III**
  tharwell@nealharwell.com,jcole@nealharwell.com
- **Aubrey B. Harwell , Jr**
  aharwell@nealharwell.com,lpresley@nealharwell.com,claird@nealharwell.com,lmartin@nealharwell.com
- **Jerry E. Martin**
  jmartin@barrettjohnston.com,eseaborn@barrettjohnston.com,nchanin@barrettjohnston.com,jmartin@rgrdlaw.com,ggilbert@barrettjohnston.com
- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Samuel H. Rudman**
  srudman@rgrdlaw.com
- **Nathan C. Sanders**
  nsanders@nealharwell.com,awade@nealharwell.com
- **Marie T. Scott**
  mscott@nealharwell.com
- **Audra J. Soloway**
  asoloway@paulweiss.com
- **Overton Thompson , III**
  othompson@bassberry.com,jennifer.lavely@bassberry.com,lbilbrey@bassberry.com
- **Christopher S. Turner**
  christopher.turner@lw.com
- **Peter A. Wald**
  peter.wald@lw.com
- **Christopher M. Wood**
  cwood@rgrdlaw.com,9101599420@filings.docketbird.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)