# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JACKSON COUNTY EMPLOYEES'    )
RETIREMENT SYSTEM, et al.,    )
    )
    Plaintiffs,    )
    )    NO. 3:18-cv-01368
v.    )
    )    JUDGE CAMPBELL
CARLOS GHOSN, et al.,    )    MAGISTRATE JUDGE NEWBERN
    )
    Defendants.    )

## MEMORANDUM

Pending before the Court are Motions to Dismiss filed by Defendant Greg Kelly ("Kelly") (Doc. No. 63), Defendants Nissan Motor Co., Ltd. ("Nissan"), Hiroto Saikawa ("Saikawa"), Hiroshi Karube ("Karube"), and Joseph G. Peter ("Peter") (Doc. No. 68), and Defendant Carlos Ghosn ("Ghosn") (Doc. No. 77). Plaintiffs filed a Response in Opposition (Doc. No. 86), and Defendants filed Replies (Doc. Nos. 104, 105, 108).

Ghosn filed a Notice and Supplemental Declaration of Audra J. Soloway in support of his Motion to Dismiss. (Doc. Nos. 112, 113). Plaintiffs filed a Response. (Doc. Nos. 117, 118). Ghosn and Nissan filed Replies to Plaintiffs' Response. (Doc. Nos. 123, 124, 128). Plaintiffs filed a Notice of Supplemental Authority in Support of their Omnibus Opposition to Defendants' Motions to Dismiss (Doc. No. 119), to which Nissan filed a Response (Doc. No. 125). Nissan filed a Notice of Relevant Development (Doc. Nos. 129, 130). Plaintiffs filed a Response (Doc. Nos. 131, 132) and Nissan filed a Reply (Doc. Nos. 133, 134, 135).

For the reasons set forth more fully below, the Motions to Dismiss filed by Ghosn and Kelly (Doc. Nos. 63, 77) will be **DENIED**, and the Motion to Dismiss filed by Nissan, Saikawa, Karube, and Peter (Doc. No. 68) will be **GRANTED**, in part, and **DENIED** in part.

# I.     FACTUAL BACKGROUND & PROCEDURAL HISTORY

Lead plaintiff, Jackson County Employees' Retirement System ("Jackson County"), and named plaintiff, Providence Employees Retirement System ("Providence"), (collectively "Plaintiffs") filed this class action on behalf of purchasers of Nissan securities between May 11, 2014 and November 16, 2018 (the proposed class period ("Class Period")), against Nissan, Carlos Ghosn, former Chairman of the Board of Directors (the "Board"), Representative Director, Chief Executive Officer, and President; Greg Kelly, former Representative Director and Executive Vice President; Hiroto Saikawa, former Representative Director and Chief Executive Officer; Hiroshi Karube, current Chief Financial Officer; and Joseph G. Peter, former Chief Financial Officer, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), Securities and Exchange Commission (SEC) Rule 10b–5, 17 CFR § 240.10b–5, and the Financial Instruments and Exchange Act of Japan ("FIEA"). (Doc. No. 58).

The Amended Complaint, filed on May 6, 2019, alleges that, since at least 2010, Nissan's then-CEO and Chairman, Carlos Ghosn, engaged in an unlawful scheme to increase his own pay by approving billions of yen in deferred compensation, which Nissan would be obligated to pay him at later dates. Defendants allegedly made false and misleading statements regarding executive compensation in Nissan's annual financial reports, resulting in an understatement of Nissan's compensation expenses and a concomitant overstatement of Nissan's operating income throughout the Class Period. At the same time, Defendants also made false and misleading statements regarding Nissan's corporate governance and internal controls, compliance with applicable laws and regulations, and commitment to ethical conduct in Nissan's other mandatory disclosure documents. Nissan's annual financial reports and other mandatory disclosure documents

2

containing the alleged misstatements were translated into English and published on Nissan's investor relations website throughout the Class Period.

On August 5, 2019, Ghosn, Saikawa, and Karube moved to dismiss the Exchange Act claims and Nissan moved to dismiss the FIEA claim pursuant to Rule 12(b)(2) for lack of personal jurisdiction. (*See* Doc. Nos. 77, 68). Nissan also moved to dismiss the FIEA claim on the basis of *forum non conveniens*. (*See* Doc. No. 68).[1] Additionally, all the defendants moved to dismiss the Exchange Act claims pursuant to Rule 12(b)(6) for failure to state a claim. (Doc. Nos. 63, 68, 77).

## A. The Defendants

Nissan is a multinational automobile manufacturer with its international headquarters in Japan. (Doc. No. 58 ¶ 16). Nissan's common stock is traded in Japan on the Tokyo Stock Exchange and its American Depository Receipts ("ADRs") trade on the over-the-counter ("OTC") market in the United States. (*See* Doc. No. 58 ¶¶ 139, 140).[2]

Ghosn was Nissan's President, CEO, a Representative Director, and Chairman of Nissan's Board of Directors during the Class Period, stepping down as CEO and President in April of 2017. (Doc. No. 58 ¶ 32; SCIG Report, Doc. No. 73-5 at PageID # 951-53). Ghosn made many of the false or misleading statements when presenting on behalf of Nissan at shareholders' meetings, (Doc. No. 58 ¶¶ 59, 65-66, 73, 79, 85), and press conferences, (Doc. No. 58 ¶¶ 58, 64, 72), by endorsing and providing introductory letters to Annual Reports 2014, 2015, 2016, 2017 (Doc. No.

---

[1]     Nissan also moved to dismiss on the basis of international comity, however, it fails to address the *Colorado River* abstention doctrine applied in the Sixth Circuit by courts in weighing concerns of international comity. (*See* Doc. No. 133 at 4 (conceding that Sixth Circuit courts apply the *Colorado River* doctrine in evaluating whether to relinquish jurisdiction)). Because Nissan has failed to develop an argument under the *Colorado River* doctrine, the Court declines to consider the issue of international comity in ruling on Nissan's pending motion.

[2]     Jackson County purchased Nissan ADR securities and Providence purchased Nissan common stock. (Doc. No. 58 ¶¶ 14-15).

3

58 ¶¶ 94, 96, 103) and Sustainability Reports 2014, 2015, 2016 (Doc. No. 58 ¶ 96 ), and by signing "Confirmation Notes" accompanying Financial Reports 2014, 2015, 2016 (Doc. No. 58 ¶¶ 60, 68, 74).

Kelly joined Nissan's Board of Directors in June of 2012 as a Representative Director. (SCIG Report, Doc. No. 73-5 at PageID # 952-53, 956; Doc. No. 58 ¶¶ 3, 18). From 2009 to 2015, Kelly was Nissan's Senior Vice President. (SCIG Report, Doc. No. 73-5 at PageID # 952-53, 956; Doc. No. 58 ¶ 18). As Senior Vice President, Kelly was responsible for Nissan's Global Human Resources and oversaw Nissan's CEO Office, Alliance's CEO Office, Nissan's Secretariat's Office, and Nissan's Legal Department. (SCIG Report, Doc. No. 73-5 at PageID # 956). He also served as the liaison officer of the management side toward Statutory Auditors. (SCIG Report, Doc. No. 73-5 at PageID # 956). Kelly was known to Nissan insiders as the "'CEO whisperer'" and Nissan's internal investigation revealed that he was "'the mastermind of [the scheme], together with Carlos Ghosn.'" (Doc. No. 58 ¶ 3). Kelly made many of the false or misleading statements by preparing and publishing the Annual Reports 2014, 2015, 2015, 2016, 2017, and 2018 under his name. (Doc. No. 58 ¶¶ 18, 94, 96, 103, 108).

Saikawa became a member of Nissan's Board and Executive Vice President in 2005. (Doc. No. 58 ¶ 19). In 2007, Saikawa was promoted to head Nissan's U.S. operations and served in that position when Nissan relocated its U.S. headquarters from California to Franklin, Tennessee. (Doc. No. 58 ¶ 19). Saikawa became a Representative Director in 2011 and served as Chief Competitive Officer – second in command to Ghosn – from January 2014 until his appointment as co-CEO from October 2016 until March 31, 2017. (Doc. No. 58 ¶ 19). Saikawa served as CEO of Nissan starting on April 1, 2017. (Doc. No. 58 ¶ 19). Saikawa made many of the false or misleading statements when presenting on behalf of Nissan at shareholders' meetings, (Doc. No. 58 ¶ 85), and

4

press conferences, (Doc. No. 58 ¶¶ 78, 84), by endorsing and providing introductory letters to Annual Reports 2017, 2018, (Doc. No. 58 ¶¶ 103, 108), and Sustainability Reports 2017, 2018, (Doc. No. 58 ¶¶ 96, 105, 106, 108), and by signing "Confirmation Notes" accompanying Financial Reports 2017 and 2018 (Doc. No. 58 ¶¶ 80, 86). (Doc. No. 58 ¶ 19).

Peter served as the CFO of Nissan between December 1, 2009 and May 2018, and Karube has been the CFO since May 18, 2018. (Doc. No. 58 ¶¶ 20-21). As CFO, they were responsible for overseeing Nissan's financial activity, including balance sheets, cash flow, and compliance with corporate governance practices, as well as for financial planning and analysis, control, accounting, treasury, tax, investor relations, and M&A support. (Doc. No. 58 ¶¶ 20-21). Peter made many of the false or misleading statements by endorsing and providing introductory letters to Annual Reports 2015, 2016, 2017 (Doc. No. 58 ¶¶ 96, 103) and by signing "Confirmation Notes" accompanying Financial Reports 2014, 2015, 2016, and 2017 (Doc. No. 58 ¶¶ 60, 68, 74, 80). (Doc. No. 58 ¶ 21). Karube made many of the false or misleading statements by endorsing and providing introductory letters to Annual Report 2018 (¶ 108) and Sustainability Report 2017 (¶ 96, 105), and signing the "Confirmation Note" accompanying the Financial Report 2018 (Doc. No. 58 ¶ 86). (Doc. No. 58 ¶ 20).

**B.  Nissan's ADR Program**

An ADR is a negotiable certificate that represents an ownership interest in an American Depository Share ("ADS") held in trust by a U.S. financial institution (the "Depository"). (Doc. No. 58 ¶ 141).  An ADS is set to a fixed ratio of underlying common stock in a foreign company purchased by the Depository. (Doc. No. 58 ¶ 141). ADRs are denominated in U.S. dollars, pay dividends in U.S. dollars, and are traded like the shares of U.S. based companies. (Doc. No. 58 ¶ 142). Accordingly, ADRs allow U.S. investors to invest in foreign companies without the need to

transact in a foreign currency or navigate a foreign stock market. (Doc. No. 58 ¶ 142). At the same time, ADR programs provide foreign companies access to U.S. investors. (Doc. No. 58 ¶ 142).

Nissan's ADRs trade pursuant to a sponsored Level I ADR program. (Doc. No. 58 ¶ 143). A sponsored Level I ADR program is initiated by the issuer (here, Nissan), and involves the filing of a F-6 registration statement and allows an exemption under SEC Rule 12g3-2(b) from Exchange Act registration. (Doc. No. 58 ¶ 143). In the present case, the Exchange Act claims are asserted by Jackson County on behalf of purchasers of ADSs. (Doc. No. 58 ¶¶ 8, 16).

### C. The Fraudulent Scheme

The Amended Complaint alleges that Nissan's current organizational structure and Ghosn's rise to power therein are both rooted in Nissan's financial troubles of the 1990s. (Doc. No. 58 ¶ 28). In 1999, French carmaker Renault bailed out Nissan by purchasing 36.8% of Nissan's shares. (Doc. No. 58 ¶ 30). Since 1999, Nissan has been part of the Renault-Nissan-Mitsubishi Alliance (the "Alliance"), a partnership between Nissan of Japan, Renault of France, and, since 2016, Mitsubishi Motors of Japan. (Doc. No. 58 ¶ 16). As part of the bailout, Renault sent Ghosn, Renault's then-Executive Vice President, to serve as Nissan's Chief Operating Officer. (Doc. No. 58 ¶ 31; SCIG Report, Doc. No. 73-5 at PageID # 951-51). Ghosn implemented significant changes to Nissan's corporate structure and governance upon his arrival at Nissan, including making English, not Japanese, the official language of the Company, and overhauling the manner in which the Company compensated senior employees by enforcing a performance based system instead of rewarding seniority. (Doc. No. 58 ¶¶ 17, 31).

By 2008, Ghosn was Nissan's President and CEO, a Representative Director, and Chairman of Nissan's Board of Directors. (Doc. No. 58 ¶ 32; SCIG Report, Doc. No. 73-5 at PageID # 951-52). Ghosn also had concurrent positions as Chairman and President of the Alliance

and Chairman and CEO of Renault starting in 2009, and Chairman of Mitsubishi Motors starting in 2016. (SCIG Report, Doc. No. 73-5 at PageID # 951-52; Doc. No. 58 ¶ 17).

Ghosn substantially determined the amounts of compensations for individual Directors and top line management all on his own. (SCIG Report, Doc. No. 73-5 at PageID # 956). Ghosn was delegated by the resolution of Nissan's Board of Directors to determine the compensations of the Directors and top line managers (including Executive Vice Presidents, Senior Vice Presidents, Corporate Vice Presidents, and Vice Presidents etc.), including determination of his own compensation. (Doc. No. 58 ¶ 41; SCIG Report, Doc. No. 73-5 at PageID # 955). Nissan's Secretariat's Office was in charge of paying the individual compensations Ghosn determined, and no information on the amounts of individual Directors' and top line managements' compensations was shared with other departments. (SCIG Report, Doc. No. 73-5 at PageID # 956).

Then, in 2009, in response to widespread public concern about excessive executive compensation in the wake of the global financial crisis, Japan's Financial System Council recommended enhanced disclosure of director pay, along with other regulatory measures aimed at improving corporate governance. (Doc. No. 58 ¶ 38). Taking heed of these recommendations, the Japanese legislature amended the disclosure rules under the FIEA to require listed companies to disclose the amount of compensation to individual directors if it exceeded ¥100 million (approximately $1.1 million when the law came into effect). (Doc. No. 58 ¶ 38). The new law mandated disclosure of the total amount of director remuneration and a detailed breakdown by salary, bonus, stock option value, pension benefits, and other payments. (Doc. No. 58 ¶ 38). It also required remuneration to be disclosed in a securities report when it was fixed, even if the actual payout was planned for the future. (Doc. No. 58 ¶ 38). Before the new law, Japanese

7

companies only had to disclose the compensation of top executives as an aggregate amount without identifying what individuals were paid. (Doc. No. 58 ¶ 38).

This change in the law impacted Nissan's Japanese securities filings beginning with the fiscal year 2009, which ended on March 31, 2010. (SCIG Report, Doc. No. 73-5 at PageID # 953). Ghosn – whose awarded compensation of ¥1.75 billion (over $15 million) in the fiscal year 2009 was more than twice the amount of Nissan's other nine top executives, combined – was concerned by the prospect of compensation transparency and worried about public-relations fallout. (Doc. No. 58 ¶ 39). Accordingly, beginning in the fiscal year ending in March 2010, Ghosn together with Kelly devised a multiyear scheme to hide Ghosn's true compensation from investors by continually "postponing" undisclosed pay until his retirement in the form of IOUs. (Doc. No. 58 ¶¶ 3, 40, 41; SCIG Report, Doc. No. 73-5 at PageID # 956). Year after year, Ghosn's reported pay grew only slightly, but he increased the IOU portion more rapidly without telling fellow board members. (Doc. No. 58 ¶ 40). Ghosn ultimately awarded himself more than $80 million in deferred compensation. (Doc. No. 58 ¶ 40).

### D. The Whistleblower Report and Nissan's Internal Investigation

Around the summer of 2018, a Nissan internal compliance auditor drew up a whistleblower report, stating that a Nissan unit was being used to provide homes to Ghosn at no cost, and that the directors' compensation information on financial filings was incomplete. (Doc. No. 58 ¶¶ 49, 51). Upon receiving the whistleblower report, Nissan began internal investigation into the alleged misconduct. (SCIG Report, Doc. No. 73-5 at PageID # 950). In August 2018, Saikawa, Nissan's then-CEO, informed the Japanese Ministry of Economy, Trade, and Industry that "Nissan was likely to face a serious problem later in the year." (Doc. No. 58 ¶ 51).

8

On the afternoon of November 19, 2018, Ghosn and Kelly were arrested in Japan by the Tokyo District Public Prosecutor's Office on charges of filing falsified Annual Securities Reports in violation of FIEA. (Doc. No. 58 ¶¶ 4, 53). Shortly thereafter, Nissan issued a release reporting that for many years, Nissan's Tokyo Stock Exchange reports had underreported Ghosn's compensation, that other improprieties by Ghosn and Kelly had been uncovered, and that Ghosn and Kelly would be removed from their positions at Nissan. (Doc. No. 58 ¶ 112). Later that evening, at around 10:00 p.m., Saikawa convened a press conference during which he admitted that: (i) significant misconduct by Ghosn and Kelly had been discovered through an internal investigation; (ii) Nissan's securities reports filed with the Tokyo Stock Exchange misrepresented the compensation paid to Ghosn; and (iii) Ghosn used Nissan investments and assets for his personal use. (Doc. No. 58 ¶¶ 5, 113). When the market opened in the US hours later, and in Tokyo the next day, the price of Nissan securities declined, causing hundreds of millions of dollars in damages to investors who purchased Nissan securities at prices inflated by defendants' fraud. (Doc. No. 58 ¶¶ 6, 114-115).

## II.    STANDARDS OF REVIEW

### A.  Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to file a motion to dismiss for lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). "In deciding a motion to dismiss for lack of personal jurisdiction, the district court may rely 'upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions.'" *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899 (6th Cir. 2017) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). "Although plaintiffs have the burden of establishing that a district court can exercise jurisdiction over the defendant, that

burden is 'relatively slight' where, as here, the district court rules without conducting an evidentiary hearing." *Id*. (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)). "To defeat dismissal in this context, plaintiffs need make only a *prima facie* showing that personal jurisdiction exists." *Id*. (citing *Air Prods*, 503 F.3d at 549). "Under these circumstances, this court will not consider facts proffered by the defendant that conflict with those offered by the plaintiff and will construe the facts in the light most favorable to the nonmoving party in reviewing a dismissal pursuant to Rule 12(b)(2)." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).

## B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6), permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*. at 678. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*.  In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Children's Servs.*, 679 F.3d 425, 429 (6th Cir. 2012).

10

## C. Securities Fraud Pleading Standards

Jackson County's securities-fraud claims implicate the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018). Accordingly, their complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citations and internal quotation marks omitted).

The Private Securities Litigation Reform Act (PSLRA) imposes two additional pleading requirements. *See id.* (citing 15 U.S.C. § 78u-4(b)(1), (b)(2)). "Plaintiffs' complaint must "specify each statement alleged to have been misleading along with the reason or reasons why the statement is misleading and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citations and internal quotation marks omitted).

## III.    ANALYSIS

## A. Personal Jurisdiction

### 1. Nissan – FIEA claim

Nissan argues that the court should not exercise jurisdiction over Providence's claim brought under FIEA.[3] Providence alleges that the court has pendent jurisdiction over the FIEA claim because it arises from the same common nucleus of operative facts as Jackson County's Exchange Act claims over which the court has original jurisdiction. (Doc. No. 58 ¶¶ 9-10).

### a.   Pendent Personal Jurisdiction

"Pendent personal jurisdiction ... exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant

---

[3]    Nissan does not challenge the court's personal jurisdiction over it with regard to Jackson County's Exchange Act claims.

Case 3:18-cv-01368   Document 136   Filed 12/29/20   Page 11 of 44 PageID #: 2589

for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim." *Ingram Barge Co., LLC v. Bunge N. Am., Inc.*, 455 F. Supp. 3d 558, 574–75 (M.D. Tenn. 2020) (quoting *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002)). "Pendent personal jurisdiction—which is sometimes characterized as a species of supplemental jurisdiction and sometimes referred to as a distinct doctrine —enables a court having original specific jurisdiction over a person with regard to a particular claim ... to exercise jurisdiction over other claims involving that person for which it otherwise may not have jurisdiction, so long as the other matters 'form part of the same case or controversy." *Ingram Barge Co.*, 455 F. Supp. 3d at 575 (citations and internal quotations omitted); *see also* Wright & Miller, 4A Fed. Prac. & Proc. Civ. § 1069.7 (discussing basis for recognizing pendent personal jurisdiction).

As noted by Providence, Jackson County's Exchange Act claims and Providence's FIEA claim derive from a common nucleus of operative facts: Nissan's alleged misstatements as to its financial results in its financial reports and the subsequent drop in its stock prices. Therefore, the Court has pendent jurisdiction over Nissan with respect to Providence's claims under FIEA. District courts have discretion as to whether to exercise pendent personal jurisdiction, the exercise of which should be informed by "considerations of juridical economy, convenience, and fairness to litigants." *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 5 (D.C. Cir. 1977) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

Nissan asserts that the United States is an inconvenient forum because it is a Japanese resident, the alleged misconduct happened in Japan, and the witnesses and relevant documents are also in Japan. (Doc. No. 69 at 17). Nissan argues that it would be unfair for it defend the FIEA claim in the United States because it is a Japanese company and Providence bought its common

stock on a Japanese exchange. (Doc. No. 105 at 15). Additionally, it asserts that the Court should not exercise pendent jurisdiction over the FIEA claim because it would raise complex and novel issues under Japanese law and because the class size for the FIEA claim would be much larger than that for the Exchange Act claims. (Doc. No. 105 at 11-14). Nissan filed a Notice of Relevant Development on November 5, 2020, stating that it had been served on August 17, 2020, with a securities lawsuit filed in Japan also arising under FIEA based on the same alleged misconduct as the present case. (Doc. No. 129 at 1-2). Nissan contends that exercising pendent jurisdiction over the FIEA claim in the present case would be unfair to Nissan considering this new lawsuit in Japan. (Doc. No. 129 at 4).

Jackson County argues that the exercise of jurisdiction over Nissan is fair because litigation the FIEA claims would not unduly burden the company because it is already obligated to appear in this court to defend the Exchange Act claims. (Doc. No. 86 at 68-70) (citing Wright & Miller, 4A Fed. Prac. & Proc. Civ. § 1069.7 (stating that "[n]otions of fairness to the defendant simply are not offended" where the claims "are nearly identical or substantially overlap"); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 36 (D.D.C. 2010) (noting that pendent personal jurisdiction ensures against due-process concerns of unfairness because the defendant is already justifiably hauled in to the forum to defend against other claims that derive from a common nucleus of operative fact) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Jackson County also asserts that the application of foreign law does not support dismissal because the Japanese law at issue is straightforward and comprehendible, largely because FIEA was modeled on the federal securities laws. (Doc. No. 86 at 59 (citing Declaration of Andrew M. Pardieck (Doc. No. 87-8 ¶¶ 30; 75)). Additionally, Jackson County notes that the elements of the FIEA claim are not in dispute and have significant overlap with the elements for securities fraud

under the Exchange Act. (Doc. No. 86 at 59-60 (citing Doc. No. 87-8, Pardieck Decl. ¶¶ 8(C), 36-40; Doc. No. 71, Yasuda Decl. ¶¶ 27-28)). It argues that the foregoing also indicates that adjudicating the FIEA claim will not unduly burden the court. (Doc. No. 86 at 60-61).

These considerations warrant the Court exercising pendent jurisdiction over the FIEA claim against Nissan.

### b. _Forum Non Conveniens_

"*Forum non conveniens* is a common law doctrine that allows a district court not to exercise its jurisdiction." *Jones v. IPX Int'l Equatorial Guinea, S.A.*, 920 F.3d 1085, 1090 (6th Cir. 2019). There are three considerations that a court must address when analyzing a motion: "(1) whether an adequate alternative forum is available; (2) whether a balance of private and public interests suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court; and (3) the amount of deference to give the plaintiff's choice of forum." *Id*. "*Forum non conveniens* decisions are 'committed to the sound discretion of the trial court.'" *Id*. (quoting *Piper Aircraft v. Reyno*, 454 U.S. 235, 257 (1981)). For the reasons explained below, the Court concludes that these factors weigh in favor of denying Nissan's motion to dismiss for *forum non conveniens*.

### i. Availability of Adequate Alternative Forum

The Court turns first to whether "an alternative forum exists, which requires another forum to be both available and adequate." *Jones*, 920 F.3d at 1090-91 (citing *Piper Aircraft*, 454 U.S. at 254 n. 22). An alternative forum is typically "available" if "the defendant is amenable to process there" and is generally "adequate" if "it can remedy the alleged harm." *Id*. "The defendant bears the burden of identifying an alternative forum that meets these criteria." *Associação Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 620 (6th Cir. 2018). "It bears emphasizing that

14

identifying an alternate forum is a prerequisite for dismissal, not a factor to be balanced. If there is no suitable alternate forum where the case can proceed, the entire inquiry ends." *Id*. at 619–20.

Nissan contends that Japan is an available and adequate forum because Nissan, which is incorporated and headquartered in Japan, is subject to the jurisdiction of Japan, is amenable to process in Japan. (Doc. No. 69 at 19). In support of its assertion that it is amenable to process in Japan, Nissan filed a declaration by Ravinder Passi, Nissan Global General Counsel, in which Mr. Passi states that "Nissan has submitted to the jurisdiction of Japan for resolution of the claim by the Tokyo Public Prosecutors Office under Japan's Financial Instruments and Exchange Act." (Doc. No. 70, Passi Decl. ¶ 4). Additionally, Nissan submits that Providence may bring suit under FIEA against Nissan in Japan and that Japanese courts can provide Providece the remedy it seeks, supported a declaration by an attorney licensed to practice law in Japan, Mitshurio Yasuda. (Doc. No. 69 at 19-20; Doc. No. 71, Yasuda Decl. ¶¶ 1, 26-28). Accordingly, Nissan argues that it has established that Japan is an available and adequate alternative forum.

Jackson County challenges Nissan's assertion in its brief that it is amendable to process in Japan, noting that Nissan's supporting declaration from its Global General Counsel is simply a non-binding assertion that does not speak to whether Nissan would submit to the jurisdiction of Japan for prospective civil litigation brought by American shareholders. (Doc. No. 86 at 61-62). In reply, Nissan points to Yasuda's supporting declaration, which states in part:

> a Japanese company whose securities are listed on a Japanese stock exchange that files an annual securities report which contains material misstatements is subject to private suits by investors seeking civil remedies for violations of the disclosure rules resulting from misstatements. Pursuant to Articles 3-2 and 3-3 of the Japanese Code of Civil Procedure, a Japanese court can and will exercise jurisdiction over claims against a defendant whose principal office is located in Japan or whose tort action occurred in Japan. The Yokohama District Court has jurisdiction over any such [alleged violations of FIEA Article 21-2] against [Nissan].

15

(Doc. No. 71, Yasuda Decl. ¶ 26). Based on the foregoing, the Court finds that Nissan has met its burden of establishing that Japan is an available and adequate forum.

ii. Balance of Public and Private Interest Factors

"If an adequate alternative forum is available, then courts examine whether the plaintiff's choice of forum is unnecessarily burdensome." *Jones*, 920 F.3d at 1092 (citing *Zions First Nat'l Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 523 (6th Cir. 2010)). "To guide that analysis, courts look to the private and public interests that the Supreme Court listed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 [ (1947) ]." *Id.* "The onus of showing that a plaintiff's choice of forum is unnecessarily burdensome falls on the defendant." *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 498 (6th Cir. 2016). Nissan has not carried that burden.

The private-interest factors weigh against dismissing this action for *forum non conveniens*. "Private-interest factors include 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* (quoting *Gulf Oil*, 330 U.S. at 508). The Court addresses each factor in turn.

*Ease of Access to Sources of Proof.* Nissan has not demonstrated that access to sources of proof renders litigating in the United States especially more burdensome than litigating in Japan. Nissan asserts the evidence it anticipates using to defend the FIEA claim is located in Japan. (Doc. No. 69 at 21; Doc. No. 70, Passi Decl. ¶¶ 15-17 (identifying potential witnesses believed to reside in Japan)). However, Nissan has not submitted any evidence that the "cost of travel and of obtaining testimony of witnesses" in the U.S. from Japanese residents would be "an oppressive or vexatious burden" on Nissan. *Zions*, 629 F.3d at 526. Nor has it identified any specific documents

16

that it intends to use for its defense against Providence's FIEA claim that would be more easily accessible in Japan. While Nissan submits that evidence relevant to the FIEA claim is in the possession of Tokyo Public Prosecutor's Office in Japan and subject to limitations on use, (Doc. No. 69 at 22; Doc. No. 70, Passi Decl. ¶ 21), that evidence would be subject to the same limitations if this action were litigated in Japan. (*See* Doc. No. 70, Passi Decl. ¶ 21 ("Any document that the Tokyo Public Prosecutor's Office needs to support its claim under [FIEA] will not be returned to Nissan until the [criminal FIEA] legal proceedings have concluded. Furthermore, Nissan may not use copies of evidence provided by the Tokyo Public Prosecutor's Office for any purpose other than defending itself against the [criminal FIEA] asserted in Japan."). Finally, Nissan has not demonstrated that the cost or difficulty of obtaining or translating any other sources of proof in Japan would be especially burdensome.

*Availability of Compulsory Process*. Nissan also has not demonstrated that a lack of compulsory process over Japanese witnesses favors litigating in Japan. Nissan contends that "[n]umerous potential Japanese witnesses …are outside this Court's compulsory process" and that "[o]btaining testimony in this Court from such persons—many of whom speak only Japanese— would be far more difficult than obtaining such testimony in a Japanese court." (Doc. No. 69 at 22; Doc. No. 73, Turner Decl. ¶¶ 2-5). But Nissan has not identified any particular witness who is unwilling to appear and thus would require compulsory process to ensure their attendance. *See Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006) ("[A]lthough the availability of compulsory process is properly considered when witnesses are unwilling, it is less weighty when it has not been alleged or shown that any witness would be unwilling to testify.").

The public-interest factors, in contrast, weigh in favor of dismissing this action for *forum non conveniens*. "Public-interest factors include administrative difficulties flowing from court

congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Hefferan*, 828 F.3d at 500 (internal quotation marks omitted) (quoting *Piper Aircraft*, 454 U.S. at 241 n. 6). The most relevant public-interest factors here relate to local interests in the litigation and to conflict of laws issues.

      *Local Interest in Deciding a Local Controversy*. Nissan argues that Japan has a stronger interest in adjudicating the FIEA claim because it is a Japanese statute. It asserts that the Tokyo Public Prosecutor's Office investigation and prosecution of Ghosn and Kelly undertaken pursuant to FIEA underscores Japan's strong interest in adjudicating the FIEA claim. (Doc. No. 69 at 20-21). Jackson County argues that the United States has a strong interest in Nissan's alleged fraud, and points to the SEC's investigation into the matter and resulting settlement as underscoring the American interest in deciding the controversy. (Doc. No. 86 at 58 (quoting the co-Director of the SEC's Division of Enforcement, that "Nissan's disclosures about Ghosn's compensation were false…Through these disclosures, Nissan advanced Ghosn and Kelly's deceptions and misled investors, including U.S. investors.") (citing SEC press release dated September 23, 2019, Doc. No. 87-7)). The court finds this factor is neutral given both countries' respective interests.

      *Conflicts of Laws*. The fact that the court will have to apply foreign law weighs in favor of dismissing the action for *forum non conveniens. See Jones v. IPX Int'l Equatorial Guinea, S.A.*, 920 F.3d 1085, 1094 (6th Cir. 2019).

      In sum, the private-interest factors weigh in favor of retaining the action here, and the public-interest factors weigh in favor of dismissal for *forum non conveniens*.

iii.   Deference to Plaintiff's Choice of Forum

*Forum non conveniens* is largely intended to secure convenient trials, and courts defer to a plaintiff's choice of forum based on an assumption that the plaintiff will choose a convenient forum. *See Jones.*, 920 F.3d at 1094 (citing *Piper Aircraft*, 454 U.S. at 255–56; *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 493 (6th Cir. 2016)). "That assumption is stronger when a plaintiff picks his home forum, so we give greater deference in those circumstances." *Id.* (citation omitted). The Sixth Circuit has explained the deference analysis as a "sliding convenience scale" where "the greater the plaintiff's connection to the United States 'and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*.'" *Hefferan*, 828 F.3d at 493–94 (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc)). While Nissan argues that Providence's choice of forum is not entitled to full deference, it acknowledges that Providence's choice of its home forum in the United States is entitled to at least some deference. (*See* Doc. No. 69 at 19; Doc. No. 105 at 17-18).

In light of the foregoing and given the roughly equal balance between the private and public interests, the Court in its discretion will not dismiss the FIEA claim based on *forum non conveniens*. *See, e.g., Silva Cruz v. Gen. Motors LLC*, 464 F. Supp. 3d 906, 914 (E.D. Mich. 2020) ("The competing interests are roughly in equipoise. That is not sufficient to warrant a transfer based upon *forum non conveniens*.") (citing *Hefferan*, 828 F.3d at 498).

2.   Specific personal jurisdiction over Ghosn, Saikawa, and Karube

Jackson County has asserted federal securities claims over Ghosn, Saikawa, and Karube. Nationwide service of process is available under Section 78aa of the Securities Exchange Act, which "confers personal jurisdiction in any federal district court over any defendant with minimum

19

contacts to the United States." *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir.

1993) (citing 15 U.S.C. § 78aa)).  In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth

Circuit articulated a three-pronged test for assessing the existence of "minimum contacts":

> First, the defendant must purposefully avail himself of the privilege
> of acting in the [United States] or causing a consequence in the
> [United States]. Second, the cause of action must arise from the
> defendant's activities there. Finally, the acts of the defendant or
> consequences caused by the defendant must have a substantial
> enough connection with the [United States] to make the exercise of
> jurisdiction over the defendant reasonable.

*SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 356 (6th Cir. 2014) (quoting *Beydoun*

*v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (quoting *Southern*

*Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968))).[4] Additionally, the

Sixth Circuit has held that:

> While it is true that "jurisdiction over the individual officers of a
> corporation cannot be predicated merely upon jurisdiction over the
> corporation," *Weller v. Cromwell Oil Co.*, 504 F.2d at 929, we hold
> that the mere fact that the actions connecting defendants to the state
> were undertaken in an official rather than personal capacity does not
> preclude the exercise of personal jurisdiction over those defendants.
> Hence, where an out-of-state agent is actively and personally
> involved in the conduct giving rise to the claim, the exercise of
> personal jurisdiction should depend on traditional notions of fair
> play and substantial justice; i.e., whether she purposely availed
> that availment.

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000). As noted

above, Nissan does not challenge the court's personal jurisdiction over it with regard to Jackson

County's Exchange Act claims. The Amended Complaint alleges that Ghosn, Saikawa, and Karube

were all actively and personally involved in the conduct giving rise to Jackson County's Exchange

---

[4]      Because the Exchange Act includes a nationwide service-of-process provision, the "forum" for the
purposes of personal jurisdiction analysis is the United States, rather than any particular federal judicial
district within the United States. *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d
651, 665 n. 15 (6th Cir. 2005) (citing 15 U.S.C. § 78aa; *United Liberty Life Ins. Co.*, 985 F.2d at 1330)).

Act claims: making materially false or misleading statements regarding executive compensation in Nissan's annual financial reports. Ghosn was allegedly personally involved in masterminding the fraudulent scheme in addition to making false statements and both Saikawa and Karube are alleged to have actively participated in the preparation of at least one of the materially false financial reports and provided Confirmation Notes as to their accuracy. Accordingly, the Court will assess whether it should exercise personal jurisdiction over Ghosn, Saikawa, and Karube pursuant to the test outlined in *Mohasco*.

        a.  <u>Purposeful Availment</u>

"Purposeful availment ... is present where the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum [s]tate, and where the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Beydoun*, 768 F.3d at 505–06 (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985))). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Neogen Corp.*, 282 F.3d at 889 (quoting *Burger King Corp.*, 471 U.S. at 475).

In the present case, Jackson County asserts that Ghosn, Saikawa, and Karube knowingly made and signed off on materially false statements in Nissan's annual financial reports and other disclosure documents which were then published in English on Nissan's investor website with full knowledge of Nissan's longstanding ADR program and U.S. investor population. This is not an instance where defendants' statements reached or caused an effect in the United States by "random" or "fortuitous" circumstances. *Cf. World–Wide Volkswagen Corp. v. Woodson*, 444 U.S.

286, 295 (1980). Rather, the English translated reports containing the alleged misstatements forming the basis for Jackson County's Exchange act claims were published on Nissan's investor website in compliance with SEC regulations so that Nissan could continue to offer ADRs to investors in the United States. (*See* Doc. No. 87-5 at PageID # 1257-58 (Nissan's annual securities reports "were translated by Nissan into English and posted on Nissan's website consistent with Nissan's reliance on the Exchange Act Rule 12g3-2 exemption from Exchange Act Section 12(g) registration."); *see also* SEC Rule 12g3–2(b), 17 C.F.R. § 240.12g3-2(b); Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers, 73 Fed. Reg. 52752-01, 52758 (Sept. 10, 2008) ("The purpose of this non-U.S. electronic publication condition is to provide U.S. investors with ready access to material information when trading in the issuer's equity securities in the over-the-counter market.").[5]

Based on the preceding overt actions, Jackson County has established a substantial connection between the United States and Defendants Ghosn, Saikawa, and Karube such that these Defendants should reasonably anticipate being haled into court here. Accordingly, the Court finds that the purposeful availment prong has been met. *See, e.g.*, *U.S. S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) (noting that signing or directly manipulating financial statements to

---

[5]     The SEC's rulemaking comments explained that:

> requiring the electronic publication in English of specified non-U.S. disclosure documents for an issuer claiming the Rule 12g3-2(b) exemption…should make it easier for U.S. investors to gain access to a foreign private issuer's material non-U.S. disclosure documents, and make better informed decisions regarding whether to invest in that issuer's equity securities through the over-the-counter market in the United States or otherwise.

Exemption From Registration Under Section 12(G) of the Securities Exchange Act of 1934 for Foreign Private Issuers, 73 FR 52752-01, 52755 (Sept. 10, 2008).

cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies the minimum contacts test).

      b.  <u>Arising From</u>

"The second requirement is that the plaintiff's cause of action arise from the defendant's contacts with the [forum] state." *Schneider v. Hardesty*, 669 F.3d 693, 703 (6th Cir. 2012). The "arising from" requirement "is satisfied when the operative facts of the controversy arise from the defendant's contacts with the state. 'Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact.'" *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723–24 (6th Cir. 2000) (quoting *Mohasco*, 401 F.2d at 384 n. 29). As previously addressed, Jackson County's Exchange Act claims "arise from" Ghosn's, Saikawa's, and Karube's false statements made in Nissan's annual financial reports. Those reports, that were directed to the United States and U.S. investors in Nissan's ADRs via publication on Nissan's investor website in English, form the basis for Jackson County's Exchange Act claims. Accordingly, the second prong of the analysis is met.

      c.  <u>Reasonableness</u>

"The third requirement is that the defendant have a sufficiently substantial connection to the forum such that the exercise of jurisdiction is not unreasonable." *Schneider*, 669 F.3d at 703. "[W]here, as here, the first two criter[ia] are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet [the substantial connection] criteri[on].'" *Id.* (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 554 (6th Cir. 2007) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir.1991))). "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; [and] (3) the plaintiff's interest in

obtaining relief[.]" *Schneider*, 669 F.3d at 703-704; s*ee also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 666 (6th Cir. 2005) ("Whether the exercise of jurisdiction over a foreign defendant is reasonable is a function of balancing three factors: 'the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.'") (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987)).

### 1. Ghosn

Ghosn argues that exercising jurisdiction would be unreasonable because the underlying events took place in Japan, many of the witnesses and documents are in Japan, and because of his ongoing defense of criminal charges in Japan. (Doc. No. 78 at 17-19; Doc. No. 108 at 11-13). He also asserts that various restrictions on his international travel arising from the criminal charges against in Japan are a burden that further mitigates against the exercise of personal jurisdiction. (Doc. No. 78 at 12; Doc. No. 128 at 3-4). Jackson County argues, among other things, that this litigation would not be an undue weight on Ghosn's attention and resources because it involves the same underlying conduct, witnesses, and evidence at issue in his upcoming criminal trial. (Doc. No. 86 at 74-80). While some burden is placed on Ghosn in having to defend claims in this case, the interest of the United States in the enforcement of federal securities laws and Plaintiffs' interest in obtaining relief make exercise of jurisdiction over Ghosn reasonable. *See Schneider*, *supra*. Accordingly, the Court will deny Ghosn's motion to dismiss for lack of personal jurisdiction.

### 2. Saikawa

Saikawa argues that exercising jurisdiction over him would be unreasonable because he lives in Japan and is not a key defendant. (Doc. No. 69 at 24-25; Doc. No. 105 at 22). Jackson County notes that Saikawa was not a low-level actor, but rather in a position of public trust with responsibility as an officer and director. (Doc. No. 86 at 74). Indeed, Saikawa became a member

of Nissan's Board and in 2005, served as a Representative Director throughout the entire class period, and served as Chief Competitive Officer – second in command to Ghosn – from January 2014 until his appointment as co-CEO in October 2016 and ultimately CEO on April 1, 2017. Jackson County also notes that Saikawa resigned as Nissan's CEO on September 9, 2019, after the Company's internal investigation revealed that he had been overpaid by over $400,000. (Doc. No. 86 at 75; Doc. No. 87-22). Applying the balancing test, there is potential for some burden on Saikawa in having to defend himself in the United States. However, the countervailing interests of the United States and Plaintiffs' make exercise of jurisdiction over Saikawa reasonable. *See Schneider*, *supra*. Accordingly, the Court will deny Saikawa's motion to dismiss for lack of personal jurisdiction.

### 3. Karube

As with Ghosn and Saikawa, there is potential for some burden on Karube in having to defend himself in the United States. Conversely, the interests of the United States and Plaintiffs in the instant suit being prosecuted against Karube are "relatively light" given the court's jurisdiction over Nissan, Ghosn, Saikawa, Kelly, and Peter. *See Bridgestone Corp.*, 399 F.3d at 666. Thus, "the marginal addition of [Karube] would add little or nothing to the potential recovery should the plaintiffs ultimately prevail on the merits and be awarded damages." *Id*. Additionally, unlike the other defendants, Karube was not a longstanding officer of Nissan alleged to have been aware of and/or involved the fraudulent conduct for multiple years. Under the circumstances of this case, the lighter interests of the United States and Plaintiffs tip against exercising jurisdiction against Karube. Accordingly, the third prong of the analysis is not met, and the Court will grant Karube's motion to dismiss for lack of personal jurisdiction.

## B. The Securities Exchange Act of 1934

The Securities Exchange Act of 1934 was the second in a series of Acts Congress passed during the Great Depression that were "designed to eliminate certain abuses in the securities industry…which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).[6] "A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Id*. at 186-87 ("'It requires but little appreciation * * * of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry.") (quoting *Silver v. New York Stock Exch.*, 373 U.S. 341, 366 (1963)). Since their enactment, the "basic policies underlying securities regulation" have been that "'[t]here cannot be honest markets without honest publicity'" because "'[m]anipulation and dishonest practices of the market place thrive upon mystery and secrecy.'" *City of Monroe Employees Ret. Sys. v. Bridgestone Corp*., 399 F.3d 651, 668 (6th Cir. 2005) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 556 (6th Cir. 2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988)))

Accordingly, Section 10(b) of the 1934 Act "makes it unlawful for any person to 'use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 15 U.S.C. § 78j(b)).

---

[6]     The Securities Act of 1933, 15 U.S.C. § 77a *et seq*.; the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*.; the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 *et seq*.; the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa *et seq*.; the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq*.; and the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq*.

Case 3:18-cv-01368   Document 136   Filed 12/29/20   Page 26 of 44 PageID #: 2604

"SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 37 (2011) (quoting 17 CFR § 240.10b–5(b)). Section 20(a) of the 1934 Act establishes liability for anyone who "directly or indirectly, controls any person liable" under the 1934 Act. 15 U.S.C. §78t(a).

    1.   Section 10(b) and Rule 10b-5(b)

To state a claim under Section 10(b) of the 1934 Act and SEC Rule 10b–5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (quoting *Matrixx*, 563 U.S. at 37–38) (internal quotation marks omitted). Stated another way, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (internal quotation marks and citation omitted). Even with the heightened pleading standards applicable to a securities fraud case under Section 10(b), for purposes of ruling on a motion to dismiss for failure to state a claim, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in plaintiff's favor. *See Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 908 n. 6 (M.D. Tenn. 2019).

Through their pending motions to dismiss, the defendants challenge the sufficiency of Jackson County's allegations as to the first element. Additionally, Kelly, Saikawa, and Peter challenge the sufficiency of Jackson County's scienter allegations.[7]

a. Element One: A Material Misrepresentation or Omission by the Defendant

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare,* 769 F.3d at 470.

i. Falsity

"The PSLRA mandates that," in order to survive a motion to dismiss, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which the belief is formed." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting 15 U.S.C. § 78u–4(b)(1)); *see, e.g.*, *In re Omnicare,* 769 F.3d at 480 n. 6 ("KBC does not need to recite in the Complaint the specific results of the audits, including the percentage of Omnicare claims audited or the non-compliance rate. Under the PSLRA, it is enough to identify the misrepresentations (the Form 10–

---

[7]    Kelly also challenges the sufficiency of the Amended Complaint's scheme liability allegations. However, Kelly's argument is relegated to a mere footnote, in which he summarily asserts that the Jackson County's Rule 10b-5(a) and (c) claim is premised solely on the alleged misstatements or omissions that form the basis of its Rule 10b-5(b) claim, *i.e.* the alleged qualitative misstatements in Nissan's Annual Reports, rather than "a separate and distinct basis for scheme liability." (See Doc. No. 64 at 16 n. 9). He fails to develop this argument in his brief or cite authority in support of his proposition that plaintiffs are required to allege a basis for scheme liability that is "separate and distinct" from alleged misstatements or omissions that form the basis for their Rule 10b-5(b) claim. Instead, he opted to quote the elements of Rule 10b-5(a) and (c) scheme liability claim set out in *SEC v. AgFeed Indus., Inc.*, 2016 WL 10934942, at *9 (M.D. Tenn. July 21, 2016). The Court finds that Kelly failed to sufficiently develop this argument in his opening brief and, accordingly, declines to consider the sufficiency of Jackson County's scheme liability claim as to Kelly in ruling on his pending motion to dismiss.

28

K statements) and explain how they are false or misleading (they conflict with the results of the audits, which show billing irregularities).").

"[A] company has a duty to disclose hard information but not soft information unless other criteria are met." *Weiner*, 365 F. Supp. 3d at 913 (quoting *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008)). "Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with 'soft' information, which includes predications and matters of opinion." *Id.* (quoting *Zaluski*, 527 F.3d at 572). With regard to soft information, "a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." *See Weiner,* 365 F. Supp. 3d at 913 (quoting *In re Ford*, 381 F.3d at 569); *see also City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005) ("the protections for soft information end where speech begins.") (internal citation omitted). "Thus, once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading." *Weiner*, 365 F. Supp. 3d at 913 (citation and internal quotations omitted).

### 1. *Statements about Nissan's ethics and legal compliance*

Nissan, Saikawa, and Peter briefly argue that two alleged misstatements regarding Nissan's ethics are not actionable because "Jackson County never alleges facts showing how these statements were false." (Doc. No. 69 at 28 (citing Doc. No. 58 ¶¶ 97, 105)). The Amended Complaint alleges that these statements about Nissan's ethics were misleading when made because they omitted material facts then known or recklessly disregarded by defendants, including that relevant Nissan employees did not "practice[] compliance with high ethical standards," and Nissan

did not "display a high level of ethics and transparency." (Doc. No. 58 ¶ 110(f) (quoting *id.* ¶¶ 97, 105)).

Contrary to the defendants' assertion, the Amended Complaint does allege facts showing how these statements were false or misleading. As Jackson County notes, the Amended Complaint specifically alleges that Nissan's own independent "Special Committee for Improving Governance" found facts demonstrating Ghosn's and Kelly's lack of ethics as managers. (Doc. No. 86 at 26 (citing Doc. No. 58 ¶ 41). Additionally, the Amended Complaint alleges numerous instances of Ghosn and Kelly, while top Nisan executives, engaging in conduct widely accepted as unethical, including falsifying documents to circumvent disclosure of compensation and private use of Nissan's company funds. These allegations are sufficient to support Jackson County's claims that Nissan did not display a high level of ethics and that its employees repeatedly engaged in unethical conduct.

Nissan, Saikawa, and Peter also argue that "[n]othing alleged renders false or misleading these [sic] general statement about [Nissan]'s 'aims' for adhering to laws and rules." (Doc. No. 105 at 23). However, defendants mischaracterize the alleged statement, which was not that Nissan aimed to comply with laws, but rather that it aimed "to conduct fair, impartial and efficient business activities … by adhering to the applicable laws and corporate rules." (Doc. No. 58 ¶ 104). Additionally, the Amended Complaint alleges that Nissan has admitted that Ghosn and Kelly engaged in "serious misconduct" by manipulating and underreporting Ghosn's compensation and its Special Committee found "facts sufficient to suspect violations of laws and regulations" (Doc. No. 58 ¶¶ 112, 41). The Court finds that the Amended Complaint sufficiently alleges that the alleged misstatement was false or misleading.

30

## 2. Statements about Nissan's corporate governance

Nissan, Saikawa, and Peter contend that the Amended Complaint fails to plead the falsity of the statements in its Sustainability Reports that "Nissan uses a corporate structure with supervision by the Board of Directors and auditing by the Statutory Auditors…[and that] outside directors … make key decisions on important company operations, as well as supervising individual directors' execution of duties." (Doc. No. 69 at 27 and Doc. No. 105 at 22-23 (quoting Doc. No. 58 ¶ 99)). They argue that Jackson County has not shown that the statement was actually false. Instead, according to the defendants, Jackson County has only alleged that Nissan did not effectively use that corporate structure. They contend that allegations that a corporate structure was not effective do not contradict statements about the structure's existence, and thus do not demonstrate that the statement was false when made. (Doc. No. 69 at 27; Doc. No. 105 at 23).

However, as Jackson County points out, the Amended Complaint asserts more than that Nissan's corporate structure was ineffective. Jackson County pleads multiple specific, detailed factual allegations that, when taken as true, demonstrate, at least as to Ghosn's compensation, there was no "supervision by the Board of Directors" at all. The Complaint alleges that Nissan's own internal "Special Committee for Improving Governance" found that Ghosn "determin[ed] … his own compensation" and "did not relinquish any decision-making authority regarding Nissan's human affairs and compensation even after retiring as CEO in 2017[.]" (Doc. No. 58 ¶¶ 41, 120). Jackson County further alleges that Nissan's Special Committee also "found that the Board operated in 'an atmosphere where it [was] not possible to ask questions about or give opinions on the agenda at the meetings,' and that until June 2018, the average length of the meetings of the Board 'was less than 20 minutes.'" (Doc. No. 58 ¶ 123). These allegations explain that it was false or misleading to state that Nissan used a corporate structure with supervision by the Board of Directors because the

actual involvement of Nissan's Board of Directors fell far short of the supervisory oversight role represented to investors.

Nissan, Saikawa, and Peter also argue that Jackson County has not shown that it was false or misleading to state that Nissan had appointed two new independent directors as part of its effort to improve its governance because it does not allege that Nissan did not actually appoint the two directors. (Doc. No. 69 at 28). But, when analyzed in context, the Amended Complaint alleges that Nissan stated that it was "improving its governance through an enhanced compliance system. As part of this effort, the company appointed two new independent directors at the beginning of the current fiscal year. By reinforcing governance, Nissan is contributing to the growth of the company while increasing shareholder value." (Doc. No. 58 ¶ 109). Jackson County explains this statement does not merely state that Nissan appointed the directors as part of its effort to improve its governance, but instead that Nissan was improving and reinforcing its governance in part by having appointed two new independent directors. Jackson County further explains that this statement was misleading because the appointment of the two directors did not actually improve Nissan's governance, legal compliance, or controls with respect to Ghosn's secret compensation. (*See* Doc. No. 86 at 25). Nissan, Saikawa, and Peter filed a Reply but did not respond to Jackson's County's argument with respect to the adequacy of its pleading the falsity of this statement. (*See* Doc. No. 109 at 22-24).

ii.  <u>Materiality</u>

The Supreme Court has endorsed "a fact-intensive test" of materiality in securities fraud cases that is dependent "on the significance the reasonable investor would place on the withheld or misrepresented information." *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir.

2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988))). Accordingly, "the materiality inquiry requires the court to place itself in the shoes of a reasonable investor deciding whether to buy, sell, or retain the company's stock." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *16 (M.D. Tenn. Dec. 18, 2017); *see, e.g., Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) ("Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.") (citation omitted). Additionally, context must inform determinations of materiality:

> In general, the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements. Thus, we must tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context. *See* Jennifer O'Hare, *The Resurrection of the Dodo: The Unfortunate Re-emergence of the Puffery Defense in Private Securities Fraud Actions*, 59 Ohio St. L.J. 1697, 1727–1731 (1998) (illuminating the importance of context to materiality determinations). Otherwise, we risk prematurely dismissing suits on the basis of our intuition.

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014); *see, e.g., id.* at 478 ("as we have said and the Supreme Court has made clear, context matters when analyzing materiality") (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)). The question of whether alleged misrepresentations or omissions are material is a mixed question of law and fact. *See Helwig*, 251 F.3d at 563 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *see id.* (noting that "[c]ourts generally reserve such questions for the trier of fact.").

In the present case, the defendants generally assert that most, if not all, of the alleged qualitative misstatements in Nissan's Financial Reports, Annual Reports, and/or Sustainability Reports during the Class Period concerning Nissan's corporate governance and internal controls, compliance with applicable laws and regulations, and commitment to transparent and ethical

33

conduct are immaterial puffery that cannot form the basis for Jackson County's claims under the Section 10(b) because they are merely "generalized statements of optimism that are not capable of objective verification." (Doc. No. 78 at 25-26; *see also* Doc. No. 69 at 25-26).

Jackson County argues that the alleged misstatements about Nissan's Board's role and transparency in corporate governance and performance disclosures are not puffery because they are statements of fact that can be proven or disproven using standard tools of evidence. (Doc. No. 86 at 28 (citing *Bridgestone*, 399 F. 3d at 669, 674)). It argues the alleged misstatements about legal compliance are not puffery either, noting that liability can attach to a company's general assertion of legal compliance if the complaint adequately alleges that the Defendants knew that the statements were untruthful. (Doc. No. 86 at 29 (citing *Omnicare*, 769 F.3d 480-81 (rejecting argument that a company cannot be held liable for stating it was "in material compliance with law regulations" when it possessed contrary facts that a jury could find were material)). As for the alleged misstatements about Nissan's ethics, Jackson County notes that these too must still "be evaluated in context to determine if they convey more than just generalized optimism," and asserts that, as pled, they did. (Doc. No. 86 at 29 (quoting *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017)).

The defendants filed replies but did not advance arguments or analysis as to the challenged statements in the context of the facts alleged in the Amended Complaint. (*See* Doc. No.105 at 23 ("such amorphous statements about general corporate transparency are textbook puffery."); Doc. No. 108 at 16-17 ("the qualitative statements in Section V.B of the Amended Complaint are exactly the type of immaterial puffery the Sixth Circuit has found to be inactionable.")). At this stage in the lawsuit, construing the Amended Complaint in the light most favorable to Jackson County, the Court finds that a reasonable juror could conclude that defendants' statements concerning Nissan's

corporate governance and internal controls, legal compliance, and ethics, were material misrepresentations.

### iii. "Making" a Statement

As noted above, Rule 10b–5(b) makes it unlawful for "any person, directly or indirectly, ... [t]o *make* any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 CFR § 240.10b–5(b) (emphasis added). In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id*. at 142-145 ("participating in the drafting of a false statement … is merely an undisclosed act preceding the decision of an independent entity to make a public statement."). The Court reasoned that "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right," and explained:

> This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id*. at 142–43. On the facts of *Janus*, this meant that an investment adviser involved in the drafting and preparation of a client's prospectuses was not the "maker" of allegedly fraudulent statements published in the client's prospectuses because only the client -- not the advisor -- bore the statutory obligation to file the prospectuses under federal law. *Id*. at 147.

Ghosn argues that the Amended Complaint fails to plead that he "made" alleged misstatements in Nissan press releases announcing Nissan's financial results for the fiscal years ending in March of 2014, 2015, and 2016 (Doc. No. 58 ¶¶ 58, 64, 72) because the specific misstatements were not directly quoting him and the portions of the releases that did directly quote

him did not contain misstatements. (Doc. No. 78 at 20-21; Doc. No. 108 at 14). Ghosn's "maker" argument concerning alleged misstatements in Nissan's Annual and Sustainability Reports employs same reasoning: that because the alleged misstatements were not contained within his opening letters and introductory remarks the Amended Complaint fails to plead that he "made" them. (Doc. No. 78 at 21-23; Doc. No. 108 at 14-15).

However, under *Janus* the key to § 10(b) liability is whether a party has "control over a statement's content and whether and how to communicate it." 564 U.S. at 142 (rejecting the argument that § 10(b) liability requires that the defendant "create" the statement); *see also Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1096 (2019) ("in *Janus*, we sought an interpretation of "make" that could neatly divide primary violators and actors too far removed from the ultimate decision to communicate a statement."). As Jackson County points out, Ghosn was the only individual quoted in the press releases and is alleged to have led press conferences the day after each release where he "delivered the statements in the press releases himself." (Doc. No. 86 at 30 (citing Doc. No. 79; Doc. No. 58 ¶¶ 58, 64, 72)). Additionally, at the time of the alleged misstatements published in Nissan's Reports, Ghosn was Nissan's CEO and Chairman and alleged to have exercised total control over all aspects of the Company's governance and internal management. The Court finds that the Amended Complaint adequately alleges Ghosn's ultimate authority over Nissan's press releases, Annual Reports, and Sustainability Reports, including control over the alleged misstatements' content and whether and how to communicate them. *Janus*, 564 U.S. at 142.

Kelly challenges the adequacy of the Amended Complaint's allegations that he, as one of Nissan's representative directors, authorized the alleged misstatements in the Annual Reports and allowed the Annual Reports to be published under his name and helped prepare them. (Doc. No.

36

58 ¶¶ 18, 94, 96, 103, 108). Kelly argues that court should ignore the allegations that these reports were published under his name because the reports themselves disprove those allegations. (Doc. No. 64 at 17-18). Alternatively, Kelly argues that he was not the "maker" of the alleged misstatements in the Annual Reports because he "did not sign" them, belong to a group that "authored" them, provide a letter for inclusion, or have any specific pieces of pieces of information "attributed" to him. (Doc. No. 86 at 18-19).

First, as Kelly acknowledges, his name appears in each of the Reports. (Doc. No. 64 at 17). Significantly, Kelly's name appears in the "Corporate Governance" sections of these reports. Viewing the facts in the lights most favorable to Jackson County, as the Court is required to do at the motion to dismiss stage, the Court finds that the reports do not disprove or otherwise contradict the allegations that they were published by Kelly and under his name. As for Kelly's second argument, the Court is not persuaded that Jackson County fails to adequately plead Kelly's status as a maker of the alleged misstatements in the reports simply because Kelly did not contribute letters, statements, or direct quotes to the reports. The Amended Complaint alleges that Kelly was intimately involved in this scheme and received all of the reports either before or shortly after they were published. Viewing the facts alleged in the Amended Complaint in the light most favorable to Jackson County, the Court finds that the Amended Complaint sufficiently alleges that Kelly possessed ultimate authority over the alleged misstatements in Nissan's Annual Reports, including control over their "content and whether and how to communicate it." *Janus*, 564 U.S. at 142.

b. Element Two: Scienter

Kelly, Saikawa, and Peter also argue that the Amended Complaint fails to allege facts plausibly suggesting that they acted with scienter. "To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state

embracing intent to deceive, manipulate, or defraud.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (internal quotations and citation omitted). "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). "Recklessness is not negligence, but more 'akin to conscious disregard.'" *Id.* (quoting *PR Diamonds, Inc.*, 364 F.3d at 681).

"Under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Matrixx*, 563 U.S. at 48 (quoting 15 U.S.C.A. § 78u–4(b)(2)(A)).[8] "This standard requires courts to take into account 'plausible opposing inferences.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323). "A complaint adequately

---

[8]     The Sixth Circuit has enumerated a "non-exhaustive list of factors that do not necessarily establish scienter, but are 'usually relevant' to its analysis," which includes allegations of:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Frank*, 646 F.3d at 959 n. 2 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001).

38

pleads sciter under the PSLRA 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id*. (quoting *Tellabs*, 551 U.S. at 324). The inquiry "[is] not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 322-23. ("The strength of an inference cannot be decided in a vacuum."). Rather, *"[i]n making this determination, the court must review 'all the allegations holistically.'"* *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326).

Here, when the factual allegations are considered collectively, there is a strong inference that Defendants acted with at least reckless disregard for the misleading nature of their statements that is at least as compelling as any innocent inference.

> i. Kelly

The Amended Complaint alleges that Nissan's own internal "investigation showed that over many years both Ghosn and Kelly have been reporting compensation amounts in the Tokyo Stock Exchange securities report that were less than the actual amount, in order to reduce the disclosed amount of Carlos Ghosn's compensation." (Doc. No. 58 ¶ 112). Jackson County alleges Kelly's "deep involvement" in working to shield Ghosn's compensation from disclosure, including that Kelly personally "had various discussions on how to pay the Postponed Compensations without disclosing." (Doc. No. 58 ¶¶ 38-41, 112). Pursuant to these discussions, Kelly, "as the person responsible for Global Human Resources and Legal," was alleged to have been involved in "falsif[ying]" documents and "manipulat[ing]" the "details of compensation" to increase the amount paid to Ghosn and decrease the amount disclosed. (Doc. No. 58 ¶ 41). Kelly was also personally in charge of the use of Nissan's Dutch subsidiary, Zi-A, to buy or rent properties for

39

Ghosn's use, instead of to fund venture capital investments as was that entity's supposed purpose. (Doc. No. 58 ¶ 48).

Kelly asserts without reference to authority that allegations that "predate the Class Period … cannot form the basis for Plaintiffs' claims. (*See* Doc. No. 64 at 4). However, "[t]he proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in the case." *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-CV-2475, 2018 WL 2933406, at *6 (M.D. Tenn. Apr. 19, 2018) (citing *Zelman v. JDS Uniphase Corp.*, 376 F.Supp.2d 956, 970 (N.D. Cal. 2005)). Kelly does not argue a competing inference could be drawn from the allegations in the Amended Complaint, but rather urges the Court to disregard the allegations as untrue. As noted by Jackson County, at this stage, the Court must accept the well-plead allegations in the Amended Complaint as true. Although Kelly filed a Reply, he did not respond to Jackson County's arguments regarding its scienter allegations. (*See* Doc. No. 104).

ii.   Saikawa

Jackson County argues the compelling inference of knowledge or recklessness can be derived from the fact that Saikawa was a representative director during the entire Class Period and that Ghosn continued to control the Company and did not relinquish his decision-making authority regarding human affairs and compensation even after Saikawa became CEO of Nissan in April of 2017. Saikawa also signed documents regarding Ghosn's deferred compensation and "post-retirement treatment" and then signed off on financial reports that omitted Ghosn's post-retirement compensation. Additionally, a senior Nissan executive who managed the CEO's office at the time Saikawa was either co-CEO or CEO had identified improprieties by Ghosn that may have risen to the level of criminal conduct.

40

While Saikawa argues the inference to be drawn from the facts alleged in the Amended Complaint is that he was "deceived by Ghosn and Kelly" and that Kelly "obfuscate[d] the already hidden conduct" from him, (Doc. No. 69 at 30-31), the Amended Complaint alleges that, as a member of Nissan's Board of Directors, Saikawa was responsible for supervision, and that as a representative director, he was specifically supposed to consult with respect to director compensation. (Doc. No. 58 ¶¶ 99, 93, 120). Accordingly, Saikawa's claimed ignorance supports Jackson County's allegation of recklessness given his alleged duties to monitor the specific conduct at issue.

iii.   Peter

Jackson County argues the compelling inference of knowledge or recklessness can be derived from the fact that, as CFO, Peter was responsible for overseeing Nissan's finance's controls and compliance with corporate governance practices. (Doc. No. 58 ¶¶ 20-21). Peter points to the Sixth Circuit's statement in *PR Diamonds, Inc. v. Chandler* that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." (Doc. No. 69 at 29 and Doc. No. 104 at 24 (quoting 364 F.3d 671, 688 (6th Cir. 2004)). That holding, however, considered whether executives could be presumed to have knowledge of "accounting issues [that were] relatively arcane in nature and scope" and that did not "pertain[ ] to central, day-to-day operational matters." *See Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *21 (M.D. Tenn. Dec. 18, 2017) (quoting *PR Diamonds*, 364 F.3d at 688). While the Sixth Circuit held that an individual defendant could not be presumed to have knowledge of every fact to which he had access, the court also included the important corollary that "high-level executives can be presumed to be aware of matters central to their business's operation." *Id*. The overall operation of Nissan's corporate governance and internal

controls, including how director compensation was set, was a matter central to Nissan's operations. Additionally, like Saikawa, Peter argues in favor of a competing inference that he too was "deceived by Ghosn and Kelly." (Doc. No. 69 at 30-31). However, his claimed ignorance supports Jackson County's allegation of recklessness given that he is alleged to have had a duty to monitor Nissan's finance's controls and compliance with corporate governance practices. (Doc. No. 86 at 39-40).

Taken collectively, the Court finds that these allegations give rise to a "cogent and compelling" inference that the Defendants acted with at least deliberate recklessness that "a reasonable person" would deem "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S., at 323, 324.

    2.  Section 20(a) – Controlling Persons

Section 20(a) of the Securities Exchange Act provides that "[e]very person who ... controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). The "controlling person" must be an actual participant and in control of the specific activity at issue. *See Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-CV-2475, 2018 WL 2933406, at *11 (M.D. Tenn. Apr. 19, 2018). Because control person liability is derivative, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act. *North Port Firefighters' Pension—Local Option Plan v. Fushi Copperweld, Inc.*, 929 F.Supp.2d 740, 788-89 (M.D. Tenn. 2013). In order to plead control person liability, a plaintiff needs to establish that the defendant actually participated in the operations of the violator and that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated. *See Zwick Partners,* 2018

42

WL 2933406, at *11. "'Allegations of control are not averments of fraud and therefore need not be pleaded with particularity.'" *Fushi*, 929 F. Supp. 2d at 789.

### a. Kelly

The Court has already found that Kelly was a "maker" of the alleged misrepresentations in Nissan's Annual Reports. For the same reasons, the Amended Complaint sufficiently alleges that Kelly exercised at least some control over Nissan's allegedly misrepresented financials results reported within the Annual Reports. *See Zwick Partners,* 2018 WL 2933406, at *11. Therefore, the Second Amended Complaint sufficiently states a claim for Section 20(a) liability for purposes of Kelly's Motion to Dismiss.

### b. Saikawa and Peter

The Amended Complaint alleges that Saikawa and Peter each participated in the operations of Nissan while holding their respective positions as representative director and CEO and CFO. (Doc. No. 58 ¶¶ 19-21). While in these positions, Peter and Saikawa each are alleged to have actively participated in the preparation of at least one of the materially false financial reports, providing Confirmation Notes as to their accuracy. (Doc. No. 58 ¶¶ 60, 68, 74, 80, 86). Thus, these defendants are alleged to have had the "'power to control the specific transaction or activity upon which the primary violation is predicated'" and to have exercised that power by actively participating in the disclosures. *Fushi*, 929 F. Supp. 2d at 788. The Court finds that these allegations sufficiently plead that Saikawa and Peter were "control persons" for purposes of Jackson County's "control-person" claims.

## IV.     CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed by Defendants Ghosn and Kelly (Doc. Nos. 63, 77) will be **DENIED**. The Motion to Dismiss filed by Defendants Nissan, Saikawa, Karube, and Peter (Doc. No. 68) is **GRANTED**, in part, and **DENIED** in part.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE